ACCEPTED
15-25-00020-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/17/2025 7:29 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00020-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
4/17/2025 7:29:05 PM
CHRISTOPHER A. PRINE
Clerk

IN THE FIFTEENTH COURT OF APPEALS

Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink
Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and
Property First Group, LP,

*Appellants,*

v.

SafeLease Insurance Services, LLC,

*Appellee.*

On Appeal from the Third Division of the Texas Business Court
Cause No. 25-BC03A-0001

## APPELLANTS' BRIEF

GREENBERG TRAURIG, LLP

Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
justin.bernstein@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

COUNSEL FOR APPELLANTS

## ORAL ARGUMENT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Storable believes oral argument would assist the Court by allowing inquiry into SafeLease's forum-shopping strategy and the likely consequences for business-court litigation if that strategy is permitted. Oral argument would also provide the opportunity to further explain how pertinent details of the operation of the software side of the growing self-storage market noted in this brief impact the legal arguments and permit this Court to inquire into important questions concerning the lack of sufficient evidence in this record required for a temporary injunction.

## IDENTITIES OF PARTIES AND COUNSEL

### Appellants

Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP

### Counsel for Appellants

*Appellate Counsel:*
Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
justin.bernstein@gtlaw.com
GREENBERG TRAURIG, LLP
300 West 6th Street,
Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

*Trial Counsel:*
Ray T. Torgerson
State Bar No. 24003067
rtorgerson@porterhedges.com
Jonna N. Summers
State Bar No. 24060649
jsummers@porterhedges.com
Elizabeth "Liza" Eoff
State Bar No. 24095062
leoff@porterhedges.com
Lakshmi N. Kumar
State Bar No. 24144581
lkumar@porterhedges.com
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
T: (713) 226-6000
F: (713) 226-6000

Katherine G. Treistman
State Bar No. 00796632
katherine.treistman@arnoldporter.com
Andrew D. Bergman
State Bar No. 24101507
andrew.bergman@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Suite 4000
Houston, Texas 77002
T: (713) 576-2400
F: (713) 576-2499

**Appellee**

SafeLease Insurance Services, LLC

**Counsel for Appellee**

<table>
<tr><td>***Appellate Counsel:***</td><td>***Trial Counsel:***</td></tr>
<tr><td>Judd E. Stone II</td><td>R. Paul Yetter</td></tr>
<tr><td>State Bar No. 2407670</td><td>State Bar No. 22154200</td></tr>
<tr><td>judd@stonehilton.com</td><td>pyetter@yettercoleman.com</td></tr>
<tr><td>Christopher D. Hilton</td><td>Susanna R. Allen</td></tr>
<tr><td>State Bar No. 24087727</td><td>State Bar No. 24126616</td></tr>
<tr><td>STONE HILTON PLLC</td><td>sallen@yettercoleman.com</td></tr>
<tr><td>600 Congress Ave.,</td><td>Luke A. Schamel</td></tr>
<tr><td>Austin, Texas 78701</td><td>State Bar No. 24106403</td></tr>
<tr><td>T: (737) 465-7248</td><td>lschamel@yettercoleman.com</td></tr>
<tr><td></td><td>Shannon N. Smith</td></tr>
<tr><td></td><td>State Bar No. 24110378</td></tr>
<tr><td></td><td>ssmith@yettercoleman.com</td></tr>
<tr><td></td><td>YETTER COLEMAN LLP</td></tr>
<tr><td></td><td>811 Main Street, Suite 4100</td></tr>
<tr><td></td><td>Houston, Texas 77002</td></tr>
<tr><td></td><td>T: (713) 632-8000</td></tr>
</table>

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................................... II

IDENTITIES OF PARTIES AND COUNSEL.................................................III

TABLE OF AUTHORITIES ............................................................. IX

STATEMENT REGARDING RECORD REFERENCES ........................... XIII

TERMS AND PARTY REFERENCES..........................................................XIV

STATEMENT OF THE CASE ..................................................................... XV

ISSUES PRESENTED ..................................................................XVI

INTRODUCTION ..................................................................................1

STATEMENT OF FACTS.......................................................................... 2

I.      Storable's FMS are well-regarded and successful in a competitive
        market...................................................................................................2

        A.      Storable is a successful company with sought-after FMS
                products. ..................................................................................2

        B.      Storable promotes competition by encouraging third parties
                to integrate their products into Storable's FMS via an API. ........3

II.     Storable discovered SafeLease's wrongful and unauthorized
        access of Storable's FMS. ...................................................................5

        A.      SafeLease wrongfully obtained improper access to
                Storable's FMS. ..................................................................5

        B.      Terms of Use prohibit SafeLease's use of Storable's FMS for
                commercial exploitation, or for use that is disruptive or
                deceptive. ..................................................................6

        C.      SafeLease violated the Terms of Use. ...........................................7

III.    Storable offered SafeLease an API agreement that would have
        provided the access that SafeLease improperly took, but
        SafeLease refused that offer..................................................................8

IV.     Storable blocked the unauthorized access to Storable's FMS...............9

V.      SafeLease improperly shopped its case to the business court and
        sought the same relief on the same or very similar tenuous facts.......10

A.    SafeLease forum shopped by unsuccessfully asking the district court for a temporary injunction, and then removing to the business court for a second bite at the apple. ...................10

B.    The business court's amended temporary injunction and related opinion confirm that SafeLease's antitrust claim does not support the temporary injunction.................................12

SUMMARY OF THE ARGUMENT.................................................................14

ARGUMENT...................................................................................................16

I.    SafeLease Untimely Removed To Forum Shop After An Adverse Ruling..............................................................................................16

A.    SafeLease was required to request removal within 30 days of when it discovered, or should have discovered, facts establishing the business court's jurisdiction. .............................16

B.    SafeLease requested removal to the business court more than 30 days after discovering facts establishing the business court's jurisdiction. ......................................................17

1.    SafeLease does not deny that it knew sufficient jurisdictional facts more than 30 days before filing its Notice of Removal. ................................................................17

2.    SafeLease's own petition, testimony, and emails proved that SafeLease knew of sufficient jurisdictional facts more than 30 days before requesting removal.........18

C.    SafeLease Identified No Statutory Text That Supports Its Interpretation.....................................................................25

D.    The Remand Denial's treatment of the word "action" is internally inconsistent. ..................................................................26

E.    Applying the statute as written is efficient, and in harmony with the statute's context and objectives, which makes that application far from "absurd."......................................................28

1.    The context of the 30-day deadline supports applying that deadline as written.......................................................28

2.    The results that SafeLease described as "absurd" either benefit the judicial system or will not occur...........29

II.     SafeLease's Use Of Removal To Evade The District Court's
        Ruling Is Impermissible Forum Shopping That Must Be Barred
        To Preserve The Integrity Of The Judicial System. ...............................33

        A.      Forum shopping violates public policy by wasting resources
                and eroding the public's perception of the judiciary as
                neutral. ...................................................................................................33

        B.      SafeLease engaged in the type of forum shopping that courts
                must prevent. .........................................................................................36

III.    The Required Element Of A Probable, Imminent, And
        Irreparable Injury Is Not Supported By Legally Or Factually
        Sufficient Evidence. ...........................................................................................40

        A.      SafeLease's alleged harms are compensable with money
                damages, which means they are not irreparable. .........................40

                1.      Paying a higher price for API access is not irreparable
                        harm. .............................................................................................41

                2.      Temporarily hiring more staff and coordinating with
                        operators is not irreparable harm. .......................................41

        B.      SafeLease provided legally and factually insufficient
                evidence of the likelihood and imminence of bankruptcy. ........47

        C.      The evidence conclusively established that SafeLease would
                not suffer irreparable harm. ...............................................................49

IV.     SafeLease Failed To Establish A Probable Right To Recover. ..............51

        A.      Standards for the justification defense. .........................................51

        B.      Storable has a legal right as a property owner to prevent
                SafeLease from accessing Storable's FMS. ...................................52

        C.      The Terms of Use give Storable a contractual right to
                prevent the type of access SafeLease seized. ...............................53

                1.      Storable has a right under the Terms of Use to block
                        SafeLease's non-API access because it interfered with
                        the integrity and performance of Storable's FMS. ............53

                2.      Storable has a right under the Terms of Use to block
                        SafeLease's non-API access because SafeLease used
                        that access for its own commercial purposes. ....................56

D.     Storable had a right under the Terms of Use to block SafeLease's non-API access because that access circumvented security measures and illegally gathered tenant information. ........................................................58

E.     At minimum, Storable demonstrated a good faith belief in a colorable right to deny access. ......................................................60

V.    SafeLease's Unclean Hands Defeat Its Entitlement To The Equitable Remedy Of A Temporary Injunction. ...................................62

VI.   The Temporary Injunction Functions As A Mandatory Injunction Requiring Storable To Provide Services, And A Mandatory Injunction Requires Clear And Compelling Evidence...........................64

PRAYER ........................................................................................................ 65

CERTIFICATE OF COMPLIANCE.............................................................. 67

CERTIFICATE OF SERVICE........................................................................ 67

APPENDIX .....................................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ASICS Am. Corp.*,
  No. 05-22-00994-CV, 2023 WL 333711 (Tex. App.—Dallas Jan. 20,
  2023, no pet.) ................................................................................................34

*In re AutoNation, Inc.*,
  228 S.W.3d 663 (Tex. 2007) ....................................................................33, 38

*Bienati v. Cloister Holdings, LLC*,
  691 S.W.3d 493 (Tex. 2024) ............................................................40, 48, 51

*In re Boehme*,
  256 S.W.3d 878 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ..................33

*Butnaru v. Ford Motor Co.*,
  84 S.W.3d 198 (Tex. 2002)..............................................................................40

*Camp Mystic, Inc. v. Eastland*,
  399 S.W.3d 266 (Tex. App.—San Antonio 2012, no pet.) .........................41, 45

*Canadian Helicopters Ltd. v. Wittig*,
  876 S.W.2d 304 (Tex. 1994) ............................................................................45

*City of Dallas v. TCI W. End, Inc.*,
  463 S.W.3d 53 (Tex. 2015)..............................................................................27

*City of Fredericksburg v. Bopp*,
  126 S.W.3d 218 (Tex. App.—San Antonio 2003, no pet.) ...............................63

*Combs v. Health Care Services Corp.*,
  401 S.W.3d 623 (Tex. 2013) ............................................................................30

*Crown Const. Co., Inc. v. Huddleston*,
  961 S.W.2d 552 (Tex. App.—San Antonio 1997, no pet.) ...............................62

*In re Doctors Hosp. 1997, L.P.*,
  351 B.R. 813 (Bankr. S.D. Tex. 2006) ............................................................34

*Edison Cement Corp. v. N. Carolina Furniture Direct 1, Ltd.*,
  No. 03-15-00772-CV, 2017 WL 3222565 (Tex. App.—Austin July 26,
  2017, no pet.) ..................................................................................................41

*ESI/Employee Sols., L.P. v. City of Dallas*,
  450 F. Supp. 3d 700 (E.D. Tex. 2020)..............................................................42

*In re ETC Field Services, LLC,*
No. 15-24-00131-CV, 2025 WL 582320 (Tex. App.—15th Dist., Feb. 21, 2025) ...................................................................................................26

*In re Ford Motor Co.,*
442 S.W.3d 265 (Tex. 2014) ...............................................................25

*Guzman v. Tex. Mut. Ins. Co.,*
No. 13-06-227-CV, 2007 WL 1439742 (Tex. App.—Corpus Christi—Edinburg May 17, 2007, no pet.) .........................................35, 36, 37

*Health & Human Services Comm'n v. Navarro,*
No. 15-24-00054-CV, 2024 WL 4984183 (Tex. App.—15th Dist., Dec. 3, 2024, no pet.) ...................................................................................25

*Helena Chem. Co. v. Cox,*
664 S.W.3d 66 (Tex. 2023)...................................................................46

*Juliette Fowler Homes, Inc. v. Welch Associates,*
Inc., 793 S.W.2d 660, 665 (Tex. 1990) ...............................................60

*Kelley v. Homminga,*
706 S.W.3d 829 (Tex. 2025) ...............................................................36

*Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.,*
49 S.W.3d 544 (Tex. App.—Austin 2001, pet. dism'd)...............57, 58

*Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.,*
No. 13-13-00087-CV, 2013 WL 5305238 (Tex. App.—Corpus Christi–Edinburg Sept. 19, 2013, pet. denied) ...............................................47

*Long v. Long,*
814 S.W.2d 227 (Tex. App.—San Antonio 1991, no writ)................42

*In re Lowery,*
999 S.W.2d 639 (Tex. Rev. Trib. 1998) .............................................33

*Luccous v. J. C. Kinley Co.,*
376 S.W.2d 336 (Tex. 1964) ...............................................................62

*Marcus Cable Associates, L.P. v. Krohn,*
90 S.W.3d 697 (Tex. 2002)..................................................................53

*In re Moore,*
No. 13-21-00004-CV, 2021 WL 717613 (Tex. App.—Corpus Christi–Edinburg Feb. 24, 2021, no pet.) .................................................34, 38

*Nelson v. Sheedy*,
No. 05-16-01262-CV, 2018 WL 2434389 (Tex. App.—Dallas May 30,
2018, pet. denied)..................................................................................46

*Osmose Utilities Services, Inc. v. Navarro Cnty. Elec. Coop.*,
707 S.W.3d 117 (Tex. Bus. Ct. 2025) ...............................................30

*Providence Title Co. v. Fleming*,
No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023) ...............46

*Providence Title Co. v. Truly Title, Inc.*,
547 F. Supp. 3d 585 (E.D. Tex. 2021)................................................46

*Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*,
29 S.W.3d 74, 81 (Tex. 2000). ..........................................................52

*Quixtar Inc. v. Signature Mgmt. Team, LLC*,
315 S.W.3d 28 (Tex. 2010)................................................................33

*Reach Group, L.L.C. v. Angelina Group*,
173 S.W.3d 834 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ...................46

*Reliant Energy, Inc. v. Gonzalez*,
102 S.W.3d 868 (Tex. App.—Houston [1st Dist.] 2003), aff'd, 159 S.W.3d
615 (Tex. 2005)..................................................................................34

*Renovation Gurus, LLC v. Lake Point Assisted Living, LLC*,
No. 05-19-00499-CV, 2020 WL 477135 (Tex. App.—Dallas Jan. 29,
2020, no pet.) ....................................................................................40

*Rieder v. Woods*,
603 S.W.3d 86 (Tex. 2020)................................................................52

*RP&R, Inc. v. Territo*,
32 S.W.3d 396 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ...................64

*Space Master Intern., Inc. v. Porta-Kamp Mfg. Co., Inc.*,
794 S.W.2d 944 (Tex. App.—Houston [1st Dist.] 1990, no writ) ...................34

*In re Team Rocket, L.P.*,
256 S.W.3d 257 (Tex. 2008) ........................................................35, 40

*Tex. Beef Cattle Co. v. Green*,
921 S.W.2d 203 (Tex. 1996) ...........................................51, 52, 60, 61

*Tex. Health Huguley, Inc. v. Jones*,
637 S.W.3d 202 (Tex. App.—Fort Worth 2021, no pet.)................64

*Truly v. Austin*,
  744 S.W.2d 934 (Tex. 1988) ..................................................................62, 63

*Veterinary Specialists of N. Tex., PLLC v. King*,
  No. 05-21-00325-CV, 2022 WL 406095 (Tex. App.—Dallas Feb. 9, 2022,
  no pet.) .............................................................................................................40

*Wynne v. Fischer*,
  809 S.W.2d 264 (Tex. App.—Dallas 1991, writ denied) ...................................63

*Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*,
  449 S.W.3d 98 (Tex. 2014)...............................................................................60

**Statutes**

TEX. BUS. & COM. CODE § 15.04 .............................................................................20

TEX. BUS. & COM. CODE § 15.05 .............................................................................20

TEX. BUS. & COM. CODE §15.21 .............................................................................20

TEX. BUS. & COM. CODE §15.26 .............................................................................20

TEX. BUS. & COM. CODE § 324.051 .........................................................................60

TEX. BUS. & COM. CODE § 324.055 .........................................................................60

TEX. GOV'T CODE § 25A.004.............................................................................*passim*

TEX. GOV'T CODE § 25A.006.............................................................................*passim*

## STATEMENT REGARDING RECORD REFERENCES

The Clerk's Record is cited as "CR[Page#]."

The First Supplemental Clerk's Record is cited as "1SuppCR[Page#]."

The Reporter's Record for district court proceedings is cited as "DC[volume#]RR[Page#]." The Reporter's Record for business court proceedings is cited as "BC[volume#]RR[Page#]."

## TERMS AND PARTY REFERENCES

| | |
|---|---|
| API | Application Programming Interface, a type of software intermediary that facilitates coordination between software owned by different parties |
| FMS | Facility management software, which is used by operators of self-storage facilities to manage those facilities. The three Storable FMS are storEDGE, SiteLink, and Easy Storage Solutions |
| Remand Denial | The business court's February 10, 2025 Opinion and Order denying Defendants' motion to remand. CR747–755. *SafeLease Ins. Services LLC v. Storable, Inc.*, No. 25-BC03A-0001, 2025 WL 446343 (Tex. Bus. Ct. Feb. 10, 2025) |
| Risk-management product | This collectively refers to two risk-shifting products at issue in this appeal: tenant insurance and tenant protection plans |
| SafeLease | Plaintiff/Appellee SafeLease Insurance Services, LLC |
| Storable | Defendants/Appellees Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP |
| Temporary Injunction | The Amended Order Granting Temporary Injunction, signed March 11, 2025. 1SuppCR40–48 |
| Terms of Use | The agreements governing use of Storable's FMS. Each of Storable's FMS has its own similar agreement, which is titled either Terms of Use or Terms of Service. BC7RR1264 DX-1, BC7RR1273 DX-2, BC7RR1291 DX-3 |

# STATEMENT OF THE CASE

*Nature of the Case*:

Storable provides FMS to assist operators' management of self-storage facilities and also provides risk-management products such as insurance to tenants at those facilities. Storable and SafeLease negotiated the price SafeLease should pay to access Storable's FMS through an API to sell and service SafeLease's risk-management products. CR320. When those negotiations stalled, SafeLease filed antitrust and tortious interference claims seeking access to Storable's FMS without signing a contract with Storable or paying Storable for use of Storable's FMS. CR26–56.

*District Court Proceeding*:

SafeLease filed its petition, application for temporary restraining order, and temporary injunction in the District Court of Travis County, as case number D-1-GN-24-010233. CR26–56.

*District Court's Disposition*:

The Honorable Gary Harger, presiding as duty judge, granted SafeLease a TRO without a hearing or a response from Storable. CR59–62. The Honorable Jessica Mangrum, presiding in the 200th District Court, denied SafeLease's application for a temporary injunction. CR700.

*Business Court Proceeding*

After the district court's ruling, SafeLease filed a notice of removal to the Texas Business Court, Third Division. CR5. SafeLease asked the business court to extend the TRO and reconsider SafeLease's application for a temporary injunction. CR5–14; CR361-449. Storable filed a motion to remand, contending that the removal was untimely and an improper forum-shopping tactic.

*Business Court's Disposition*

The Honorable Melissa Andrews denied Storable's remand motion. CR747–755. Judge Andrews denied the motion to extend the TRO but granted the temporary injunction that the district court had denied. 1SuppCR40–48. This appeal challenges the rulings on removal and the temporary injunction. 1SuppCR167–169.

# ISSUES PRESENTED

1. The Texas legislature mandated that opposed removal to a business court is untimely if effected more than 30 days after a party knew, or should have known, facts establishing the business court's jurisdiction. However, the business court denied Defendants' motion to remand the untimely removed case to the district court. Did the business court err by concluding that the removal deadline did not begin to run until after the petition is filed, even for a plaintiff who knew it had jurisdiction initially in the business court but chose to file instead in the district court?

2. As the plaintiff, SafeLease chose to file suit initially in a Travis County district court. Should SafeLease be precluded from deliberately forum shopping by removing the initial suit, after its request for injunctive relief was unsuccessful, and seeking the same relief in the business court?

3. Was injunctive relief improperly ordered because SafeLease failed to provide legally and factually sufficient evidence of the required temporary injunction elements of imminent, irreparable harm and probable right to recover?

4. Was SafeLease ineligible to receive the equitable relief of a temporary injunction when its inequitable conduct (unclean hands) was causing the allegedly imminent harm?

## INTRODUCTION

Texas created the Business Court to provide a specialized forum for legitimate business litigation, not to facilitate forum shopping and replace price negotiations with injunctions. SafeLease obtained relief for improper purposes without legally and factually supporting its claims for an injunction.

When SafeLease became displeased with the trajectory of negotiations over the price for accessing Storable's proprietary FMS software, SafeLease asked the district court for a temporary injunction to force Storable to provide access for free. When the district court saw through this tactic, SafeLease removed its case to the business court to ask for the same relief. This removal was not only impermissible, blatant forum shopping but also untimely based on the plain language of the statutory deadline for removal.

In addition to failing procedurally, SafeLease's application for temporary injunction also fails on the merits because it seeks, without providing evidence of the required elements for a temporary injunction, to transform a routine negotiation into an "emergency" warranting extraordinary relief.

## STATEMENT OF FACTS

**I.** **Storable's FMS are well-regarded and successful in a competitive market.**

    **A.** ***Storable is a successful company with sought-after FMS products.***

Storable's CEO, Chuck Gordon, began building Storable in his dorm room 17 years ago. BC5RR138. Mr. Gordon spent the first ten years of that journey learning the customers' pain points so that he could bring what had been a hodgepodge of tools into comprehensive software products that "simplify the daily lives of our customers, make them more efficient and more profitable." BC5RR140. These and other reasons explained herein are why SafeLease targeted Storable's FMS.

Storable licenses FMS to operators of self-storage facilities in which tenants stow their excess personal property. DC2RR60–61. There are at least 20 companies in the FMS industry competing with Storable's FMS. DC2RR73–74; BC4RR236 ("20 or 30 of them"); BC5RR144–147.

Storable offers three FMS, called storEDGE, SiteLink, and Easy Storage Solutions. The facilities of Storable customers have an average of more than 300 units per facility. BC4RR130. Storable has invested tens of millions of dollars every year into research and development to provide software that is top-quality in service, security, efficiency, stability, and

convenience. BC5RR140, 142–143; BC4RR232–233 (customer testifying that Storable provides "better service," convenience, and security).

The three FMS enable facility operators to efficiently manage tenant information, rental agreements, and payments records; track revenue, occupancy rates, and individual tenants as they move in and move out; and automate these and other tasks. BC5RR132; DC2RR251; BC3RR254; BC5RR20, 210. The integration of these functions into one system makes facilities more efficient. BC5RR140.

On the other hand, SafeLease parasitically sought shortcuts into Storable's FMS to make up for a failed business model. BC4RR83; BC5RR96–99; DC2RR198–199; BC7RR2578, DX-172. In fact, Storable declined acquisition overtures by SafeLease as recently as 2024, until SafeLease escalated by filing a lawsuit. BC5RR100–101.

### B. *Storable promotes competition by encouraging third parties to integrate their products into Storable's FMS via an API.*

Storable's success in part derives from a business plan that includes designing its FMS to integrate with software from its competitors.

In addition to licensing FMS to operators, Storable allows third-party vendors that compete with Storable to connect their software to Storable's FMS if those vendors enter into an API agreement governing the price,

contractual limitations on its use, and conditions for that access. DC2RR63, 65.

An API gives third-party computer programs a more secure and tailored way to access Storable's FMS, instead of accessing via the user interface designed for humans. DC2RR83, 104. API access provides several advantages over user-account access, including that API access puts less burden on Storable's FMS, allows customization to match the needs of each party, permits Storable to better monitor activity, and can easily limit users to viewing only the data that they need for their legitimate business purposes. BC5RR259; BC4RR143; DC2RR252–253; BC3RR217; DC2RR104–105.

Competing software for risk-management products like tenant insurance can integrate into Storable's FMS[1] through an API if they sign an API agreement. No risk-management-product vendor except SafeLease accesses Storable's FMS without an API. DC2RR87, 117; BC5RR151.

Storable offers its own risk-management products at facilities that use Storable's FMS, use other companies' FMS, and forgo using any FMS. DC2RR129–130. So does SafeLease. DC2RR188; BC4RR23. Storable allows operators using Storable's FMS to choose which risk-management-product

---

[1]    Since API require substantial work from Storable to create and maintain, Storable does not offer an API for its lower-cost FMS called Easy Storage Solutions. BC5RR157–158.

vendors they partner with. DC2RR130–131. In fact, Storable's website *advertises* competing risk-management-product vendors who are integrated into Storable's FMS because operators want to see their FMS provide choices. DC2RR133–135; BC5RR147–148.

SafeLease has never entered into an API agreement or any other agreement, or paid any money to Storable, to use Storable's FMS. Instead, SafeLease wrongfully obtained user access to Storable's FMS by manipulating Storable's customers. BC4RR43–44; BC5RR65–66.

## II. Storable discovered SafeLease's wrongful and unauthorized access of Storable's FMS.

### A. *SafeLease wrongfully obtained improper access to Storable's FMS.*

In April of 2024, Storable hired Dan Fritcher, Vice President of DevOps and Engineering, to enhance the security and stability of Storable's software. DC2RR241–242. Mr. Fritcher detected and investigated security and stability problems stemming from a high volume of activity on Storable's FMS carried out by "bots" (i.e., computer programs designed to perform automated tasks in a way that simulates human activity). DC2RR101, 242–246, 250. This investigation determined that SafeLease was at minimum the main source of these problems. *Id.*; BC5RR235. This automated behavior frequently caused massive spikes in usage, including more than a million daily hits to Storable's FMS servers that were not designed to interface with

bots. DC2RR245–248; DX-77 at BC7RR2023; DX-78 at BC7RR2024; DX-79 at BC7RR2025; PX-39 at BC7RR597; BC5RR235–239.

Because of the surreptitious and unauthorized nature of SafeLease's access, Storable had "no visibility into their backdoor methods of getting into our software." DC2RR104–105. SafeLease's access outside of an API allowed it to see private customer information, such as driver's license numbers and home addresses, that was not necessary for SafeLease to service its risk-management products. DC2RR193–194, 256–257; BC3RR255. Storable was unable to determine what SafeLease did with that information. DC2RR257.

**B.** ***Terms of Use prohibit SafeLease's use of Storable's FMS for commercial exploitation, or for use that is disruptive or deceptive.***

Use of Storable's FMS is governed by Terms of Use. DX-1 at BC7RR1264; DX-2 at BC7RR1273; DX-3 at BC7RR1291. The Terms of Use grant operators "a non-exclusive, non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed **solely for your internal business purposes**." DX-2 ¶ 4.1 (emphasis added). BC7RR1278. Relatedly, the Terms of Use tell operators they "may not, and you shall ensure your Users do not … sublicense … **or otherwise commercially exploit**" Storable's FMS, DX-2 ¶ 4.3 (ii), and that "[a]ny use by a third party, affiliate, agent of customer, or any use to

develop a commercial product, requires a separate third-party [Data Exchange Interface] DEI agreement." DX-2 ¶ 4.5, BC7RR1278–1279. An API agreement is a type of DEI agreement. DC2RR128; BC5RR71.

The Terms of Use also permit Storable to block access that will "interfere with or disrupt the integrity or performance of the [Storable FMS] Services or third-party data contained therein." DX-2 ¶ 4.3(viii), BC7RR1279.

Lastly, the Terms of Use permit Storable to block users who "engage in any illegal or deceptive trade practices," or "circumvent or disable any security or other technical features or measures of the [Storable FMS]." DX-2 ¶ 4.3(iv), (v), BC7RR1278.

## C. *SafeLease violated the Terms of Use.*

SafeLease manipulated Storable's customers into giving SafeLease full administrative access to Storable's FMS that violated all of the Terms of Use rules described above. BC4RR39–40; *see infra* Argument Section IV.C.

Despite being a third party without an API agreement, SafeLease commercially exploited Storable's FMS to find and service customers of SafeLease's products. BC5RR70, 72, 173; DC2RR126.

SafeLease's non-API access threatened the integrity of Storable's FMS by recklessly exposing customer information, including Personally

Identifiable Information, to higher risks of data breach in ways that could have been mitigated by an API agreement. DC2RR193–194, 252–253, 254, 256–257; BC3RR217, 255; BC5RR165; BC4RR224–225. An API would have tailored access so that SafeLease could only pull data necessary for legitimate purposes. *Id.*

SafeLease's use of bots to invade Storable's FMS interfered with performance by slowing the FMS and misusing the FMS in ways that required intervention by Storable's technical support team. BC5RR167, 196, 239; DC2RR127; DX-37 at BC7R1717; DX-40 at BC7RR1732. This invasion also circumvented security measures and created security risks for Storable and its customers. DC2RR195–196; BC4RR52–57; CR334–335; BC5RR13, 110–111, 112, 242, 247, 264; DX-359 at BC7RR3787.

### III. Storable offered SafeLease an API agreement that would have provided the access that SafeLease improperly took, but SafeLease refused that offer.

To prevent the stability and security problems caused by SafeLease's method of using Storable's FMS, Storable asked SafeLease to enter into an API agreement at the same price that several other risk-management-product vendors had accepted. DC2RR 117, 136, 139–140; BC3RR229–230; BC5RR151–152, 158; DX-5 at BC7RR1324; DX-7 at BC7RR1341; DX-176 at BC7RR2668; BC5RR156; BC5RR218–219. SafeLease refused to enter into an

API agreement because the price was higher than SafeLease wanted to pay. DC2RR137, 173; BC5RR50–51 (SafeLease CEO testifying SafeLease rejected API due to price).

## IV. Storable blocked the unauthorized access to Storable's FMS.

In October 2024, Storable informed SafeLease that Storable would be rolling out a new security initiative. BC5RR242. SafeLease's current petition alleges the following timeline unfolded:

- On November 4 and 6 of 2024, Storable blocked SafeLease IP addresses from logging into two of Storable's FMS, but SafeLease circumvented these blocks. CR334–335.

- On December 4, 2024, Storable again blocked SafeLease's access to those two FMS, but "SafeLease was able to engineer a solution to restore access." CR334–335.

- On December 17, 2024, Storable blocked not only SafeLease's IP addresses but also user accounts that use SafeLease email addresses, which SafeLease could only circumvent with a "technical workaround." CR334–335.

As explained below in Argument Section IV.D, testimony revealed that SafeLease deployed an array of tactics to circumvent Storable's security measures.

**V.    SafeLease improperly shopped its case to the business court and sought the same relief on the same or very similar tenuous facts.**

    **A.    *SafeLease forum shopped by unsuccessfully asking the district court for a temporary injunction, and then removing to the business court for a second bite at the apple.***

On December 30, 2024, on the night before New Year's Eve when it would be extremely difficult for defendants to obtain emergency representation for a TRO hearing, SafeLease filed in the district court a petition asserting a state antitrust claim and requesting a TRO and temporary injunction. Hearing one side of the story, the court issued a TRO to prevent Storable from precluding SafeLease's unauthorized access to its FMS. CR59–62. Subsequently, after an eight-hour evidentiary hearing, the district court denied the request for a temporary injunction. DC2RR35, 296; CR700.

Having lost in the district court, SafeLease filed a Notice of Removal to the business court on January 29, 2025. CR5. This Notice of Removal was untimely under the governing statutory deadline, which bars removal "later than the 30th day after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action." TEX. GOV'T CODE § 25A.006(f)(1). SafeLease did not deny—and its own petition, testimony,

-10-

and emails proved—that SafeLease knew of sufficient jurisdictional facts more than 30 days before removing the case. *See infra* Argument Section I.B.2

The day after filing its Notice of Removal, SafeLease filed in the business court a request for the same temporary injunction that the district court rejected. CR361. SafeLease did not deny that this was part of a deliberate forum-shopping strategy. The details of SafeLease's forum-shopping plan are described below in Argument Section II, along with the common-law requirement that courts prevent such strategies due to their corrosion of the judicial system.

Storable filed a motion to remand objecting that removal was untimely as well as impermissible forum shopping. CR461–478; CR488–495. The business court denied the motion to remand. CR747–755.

The business court permitted SafeLease to retry its request for a temporary injunction through three full days of evidentiary hearing and a partial-day hearing for closing arguments. BC2RR1 to BC6RR32. The business court granted a temporary injunction under the condition that SafeLease post a $6.6 million bond to protect Storable against third-party access to its systems, with no ability to control risks and damages caused by that access. CR927. The day after the injunction issued, which is also one day

after SafeLease's counsel told the business court that "SafeLease is about to go out of business," SafeLease posted a $6.6 million cash bond. BC6RR12; CR950.

**B.** ***The business court's amended temporary injunction and related opinion confirm that SafeLease's antitrust claim does not support the temporary injunction.***

SafeLease submitted a proposed temporary injunction with the finding that "SafeLease has a probable right to relief on its claims for violation of the Texas Antitrust Act." CR912. The business court deleted this finding, as well as supporting findings about the market and anticompetitive behavior, when it signed the original temporary injunction. CR928 (mentioning a probable right to recover only on "claims for tortious interference with valid, existing SafeLease contracts").

Storable filed a motion to reconsider the original temporary injunction. CR956. This motion argued in part that two seemingly vestigial remnants from discussing an antitrust claim (mentioning "anticompetitive" conduct and "leveraging market power") should be reconsidered. CR958. Storable filed a notice of appeal to this Court. CR971. Soon after, the business court signed an Amended Order Granting Temporary Injunction deleting those two remnants. 1SuppCR40–48. *See* Appx. 10 (redlined copy of the Amended Order showing provisions the Court deleted from SafeLease's proposed

Order). The business court also signed an opinion clarifying that "the TI Order does not rely on SafeLease's antitrust claim; it relies exclusively on SafeLease's claim for tortious interference with existing contracts." 1SuppCR52.

While the amended temporary injunction deleted and adjusted some findings, it retained the same injunctive language from the original temporary injunction, which stated:

> As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

1SuppCR47.

In response to threats from SafeLease that Storable would violate the Temporary Injunction if it blocked access as to *new* customers, Storable filed a motion to clarify the Temporary Injunction. 1SuppCR58, 67. The business court confirmed that the Temporary Injunction does not prevent Storable from blocking access to new customers. 1SuppCR112.

After rulings on Storable's motion to reconsider the original temporary injunction and motion to clarify the amended temporary injunction, Storable

supplemented the appellate record and filed an amended notice of appeal to appeal the Amended Order Granting Temporary Injunction, the Remand Denial, and related rulings. 1SuppCR167, 172.

## SUMMARY OF THE ARGUMENT

The Court need not reach the substantive basis for dissolving the Temporary Injunction because SafeLease's removal of its tenuous case to the business court should have been remanded to the district court where it chose to file initially. However, if the case is permitted to remain in the business court, the lack of merit of SafeLease's substantive arguments compels dissolution of the temporary injunction.

Statutes mandate that the deadline for SafeLease to request removal to the business court was 30 days from when SafeLease discovered, or should have discovered, facts establishing the business court's jurisdiction. SafeLease does not deny—and its own petition, testimony and contemporaneous emails establish—that SafeLease knew jurisdictional facts more than 30 days before it filed its Notice of Removal. Nevertheless, the business court denied Storable's motion to remand, based on judicially adding language to the statute that clashes with other statutory text and the objectives of the deadline.

SafeLease argued that courts must rewrite the removal statute because applying it as written leads to absurd results. But far from being absurd, applying the statute as written is more consistent with the legislature's prudent goals of reducing inefficiency and forum shopping.

SafeLease's forum shopping is an additional reason this case must be remanded. SafeLease knew that it could have filed initially in the business court, but instead chose to first check if the district court would grant a temporary injunction. When the district court denied a temporary injunction, SafeLease removed the case to ask the business court for the same relief. If this forum shopping strategy is permitted, it will degrade the judicial system, both by injecting inefficiency and by eroding public perception of judges as neutral arbiters.

Regardless of whether the business court or the district court is the proper forum for deciding SafeLease's application for temporary injunction, that application fails on the merits as a matter of law for three reasons.

First, SafeLease failed to provide legally or factually sufficient evidence of harm that is probable, imminent, and irreparable. The harms for which SafeLease provided some evidence—paying a higher API price and hiring more staff—are compensable with money damages, which categorically is not

irreparable harm. The harms for which SafeLease provided mere speculation are both supported by no evidence and contradicted by unrebutted evidence.

Second, the undisputed facts show that SafeLease cannot establish a probable right to recover. SafeLease cannot recover because Storable is justified in blocking access to its FMS based on Storable's rights as owner of the FMS and party to the Terms of Use. At minimum, Storable conclusively demonstrated a good-faith belief in a *colorable* right, which is a complete defense to the only claim for which the business court found a probable right to recover—tortious interference with an existing contract.

Third, SafeLease's unclean hands prevent it from receiving the equitable remedy of a temporary injunction. SafeLease dirtied its hands by deliberately creating the emergency it alleges, deceiving customers about its relationship with Storable, circumventing security measures, and forum shopping.

## **ARGUMENT**

I. **SafeLease Untimely Removed To Forum Shop After An Adverse Ruling.**

   A. *SafeLease was required to request removal within 30 days of when it discovered, or should have discovered, facts establishing the business court's jurisdiction.*

The right to remove to the business courts is created and circumscribed by statute. TEX. GOV'T CODE § 25A.006(d), (f). While an *agreed* notice of

removal may be filed at any time, opposed notices like the one at issue "must" be filed:

> not later than the 30th day after the date the party requesting removal of the action **discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction** over the action.

TEX. GOV'T CODE § 25A.006(f)(1) (emphasis added).

"If the business court does not have jurisdiction of the action, the business court **shall** remand the action to the court in which the action was originally filed." TEX. GOV'T CODE § 25A.006(d) (emphasis added).

**B.** ***SafeLease requested removal to the business court more than 30 days after discovering facts establishing the business court's jurisdiction.***

    **1.** **SafeLease does not deny that it knew sufficient jurisdictional facts more than 30 days before filing its Notice of Removal.**

SafeLease filed its Notice of Removal on January 29, 2025. CR5. Thirty days before that filing is December 30, 2024.

SafeLease did not deny that before December 30, 2024, SafeLease knew of facts that SafeLease asserts establish several independently sufficient grounds for the business court's jurisdiction. Nor did SafeLease deny that it knew it could have initially filed its Original Petition in the business court. Instead, SafeLease argued that post-petition events *also*

-17-

support jurisdiction and make SafeLease "even more certain" of jurisdiction. CR550, Opposition to Remand at 15.

There is no basis in statutory text, or the purpose of the deadline, for resetting the 30-day clock every time a party learns additional facts beyond facts sufficient for initially "establishing the business court's jurisdiction." TEX. GOV'T CODE § 25A.006(f)(1).

**2.    SafeLease's own petition, testimony, and emails proved that SafeLease knew of sufficient jurisdictional facts more than 30 days before requesting removal.**

SafeLease's petition, testimony, and contemporaneous emails show that it knew of sufficient jurisdictional facts weeks before December 30, 2024.

SafeLease's Verified Original Petition described several independent grounds for jurisdiction that occurred before December 30. In addition, because SafeLease filed that petition *on* December 30, if SafeLease could reasonably have learned the grounds for its Original Petition even one day before filing it, SafeLease's Notice of Removal was untimely. Since the allegations in a *verified* petition are made under penalty of perjury and must

be properly investigated, SafeLease "reasonably should have discovered" facts earlier than the filing date. Tex. Gov't Code § 25A.006(f)(1).[2]

The sections below show, for each of the grounds for jurisdiction, that the evidence established SafeLease's early knowledge. SafeLease did not rebut this evidence with evidence or argument.

> ### a. SafeLease knew early on of facts allegedly supporting its claims that Storable violated the Business & Commerce Code and trade regulation.

The business court has jurisdiction over "an action that arises out of a violation of the . . . Business & Commerce Code by an organization." Tex. Gov't Code § 25A.004(d)(3). SafeLease's Notice of Removal argued that this action meets that requirement. CR8, Notice at 4.

SafeLease's Original Petition asserted that Storable violated the Business & Commerce Code's Chapter 15, titled the Texas Free Enterprise and Antitrust Act of 1983:

---

[2] Because of this pre-petition knowledge, and the fact that SafeLease's application for temporary injunction was within its Verified Original Petition, SafeLease cannot avail itself of the removal deadline that applies "if an application for temporary injunction **is pending** on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action." Tex. Gov't Code § 25A.006(f)(2) (emphasis added).

- "This conduct is an attempted monopolization in violation of TEX. BUS. & COM CODE §15.05(b)." CR45, Petition ¶ 85.

- "Jurisdiction and venue are proper in this Court pursuant to ... TEX. BUS. & COM. CODE ANN. §15.21 and §15.26." CR30, Petition ¶ 18.

- "Under TEX. BUS. & COM. CODE §15.21, SafeLease is entitled to recover its reasonable attorney fees and costs spent in this matter." CR45, Petition ¶ 89.

- "Federal case law is instructive in applying the Texas Antitrust Act. *See* TEX. BUS. & COM. CODE § 15.04." CR50, Petition ¶ 102.

- Asserting a cause of action for "Violation of Texas Antitrust Act." CR44–45, Petition ¶¶ 82–89.

The above-referenced Antitrust Act regulates "restraint of trade." TEX. BUS. & COM. CODE § 15.05(a). Accordingly, SafeLease's Notice of Removal also stated that the business court has jurisdiction because SafeLease pled "an action in which a claim under a state or federal securities or **trade regulation** law is asserted against . . . an organization." This is another independently sufficient ground for jurisdiction. CR8, Notice at 4 (citing TEX. GOV'T CODE § 25A.004(b)(3)) (emphasis added).

The Original Petition alleged that actionable antitrust conduct began before December 30, 2024. For example, the Original Petition alleges that:

- by November 6, 2024, Storable had blocked SafeLease from accessing two of the three FMS at issue, CR39, Petition ¶ 55;

-20-

- by December 4, 2024, Storable engaged in another wave of blocking, which "cut off SafeLease's access to customer accounts and was a direct interference with servicing its policies," CR39, Petition ¶ 56; and

- by December 17, 2024, "defendants took their most dramatic step," through alleged antitrust violations such as blacklisting SafeLease and selectively deactivating accounts that SafeLease alleges it was authorized to use. CR39, 47, Petition ¶ 58, 94.

SafeLease's counsel described blocking access on December 17, 2024 as "improper conduct by a dominant, monopoly competitor." DC2RR41.

Contemporaneous emails show that SafeLease knew of the facts allegedly supporting its antitrust claim at least as far back as November 6, 2024. On that day, SafeLease's CEO sent an email stating that Storable's actions showed an intent to deprive the market of a low-cost competitor and tie products in a way that disadvantaged competitors. DX122 at DC8RR375.

SafeLease's CEO also testified that, as early as October 2024, he was aware that Storable requested a higher price for a tenant that "previously was a Storable insurance customer." DC2RR164–165. This is the same pricing that SafeLease's Original Petition alleges was anticompetitive use of "monopoly power" that was "designed as merely another way to drive a low-cost competitor out of the market." CR38–39, Petition ¶¶ 52, 53; *see also* CR28, Petition ¶ 8 ("This is blatant monopoly leveraging, not legitimate competition.").

-21-

SafeLease's Notice of Removal stated "these same facts constitute tortious interference with both Plaintiff's existing contracts and Plaintiff's prospective business relationships," which are SafeLease's only claims besides violation of the Antitrust Act. CR6, Notice at 2.

Therefore, SafeLease's own statements show that it knew by October 2024, and certainly no later than December 17, 2024, of the allegedly anticompetitive and tortious-interference conduct it identified as creating the business court's jurisdiction. Either of those dates makes the Notice of Removal untimely.

### b. SafeLease knew before December 30 of facts that SafeLease stated show more than $10 million in controversy.

SafeLease's Notice of Removal asserted that "both the $5 million and $10 million thresholds for Texas Business Court jurisdiction are satisfied." CR8, Notice at 4 (citing TEX. GOV'T CODE § 25A.004(b), (d)). SafeLease argued that more than those amounts is in controversy for several reasons, all of which SafeLease knew before December 30.

*First*, SafeLease's Notice argues that more than the jurisdictional amount is in controversy based on the number of tenants SafeLease will be unable to service. SafeLease's Notice explained that inability to serve even *45,000* tenants would cost SafeLease $6.5 million *annually*. CR7, Notice at

3. SafeLease's Original Petition alleged that Defendants had already taken steps toward preventing SafeLease from servicing *246,000* tenants and that as of December 17, 2024 Defendants had already prevented service on *84,062* tenant plans. SafeLease's own numbers show that it knew by December 17 that more than the jurisdictional amount was in controversy. CR39–40, 44, Petition ¶¶ 58, 80.

*Second*, SafeLease's Notice argues that more than the jurisdictional amount is in controversy because SafeLease's "entire enterprise is jeopardized" by actions that SafeLease learned of before December 30, 2024: pricing demands in October of 2024 and cutting access on December 17, 2024. CR6–7, Notice at 2–3; *see also* CR39, Petition ¶ 53 ("it would drive SafeLease out of business"). SafeLease valued its entire business at "$140 million." CR7, Notice at 3.

On November 6, 2024, SafeLease's CEO wrote that Storable's pricing demands were intended to drive SafeLease out of the market and erode all of SafeLease's profitability. DX122 at DC8RR375 (admitted at January 16 hearing). He reiterated this point by testifying that SafeLease would not have been able to "continue operating under the terms that Storable was proposing" in October 2024. DC2RR164–165; BC5RR48. SafeLease's CEO also testified that reversing the loss of access that occurred "on December 17"

was necessary so that "our business does not end." DC2RR144. SafeLease's counsel similarly argued that when Storable "cut us off on **December the 17th**," that put SafeLease "at risk of losing everything, its **entire business**." DC2RR46 (emphasis added).

This early knowledge of allegedly catastrophic pricing demands and loss of access is why SafeLease's Original Petition alleged that prices demanded in October 2024 "would drive SafeLease out of business" and that when its access to the FMS is precluded, "SafeLease's ability to run its business and administer insurance services for its customers is entirely hamstrung." CR39, 47, Petition ¶¶ 53, 95.

*Third*, SafeLease's Notice argues that more than the jurisdictional amount is in controversy because hundreds of millions of dollars of insurance coverage are at risk. CR7, Notice at 3. SafeLease's CEO testified that he learned on December 17, 2024 of loss of access that endangered insurance coverage and therefore put "hundreds of millions of dollars at risk." DC2RR145.[3]

---

[3]  Defendants raised testimony and emails to the business court, yet the business court erroneously stated that "Defendants provide **no evidence**" that SafeLease knew or should have known earlier. CR648–650, Reply Supporting Motion to Remand at 7–9; CR750, Remand Denial at 4 (emphasis added).

Therefore, SafeLease should have known, and did know, before December 30 that the jurisdictional amounts were in controversy due to alleged antitrust violations.

### C. *SafeLease Identified No Statutory Text That Supports Its Interpretation.*

SafeLease does not deny that Storable accurately identified the statutory text governing the timeliness of its Notice of Removal. Instead, SafeLease asks the courts to rewrite this unambiguous statute to add the words bolded below:

> not later than the 30th day after the date that **both of the following have occurred: (1)** the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction**, and (2) the petition has been filed**.

*Compare* TEX. GOV'T CODE § 25A.006(f) *with* CR544–548, Opposition to Remand at 9–13. The business court accepted this invitation by holding that the removal deadlines "do not begin running before the lawsuit is filed." CR751, Remand Denial at 5.

However, courts "cannot rewrite the statute under the guise of interpreting it." *In re Ford Motor Co.*, 442 S.W.3d 265, 284 (Tex. 2014). This Court diligently enforces that rule, which preserves the critical distinction between the legislature and the judiciary. *See, e.g., Health & Human Services Comm'n v. Navarro*, No. 15-24-00054-CV, 2024 WL 4984183, at

*5 (Tex. App.—15th Dist., Dec. 3, 2024, no pet.) ("We are not free to rewrite the statute"); *In re ETC Field Services, LLC*, No. 15-24-00131-CV, 2025 WL 582320, at *3 (Tex. App.—15th Dist., Feb. 21, 2025).

### D. *The Remand Denial's treatment of the word "action" is internally inconsistent.*

The business court held that the 30-day removal deadline cannot start until a suit is filed because that deadline uses the word "action" as shown bolded below:

> not later than the 30th day after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the **action**.

CR751–752, Remand Denial 5–6 (citing TEX. GOV'T CODE § 25A.006(f)(1)) (emphasis added). The business court reasoned that "action" means lawsuit, no lawsuit exists before suit is filed, the business court cannot have jurisdiction over a lawsuit that doesn't yet exist, and therefore the removal clock cannot start until a lawsuit is filed. *Id.* This reasoning fails in three ways.

First, interpreting the word "action" to apply only to already-filed lawsuits is inconsistent with other uses of "action" in the same section. For example, the subsection permitting a plaintiff to initially file in the business court states: "An **action within the jurisdiction** of the business court **may be filed** in the business court." TEX. GOV'T CODE § 25A.006(a)

-26-

(emphasis added). This clearly shows that a plaintiff can know before filing a lawsuit that an action is within "the business court's jurisdiction." TEX. GOV'T CODE 25A.006(f)(1).

Second, the removal deadline is not based on discovery of *jurisdiction* but rather discovery of "facts." *Id.* Facts can exist before the filing of a lawsuit.

Third, if discovering facts establishing jurisdiction really were synonymous with discovering that the business court already has jurisdiction, that would render superfluous the bolded words in the following phrase: "should have discovered, **facts establishing** the business court's jurisdiction." TEX. GOV'T CODE 25A.006(f)(1) (emphasis added). Courts must avoid constructions that render one part of a statute "meaningless or superfluous." *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 57 (Tex. 2015).

Therefore, the Remand Denial's interpretation clashes with the statutory text. And as explained in the sections below, that interpretation also conflicts with the context and objectives of the statute.

**E.** *Applying the statute as written is efficient, and in harmony with the statute's context and objectives, which makes that application far from "absurd."*

The text of the removal statute unambiguously bars SafeLease's removal. That should be the end of this Court's inquiry. However, for the sake of completeness, this section addresses SafeLease's argument that courts may add words to the statute for two reasons: (1) applying the text conflicts with the wider context and (2) leads to absurd results. Both of those reasons are false premises, for the reasons explained below.

**1.    The context of the 30-day deadline supports applying that deadline as written.**

The context surrounding the removal deadline supports allowing the 30-day clock for a plaintiff to begin running before that plaintiff has filed a petition.

The removal deadline is part of a larger structure that provides plaintiffs with *two* paths to the business court: either (1) file initially in a business court, thereby avoiding the need for removal, or (2) if they discover jurisdiction after filing, seek removal promptly. TEX. GOV'T CODE § 25A.006(a), (f). SafeLease ignores that first path when arguing that requiring prompt removal would destroy plaintiffs' rights to access the business courts. In addition, the removal deadline applies only when the parties "have not agreed to remove," in which case there is a heightened

-28-

chance that a party was prejudiced by deliberate delay. TEX. GOV'T CODE § 25A.006(f). If there is no prejudice, the parties may agree to removal "at any time." *Id.*

SafeLease also argues that context supports adding words to the deadline because the purpose of this statute is to "provide a specialized forum for complicated business disputes." CR544, Opposition to Remand 9. But as the analysis above shows, applying the deadline as written does not prevent parties from accessing this specialized forum when appropriate. If the legislature intended no time limit on raising business disputes to the business court, they would not have included *any* deadline for removal.

> **2. The results that SafeLease described as "absurd" either benefit the judicial system or will not occur.**

> **a. It is not absurd to require a plaintiff who has known for more than 30 days that it can file its action in a Business Court to do so rather than disrupt proceedings with late removal.**

SafeLease argued that it would be absurd if a plaintiff who deliberately relinquished its right to file in a business court, after knowing of that right more than 30 days before filing its petition, could not remove without agreement from defendants. CR548, Opposition to Remand 13. That disincentive for forum shopping and delay is prudent, not absurd.

Even if that consequence appeared to be unusual, rather than the expected safeguard it is, that would not satisfy the "high" bar for absurdity

because the "absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Combs v. Health Care Services Corp.*, 401 S.W.3d 623, 630 (Tex. 2013). In *Osmose Utilities Services, Inc. v. Navarro Cnty. Elec. Coop.*, 707 S.W.3d 117, 123 (Tex. Bus. Ct. 2025), a business court held that an "imperfect" procedure for removal did not meet the high bar for absurdity.

SafeLease knew, long before it filed its Original Petition, that it could have filed in the business court. The legislature wisely distinguished this from a situation in which a plaintiff did not discover facts sufficient for business-court jurisdiction until after filing its petition. It is sensible to allow the latter type of plaintiff, but not the former, to remove to the business court.

The legislature's choice to refrain from categorically denying plaintiffs the right to removal is not carte blanche for forum shopping but rather an acknowledgment that post-petition developments can create jurisdiction for the first time. For example, if a defendant became a publicly traded company (which removes the need for a minimum amount in controversy) after the filing of the petition, and the Business Court previously lacked jurisdiction only because of insufficient amount in controversy, that would start a 30-day clock for the plaintiff to remove. TEX. GOV'T CODE § 25A.004(c). SafeLease has not claimed post-petition events created jurisdiction for the first time.

### b. Applying the deadline as written will not negate defendants' right to remand.

The Remand Denial justified reading words into the statute based on "practical difficulties," such as the statute allegedly allowing a plaintiff to deny a defendant any right to remand simply by delaying its petition. CR752. That is not how the deadline operates.

The deadline clock is tied to when a party should have discovered "facts establishing the business court's jurisdiction." TEX. GOV'T CODE § 25A.006(f)(1). The facts establishing jurisdiction are a specified dollar amount in controversy and an enumerated type of claim. TEX. GOV'T CODE § 25A.004(b). Before a petition is served on defendants, only the plaintiff can reasonably be expected to determine the amount plaintiff will demand and the type of claim plaintiff will bring.

Using this case as an example, Storable believes that SafeLease's claims are a negotiation tactic rather than valid causes of action, so Storable could not reasonably have predicted which claims SafeLease would manufacture. If the absurdity doctrine had any application to this case, it would be only to prevent a defendant from losing its right to removal through no fault of its own, not to protect a plaintiff that waived its removal right through deliberate strategy.

### c. Applying the deadline as written will not unduly burden courts.

SafeLease theatrically warned the business court that if the deadline is applied as written, "[l]aborious factfinding would be required in virtually every case where removal occurs." CR549, Opposition to Remand 14. This is not a credible warning for two reasons.

First, applying the deadline as written removes the incentive for forum shopping, which will lead to far fewer plaintiffs attempting to remove their actions from the forum in which they chose to file.

Second, in a substantial percentage of those rare cases, it will be apparent from the petition when a party should have known of jurisdictional facts. For example, merely looking at a few paragraphs in SafeLease's Verified Original Petition shows that SafeLease knew early on about actions it characterizes as a threat to its entire business (which it argues puts a sufficient amount in controversy) and the types of claims over which the business court has jurisdiction (including antitrust claims). *See supra* Section I.B.2.

Reading SafeLease's own words in a filed pleading is not unreasonably burdensome, especially in contrast to the burden of every temporary injunction being tried in both a district court and a business court.

## II. SafeLease's Use Of Removal To Evade The District Court's Ruling Is Impermissible Forum Shopping That Must Be Barred To Preserve The Integrity Of The Judicial System.

### A. *Forum shopping violates public policy by wasting resources and eroding the public's perception of the judiciary as neutral.*

The Texas Supreme Court recognizes "the Legislature's legitimate interest in preventing forum-shopping." *Quixtar Inc. v. Signature Mgmt. Team, LLC*, 315 S.W.3d 28, 33 (Tex. 2010). The text of the statutory removal deadline serves that interest. *See supra* Section I.A. Even if the statute's text did not prohibit forum shopping, courts would have an independent duty to prevent forum shopping because of courts' duty to protect public policy and the integrity of the judicial system. *See In re Lowery*, 999 S.W.2d 639, 647 (Tex. Rev. Trib. 1998)("[A] justifiable concern for the relationship between judicial conduct and public perception … requires that a judge act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.")

"Texas courts have recognized an important public policy against forum shopping." *In re Boehme*, 256 S.W.3d 878, 882 (Tex. App.—Houston [14th Dist.] 2008, no pet.). This policy is based on several concerns.

First, forum shopping harms the courts and parties by "injecting inefficiency." *In re AutoNation, Inc.*, 228 S.W.3d 663, 668 (Tex. 2007).

Second, forum shopping "breeds disrespect for and threatens the integrity of our judicial system." *In re Moore*, No. 13-21-00004-CV, 2021 WL 717613, at *6 (Tex. App.—Corpus Christi–Edinburg Feb. 24, 2021, no pet.). Forum shopping is damaging not only to the affected litigants, but also to society because "forum shopping engenders an appearance of bias and impairs the appearance of judicial neutrality and integrity." *Id.* at 11; *see also In re ASICS Am. Corp.*, No. 05-22-00994-CV, 2023 WL 333711, at *5 (Tex. App.—Dallas Jan. 20, 2023, no pet.) ("Forum shopping" is "detrimental to the judicial system").

Accordingly, Texas courts strictly prohibit forum shopping even when a statute does not require them to. *See, e.g.*, *Reliant Energy, Inc. v. Gonzalez*, 102 S.W.3d 868, 875 (Tex. App.—Houston [1st Dist.] 2003), aff'd, 159 S.W.3d 615 (Tex. 2005) ("an anti-suit injunction was appropriate in this case to prevent the evasion of Texas's important public policy against forum shopping"); *Space Master Intern., Inc. v. Porta-Kamp Mfg. Co., Inc.*, 794 S.W.2d 944, 948 (Tex. App.—Houston [1st Dist.] 1990, no writ) (a plaintiff "should not be allowed to use declaratory relief as a forum-shopping device"). "Parties who forum shop in an effort to get a second bite at the litigation apple **must** be stopped in their scheming tracks." *In re Doctors*

*Hosp. 1997, L.P.*, 351 B.R. 813, 841 (Bankr. S.D. Tex. 2006) (emphasis added).

*In re Team Rocket, L.P.*, 256 S.W.3d 257, 260 (Tex. 2008) is instructive. In that case, the plaintiff filed in Harris County, where the court held that Williamson County was the proper venue. *Id.* at 259. The plaintiff nonsuited, refiled in Fort Bend County, and convinced the new court to hold that venue is proper in Fort Bend County. The Texas Supreme Court reversed to prevent forum shopping. *Id.* at 260–261.

Indeed, the courts of appeals have sanctioned forum shopping. Where a plaintiff, who exercised its right to select the forum and filed for a temporary restraining order in Travis County district court, nonsuited the case when denied the injunction and then re-filed the application in a different county, the court of appeals affirmed sanctions. *Guzman v. Tex. Mut. Ins. Co.*, No. 13-06-227-CV, 2007 WL 1439742, at *1 (Tex. App.—Corpus Christi—Edinburg May 17, 2007, no pet.). Judge Livingston explained:

> It's the forum shopping that bothers me most. You [can't] appropriately go from Judge Jenkins' courtroom to mine, … and try to get [another judge to] do what Judge Jenkins just told you not to. I don't think that is appropriate under any circumstances.

*Id.* at *3.

The appellate court was also troubled that the plaintiff failed to pursue appeal or mandamus of the first denial. *Id.*

A recent example of how courts should prevent forum shopping, even when not explicitly required by statute, is supplied by the Texas Supreme Court's recent decision in *Kelley v. Homminga*, 706 S.W.3d 829, 830 (Tex. 2025). In *Kelley*, the statute at issue set grounds for *exclusive* jurisdiction but was silent as to whether the Fifteenth Court of Appeals has *concurrent* jurisdiction over appeals from all counties. *Id.* at 830–834. The Texas Supreme Court sided with a Fifteenth Court of Appeals dissent pointing out that allowing appellants unfettered choice of where to appeal "would lead to gamesmanship." *Id.* at 831, 834 (transferring appeal out of Fifteenth Court because it lacked concurrent jurisdiction).

## B. *SafeLease engaged in the type of forum shopping that courts must prevent.*

SafeLease's conduct here is troubling and should be rebuked by Texas courts. Even the business court that denied the motion to remand characterized SafeLease's actions as "strategic" and declined to find that SafeLease did not deliberately forum shop. BC2RR31; CR542. Instead, the business court believed that it lacked authority to remand to serve the public policy against forum shopping. CR753.

SafeLease chose to file its action in, and request a temporary injunction from, the district court. CR26. SafeLease then chose the district court to hear eight hours of evidence and testimony on its request for a temporary injunction. DC2RR35, 296.

The district court informed the parties that it denied the temporary injunction and wanted the parties to agree to the form of an order memorializing that ruling. CR700. SafeLease requested that the district court issue findings of fact and conclusions of law. CR305. SafeLease also appealed to the Third, rather than the Fifteenth, court of appeals. CR295.

Storable asked SafeLease to agree to the form of the requested order. CR703. To sidestep the district court's announced ruling, SafeLease delayed responding about whether it approved the proposed order as to form and then improperly removed the case before the denial order was signed. As in *Guzman,* SafeLease attempted an end-run around the correct ruling by jumping to another court, and by choosing to abandon its appeal in the Third Court. *See* Appeal No. 03-25-00048-CV, January 27, 2025 Motion to Dismiss.

SafeLease then requested that the business court issue the same temporary injunction that the district court refused to issue. *Compare* CR306–337 (application in district court), *with* CR361–387 (application in

business court). SafeLease also relitigated the temporary injunction with another evidentiary hearing. As warned in *AutoNation*, such tactics should be rejected for "injecting inefficiency" into the judicial system. *In re AutoNation, Inc.*, 228 S.W.3d at 668.[4] SafeLease did not deny that these actions were part of its forum-shopping strategy.[5]

This Court must stop this gamesmanship, or the legitimate removal procedures will be subverted. The legislature did not authorize using the business court as a pawn in a plaintiff's forum-shopping game. The precedent SafeLease is attempting to set is an affront to the dignity of the business courts and would open the door to shopping for a jurist who disagrees with a prior ruling from a jurist of equal dignity. *See In re Moore*, 2021 WL 717613, at *6, 11 (warning against allowing forum shopping to create the impression that judges are not neutral).

---

[4] SafeLease cursorily argued that "changed circumstances" justify relitigating its request for the temporary injunction. CR386. The allegedly new circumstances SafeLease identified were (1) blocking access to an additional Storable FMS and (2) blocking accounts with SafeLease email addresses. DC2RR28–30. However, SafeLease raised both of these circumstances to the district court before and after the district court denied the temporary injunction. CR26 ¶ 58 ("deactivated storEDGE users with @safelease.com email"); CR321 ¶ 65 ("blocking the SafeLease … users with @safelease.com emails"); CR30 ¶ 80 ("defendants have taken steps to similarly restrict SafeLease's access on its SiteLink facility management software"); CR322 ¶ 72 ("they went further to cut off SafeLease from the other two facility management software products"). SafeLease provided no reason why it could not have asked the district court to consider those circumstances.

[5] The closest SafeLease came to denial is the following evasive statement: "There is nothing in the record to suggest that SafeLease unreasonably delayed in any manner." CR550, Opposition to Remand at 15.

The predictable outcome of allowing this type of forum shopping is that every plaintiff that knows a business court has jurisdiction would file its petition first in a district court, wait to see if it wins an early beneficial ruling, and if not then remove to a business court where it will start the process all over again hoping for a different result or more sympathetic judge. This case serves as a cautionary tale because SafeLease's belated removal not only allowed it to shop for judges but also wasted the time and resources of the district court, parties, and witnesses preparing for and attending a full-day hearing. If the removal deadline is not enforced, retrying temporary injunctions (and other early requests for relief, such as motions to compel arbitration or dismiss for lack of personal jurisdiction) will become routine.

In contrast, if the rule is enforced as written and intended, plaintiffs would be permitted to remove later in a case not because they knowingly sat on their rights, as in this case, but because removal became possible due to subsequent facts that came to light, such as counterclaims or new damages that establish jurisdictional grounds for the first time. "To interpret the provisions otherwise would allow forum shopping, a practice [the Texas Supreme Court's decisions] have repeatedly prohibited." *Team Rocket*, 256 S.W.3d at 260.

In conclusion, this Court should render judgment that this case is remanded to the district court because removal was untimely and a forum-shopping tactic.

## III. The Required Element Of A Probable, Imminent, And Irreparable Injury Is Not Supported By Legally Or Factually Sufficient Evidence.

To establish entitlement to a temporary injunction, SafeLease had the burden to show "a probable, imminent, and irreparable injury in the interim" before a final judgment. *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024). "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

### A. SafeLease's alleged harms are compensable with money damages, which means they are not irreparable.

"If an injury is compensable by money damages, it is, by definition, not irreparable." *Veterinary Specialists of N. Tex., PLLC v. King*, No. 05-21-00325-CV, 2022 WL 406095, at *5 (Tex. App.—Dallas Feb. 9, 2022, no pet.); *see also Renovation Gurus, LLC v. Lake Point Assisted Living, LLC*, No. 05-19-00499-CV, 2020 WL 477135, at *2 (Tex. App.—Dallas Jan. 29, 2020, no pet.) (same). SafeLease's allegations amount to arguing that without the

temporary injunction, SafeLease would have to either pay more than they wanted to for API access or hire more staff to coordinate with operators who have user-account access to Storable's FMS. Both of those alleged harms are compensable with money damages and therefore not irreparable.

### 1. Paying a higher price for API access is not irreparable harm.

SafeLease's complaint is that Storable should not be "charging $1 to $1.50 per unit for API access." CR320, 334, Second Amended Petition ¶ 60. If SafeLease pays this price and later prevails at trial, a court can easily award money damages equal to the amount that SafeLease should not have been required to pay. *See Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 274 (Tex. App.—San Antonio 2012, no pet.) ("any lost-rent damages does not amount to irreparable injury"); *Edison Cement Corp. v. N. Carolina Furniture Direct 1, Ltd.*, No. 03-15-00772-CV, 2017 WL 3222565, at *2 (Tex. App.—Austin July 26, 2017, no pet.) (holding that damaged and lost furniture was not irreparable injury to a furniture store because such harm can be calculated).

### 2. Temporarily hiring more staff and coordinating with operators is not irreparable harm.

Even if SafeLease continues to fabricate its own "emergency" by failing to pay for API access, SafeLease could operate without direct user-account access to Storable's FMS by coordinating with operators, who retain such

access. The evidence at most indicates this would cause temporary inconvenience, but "inconvenience ... does not warrant the issuance of a temporary injunction." *Long v. Long*, 814 S.W.2d 227, 228 (Tex. App.—San Antonio 1991, no writ).[6]

When SafeLease's chief revenue officer was asked whether SafeLease could continue without direct user-account access to Storable's FMS indefinitely, he testified "we're going to have to hire many more people if so ... Because a lot more kind of manual operations are required." BC3RR319–320. In answer to the question of whether SafeLease hired any additional support to maintain manual access, SafeLease's CEO admitted: "We did. It **cost** us more. We hired additional people to process things manually." BC5RR15 (emphasis added). The wages of these additional people are calculable for money damages, not irreparable harm. *See ESI/Employee Sols., L.P. v. City of Dallas*, 450 F. Supp. 3d 700, 737 (E.D. Tex. 2020) (explaining that the "need to hire additional personnel" typically does not constitute irreparable harm).

The witnesses also confirmed that SafeLease can coordinate with operators, who have the same access to Storable's FMS that SafeLease

---

[6]     In addition to not showing that this harm is irreparable, SafeLease has identified no legal basis for making Storable liable for these harms. Storable has no duty in law or contract to make SafeLease's business operations less expensive. *See infra* Section IV.

received in the temporary injunction, to jointly perform the work that SafeLease could perform on its own with direct FMS access. SafeLease and neutral witnesses testified that this process works but is more time consuming. SafeLease provided no evidence that a more time-consuming process will cause it irreparable harm.

SafeLease testified: "This is not something we can do **ourselves** anymore. We have to request this information, which **slows** down the process." BC5RR25 (emphasis added). The only operator witness confirmed this by testifying that coordinating with SafeLease while SafeLease lacks direct FMS access "is just more time consuming, but it does work." BC3RR222, 261; *see also* BC4RR253 (risk-management-product vendor testifying that after the block of SafeLease, "now the customer has to email me the reports"). This operator also testified that this process for working with SafeLease had not affected tenants or facility owners, or caused any lapsed insurance or damage. BC3RR222, 261.

SafeLease argued that coordinating with operators would not allow it to do all of the tasks it can do by directly accessing Storable's FMS through user accounts, but this defies logic and undisputed facts. The unrebutted evidence shows that SafeLease's access through user accounts is *exactly* the same as the operators' access, which means that operators can do for

SafeLease whatever SafeLease can do directly through user accounts. BC5RR30 (SafeLease's CEO testifying); DX-231 at BC7RR3145 ("We access this data the same way you do, with the username and password"); BC5RR277 ("when SafeLease talks about accessing data through the UI, they just mean making requests to fetch data in a similar way to how a user would interact with the application"). When SafeLease lacks FMS access, operators "could email the reports; and SafeLease could tell them: Hey, I need you to go execute XYZ action in the system; and the operator could do it." BC5RR162 (testimony of Storable's CEO). Storable created guides for vendors explaining how to do this for all of Storable's FMS. BC5RR165–166; DX-228 at BC7RR3127; DX-229 at BC7RR3132; DX-230 at BC7RR3140.

SafeLease argued that without its own user accounts, SafeLease cannot *by itself* change billing and insurance information in Storable's FMS or send out notices through those FMS. BC5RR18–20. But SafeLease never denied that *operators* can do all of these things through the operators' user accounts if SafeLease directs them to. For example, SafeLease argues that it faces irreparable harm because "[t]enants typically receive notices through the FMS; and because we can't log in to do that, there is no way of sending those notices." BC5RR20. But SafeLease provided no evidence suggesting SafeLease cannot simply tell operators to send those notices through the

operators' ability to log into Storable's FMS. Similarly, SafeLease's CEO admitted that for facilities using a Storable FMS, SafeLease was able to process insurance claims without access to the FMS through "more work on the facility owner's part to clearly get that information to us." BC5RR129. As a matter of law, temporary inconvenience from having to coordinate with operators cannot establish irreparable harm.

This is comparable to the situation in *Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266 (Tex. App.—San Antonio 2012, no pet.), which held that a temporary injunction was improper because while access to the property "was burdensome and inconvenient [for the parties seeking the temporary injunction], they are still allowed access to the property." *Id.* at 276; *cf. Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 306 (Tex. 1994) (denying mandamus relief because "more expense or delay" cannot establish lack of adequate remedy).

SafeLease provided no evidence that it could not afford to temporarily hire more staff, or compensate operators, to work in coordination with facility operators rather than through directly accessing Storable's FMS.

SafeLease's argument that it might lose operator customers faster in the future because customers prefer not to coordinate is "speculation" and therefore "no evidence." *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 78 (Tex.

2023); *see also Nelson v. Sheedy*, No. 05-16-01262-CV, 2018 WL 2434389, at *7 (Tex. App.—Dallas May 30, 2018, pet. denied) (holding that testimony about customers moving was speculative and thus no evidence); *Reach Group, L.L.C. v. Angelina Group*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding testimony that potential loss of clients created "great risk" was insufficient to support a temporary injunction).

Even if SafeLease had provided evidence that customer loss will imminently rise,[7] this would still not be evidence of irreparable harm because SafeLease asserted that it can track which customers it loses due to the alleged wrongdoing, and calculate how much revenue SafeLease lost from those customers. BC4RR80–81. *See Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 612 (E.D. Tex. 2021), aff'd sub nom. *Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023) (finding no irreparable harm because movant failed to prove it was "unable to calculate its business losses as a result of losing certain employees and customers").

---

[7] As explained above, the evidence showed that there was no reason for customer loss to rise because SafeLease could and can prevent customer losses through paying for an API, hiring more personnel, or coordinating with operators.

**B.** *SafeLease provided legally and factually insufficient evidence of the likelihood and imminence of bankruptcy.*

SafeLease's CEO vaguely testified that a temporary injunction is necessary so SafeLease's "business does not end," and that SafeLease was "at risk of losing everything, its entire business." DC2RR46, 144. This is legally insufficient to establish imminent irreparable harm because it is "conclusory and speculative." *Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.*, No. 13-13-00087-CV, 2013 WL 5305238, at *6 (Tex. App.—Corpus Christi–Edinburg Sept. 19, 2013, pet. denied). In *Legacy*, a business owner testified that without a temporary injunction, he would be "driven out of business" and be unable to pay for overhead. *Id.* The court of appeals held that this testimony was conclusory and therefore not evidence that could establish irreparable harm. *Id.* at *7. SafeLease's evidence falls short for the same reason.

Even if SafeLease had provided evidence of irreparable harm, it would not be entitled to a temporary injunction without also providing evidence that irreparable harm was "imminent." *Bienati*, 691 S.W.3d at 498. SafeLease failed to do so. SafeLease provided no evidence of *when* SafeLease would go out of business without a temporary injunction. SafeLease merely provided testimony that profit margins at the proposed API price were not

sufficient to cover SafeLease's costs of operating "in perpetuity." DC2RR164–165, 170; BC5RR48. SafeLease's chief revenue officer testified that the threat "feels like a ticking time bomb … death by a thousand cuts … It doesn't just happen in one **swift** blow." BC4RR22 (emphasis added). However, this is merely evidence that SafeLease could not operate *forever* at the proposed prices. SafeLease provided no evidence of when the proposed prices would drive SafeLease out of business, let alone that this would occur before SafeLease could obtain a money judgment. In addition, SafeLease admitted that its average profit is above one of the API prices Storable proposed, which would allow SafeLease to make money above its direct costs. DC2RR 168; BC5RR46.

This gap in evidence about timing is especially important for two reasons. First, SafeLease admitted that it has been able to operate without a positive net profit. BC4RR83; BC5RR96–99; DC2RR198–199; DX-172 at BC7RR2578. This highlights why evidence of reduced profits is not evidence that SafeLease would imminently go out of business. SafeLease provided no evidence, and did not even argue, that SafeLease's access to the outside money that had insulated it from negative profits would not last through trial. BBC5RR98–99. Second, Storable offered SafeLease a far "lower price

for the first three years," BC4RR151, which would have helped SafeLease pay for API access until it obtained a final judgment.

SafeLease also provided no evidence that it could not temporarily increase its profit margins by sharing less revenue with facility operators. To the contrary, SafeLease's chief revenue officer testified that this was potentially an option, and SafeLease's CEO acknowledged that the revenue share "can change." BC4RR42–43; BC5RR91. In fact, SafeLease told operators that if SafeLease pays the API price Storable requested, then SafeLease "must hike our prices for services." DX-231 at BC7RR3144; BC5RR105. Instead of this temporary mitigation, SafeLease voluntarily chooses to split more of its revenue with operators as part of a growth strategy to attract new customers. DC2RR177–178; BC3RR232; BC4RR34, 246.

## C. *The evidence conclusively established that SafeLease would not suffer irreparable harm.*

SafeLease's own statements and actions conclusively establish that SafeLease had sufficient resources to continue operating until a final judgment, which means that a temporary injunction was not required to prevent irreparable harm.

SafeLease alleged that "Defendants have threatened Plaintiff with approximately $2.75 million in anticompetitive and monopolistic rents per

year." CR8, Notice of Removal at 4. The temporary injunction scheduled trial to occur in one year and three months, which based on SafeLease's calculations would require it to pay $3.4 million through trial. 1SuppCR47. The evidence conclusively proved that SafeLease had the resources to pay $3.4 million without going out of business.

Within only one day of receiving the temporary injunction, SafeLease deposited $6.6 million in *cash* rather than take the customary path of having a surety company post the bond. CR950. This shows that SafeLease could have temporarily paid the higher API price with the money that it instead used to support the temporary injunction.

SafeLease provided more proof of its access to ample money when its CEO agreed that "in the midst of negotiating an API," he offered to purchase some of Storable's insurance book for more than 100 times as much as the alleged cost of paying the demanded API price through trial. BC5RR99–101; DX-128 at BC7RR2161. As part of that offer, SafeLease stated that it has good credit. BC5RR100. Unrebutted testimony established that SafeLease's CEO consistently bragged about having "a huge amount of liquidity." BC5RR167.

On the other side of the scale, SafeLease provided no evidence that it could not obtain sufficient credit to continue operating through trial.

## IV. SafeLease Failed To Establish A Probable Right To Recover.

### A. *Standards for the justification defense.*

One of the elements a plaintiff must show to obtain a temporary injunction is "a probable right to the relief sought." *Bienati*, 691 S.W.3d at 498. The business court found that evidence supports a probable right to recover on only one claim—SafeLease's claim "for tortious interference with valid, existing SafeLease contracts." 1Supp.CR52 at ¶ 6.

However, as a matter of law, SafeLease cannot recover on that claim if the alleged interference is within Storable's "own legal rights." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). If "the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense … and the motivation behind assertion of that right is irrelevant," even if the defendant acted with "actual malice." *Id.* at 211–212. Therefore, if Storable had a legal right to limit SafeLease's access to the FMS at issue, SafeLease has no probable right to recover. The subsections below show that Storable had a sufficient legal right to preclude access based both on its status as owner of the FMS and on the Terms of Use.

"Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Prudential Ins. Co. of Am. v. Fin. Review Services*, Inc., 29 S.W.3d 74, 81 (Tex. 2000). "Construction of a

contract is a question of law [that appellate courts] review de novo." *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020). For example, this Court may de novo review the business court's conclusion that the Terms of Use do not permit Storable to distinguish access by insurance vendors who are intent on selling their own product and overtax FMS with bots from access by other third parties such as accountants. CR930–931. Therefore, if this Court interprets the contract language discussed below as giving Storable the contractual right to block SafeLease's access to Storable's FMS, this Court should render judgment that SafeLease did not show a probable right to recover and therefore was not entitled to a temporary injunction.

Importantly, even if this Court determines Storable did not have a legal right to interfere, Storable cannot be liable for tortious interference if Storable had a "a good-faith claim to a **colorable** legal right, even though that claim ultimately proves to be mistaken." *Tex. Beef Cattle Co.*, 921 S.W.2d at 211 (emphasis added).

## B. *Storable has a legal right as a property owner to prevent SafeLease from accessing Storable's FMS.*

SafeLease admits that Storable owns the FMS at issue, and that Storable has never contracted with SafeLease to access those FMS. BC5RR285 (SafeLease's expert admitting the FMS at issue "are the property of Storable"); *see also* DC2RR127; BC3RR250; BC4RR43–44. SafeLease's

chief revenue officer also admitted that Storable has the right to charge for access to its FMS. BC4RR48.

"A property owner's right to exclude others from his or her property is recognized as one of the most essential sticks in the bundle of rights." *Marcus Cable Associates, L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002) (cleaned up). Therefore, Storable has a legal right to exclude SafeLease from accessing Storable's FMS when SafeLease has not agreed to the terms and price set by Storable. SafeLease refused to do so. This alone defeats SafeLease's tortious interference claim.

**C.** *The Terms of Use give Storable a contractual right to prevent the type of access SafeLease seized.*

The Terms of Use give Storable a contractual right to deny access in several circumstances SafeLease created.

**1.** **Storable has a right under the Terms of Use to block SafeLease's non-API access because it interfered with the integrity and performance of Storable's FMS.**

The Terms of Use permit Storable to block access that will "interfere with or disrupt the integrity or performance of the [FMS] Services or third-party data contained therein." CR398 ¶ 4.3(viii). The evidence demonstrated that SafeLease interfered with the integrity and performance of Storable's FMS and tenant data in several ways.

First, SafeLease's non-API access degraded performance of Storable's FMS. BC5RR196; DC2RR127. The Storable FMS servers that SafeLease used were not designed to handle the type of automated activity SafeLease unleashed, which can interfere with stability by causing outages. DC2RR252. SafeLease's automated access through user accounts burdens Storable's FMS more than automated access through an API because the former requires the FMS to load many elements unnecessary for automated processes, such as visual elements that would benefit only a human user. BC5RR259.

Second, SafeLease's method of access threatened the integrity of Storable's FMS by allowing SafeLease to take private identifying information about tenants, including tenants who were not SafeLease customers. DC2RR192. This information includes tenants':

- Phone numbers
- Driver's license numbers
- Names
- Home addresses
- Payment histories
- Move-in and move-out dates

DC2RR193–194; 256–257; BC3RR255. SafeLease admitted that Storable has a duty to protect tenant information. BC5RR88.

An API agreement could have selectively determined which fields SafeLease can see, whereas SafeLease's method of access allows it to see *all* information that facility operators can see. DC2RR252–253; BC3RR217. SafeLease requires operators to give SafeLease user accounts with full administrative access to Storable's FMS. BC4RR39–40. Storable considered this a serious security concern because it would allow one data breach at SafeLease to misappropriate accounts at thousands of facilities. DC2RR254, 256; BC5RR165. A competitor of Storable testified that APIs are safer. BC4RR224–225.

Third, unrebutted evidence showed that SafeLease's methods of accessing Storable's FMS caused problems that required technical support to intervene, such as SafeLease inputting decimals in a way that disrupts the FMS payment functions, or SafeLease running blanket automated processes that don't work for all facilities. BC5RR167; DX-37 at BC7RR1717; DX-40 at BC7RR1732; BC5RR239.

The above-described problems caused by SafeLease's access violate the Terms of Use's prohibition on impinging "the integrity or performance" of Storable's FMS or tenant data. DX-2 ¶ 4.3(viii) at BC7RR1279. Storable therefore had a legal right to block that access.

### 2. Storable has a right under the Terms of Use to block SafeLease's non-API access because SafeLease used that access for its own commercial purposes.

The Terms of Use explain that Storable gave facility operators a "non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed **solely** for *your* **internal** business purposes." DX-2, ¶ 4.1 at BC7RR1278 (emphasis added). The Terms of Use further tell operators they "may not, and you shall ensure your Users do not … sublicense … or otherwise commercially exploit" Storable's FMS. DX-2 ¶ 4.3 (ii) at BC7RR1278.

In addition, the Terms of Use mandated that "[a]ny use by a third party, affiliate, agent of customer, or any use to develop a commercial product, requires a separate third-party [Data Exchange Interface] DEI agreement." DX-2, ¶ 4.5 at BC7RR1279. An API agreement is a type of DEI agreement. DC2RR128; BC5RR71. SafeLease admitted that it is not a party to the Terms of Use, BC5RR70, which means that SafeLease is a "third party" and was therefore required to sign an access agreement.

In violation of these rules, SafeLease accesses Storable's FMS for *SafeLease's* business purposes, which are not "internal business purposes" of the facility operators, and without a DEI agreement. SafeLease admitted that its risk-management products are SafeLease's "commercial product."

BC5RR72. Storable has a contractual right to prevent SafeLease from using operators' logins to sell SafeLease's risk-management products and otherwise profit from tenants, which is distinct from access by an accountant who is accessing Storable's FMS solely to perform the operator's internal business. DC2RR126; BC5RR173.

This case is similar to *Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*, 49 S.W.3d 544 (Tex. App.—Austin 2001, pet. dism'd). In *Landry's*, Oyster subleased adjacent spaces to two restaurant operators named Waterfront and Stillwater. *Id.* at 546. The sublease with Waterfront stated that any restaurant in the adjacent space must be substantially different. *Id.* When Landry attempted to assume Stillwater's lease and operate its own restaurant in that space, Waterfront objected on the basis that the restaurant would not be substantially different. *Id.* Landry filed a tortious interference claim against Waterfront, who moved for summary judgment on the basis of justification. *Id.* The Court of Appeals affirmed summary judgment because Waterfront showed as a matter of law that its sublease gave it a basis to object. *Id.* at 547–552. Similarly, SafeLease's claim for tortious interference cannot succeed because the Terms of Use give Storable the right to object to inappropriate methods of accessing its FMS.

**D.** *Storable had a right under the Terms of Use to block SafeLease's non-API access because that access circumvented security measures and illegally gathered tenant information.*

The Terms of Use permit Storable to block users who "circumvent or disable any security or other technical features or measures of the [FMS]" or "engage in any illegal or deceptive trade practices." DX-2 ¶ 4.3(iv), (v) at BC7RR1278. SafeLease triggered this right by engineering several ways to circumvent restrictions on access to Storable's FMS. DC2RR195–196; BC4RR53–55.

SafeLease's petition revealed that "SafeLease was able to engineer a solution to restore access" after Storable blocked access on both November 6, 2024 and December 4, 2024. CR335. SafeLease also admitted that it created alternative user accounts, using Gmail addresses instead of SafeLease email addresses, specifically to circumvent security measures that Storable deployed in October 2024. BC4RR52–57; DX-359 at BC7RR3788; BC5RR112 (SafeLease's CEO testifying that non-SafeLease email addresses were used because of a concern that Storable would otherwise identify and block SafeLease accounts). On October 22, 2024, five days after acknowledging it received notice of Storable's new security initiative, SafeLease told operators: "SafeLease will be adding an additional administrative user to your account." DX-359 at BC7RR3788; BC5RR110–

111, 242. In January 2025, SafeLease asked operators to give it new user accounts as quickly as Storable blocked its existing accounts. BC5RR13. Storable's vice president of engineering described this behavior as "evasiveness," which is itself a violation of the Terms of Use's prohibition on circumvention, independent of whether SafeLease's ill-gotten access has already caused harm. BC5RR264.

SafeLease's method of access also interferes with the important security measure of identifying malefactors by looking for user behavior that is abnormal for the operator running that facility, such as logging in from a city in which the operator is not located. BC5RR247. This screening measure will not work if SafeLease employees are logging into accounts for facilities across the country.

Storable also had a right to protect against SafeLease's use of bots to collect private information without tenants' knowledge. This conduct constitutes "illegal or deceptive trade practices," DX-2 ¶ 4.3(iv)(v) at BC7RR1278, in part because it violates the Consumer Protection Against Computer Spyware Act's prohibitions on certain methods of collecting private information and deploying bots. TEX. BUS. & COM. CODE §§ 324.051, 324.055. DX-174 at BC7RR2580; BC5RR79–81.

In addition, because SafeLease's contracts with operators required illegal access and jeopardizing customer information, they are "void as against public policy." *Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014). Contracts that are "unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660, 665 (Tex. 1990) (holding unenforceability of noncompete was a defense against tortious interference).

### E. *At minimum, Storable demonstrated a good faith belief in a colorable right to deny access.*

The sections above explain why Storable had several legal bases to preclude SafeLease's access to Storable's FMS. At minimum, this shows that Storable had "a good-faith claim to a **colorable** legal right." *Tex. Beef Cattle Co.*, 921 S.W.2d at 211 (emphasis added).

Storable's CEO testified that he still believes that the Terms of Use give Storable the right to block SafeLease's method of access, in part because SafeLease's access delayed and destabilized Storable's FMS, and commercially exploited Storable's FMS to sell SafeLease's own commercial product. BC5RR 168. A presentation prepared for internal use at Storable six months before this litigation began explained that the way SafeLease used Storable's FMS violated Storable's Terms of Use agreements with operators.

DC2RR 102; *see also* BC4RR51–54 (showing that SafeLease violated Terms of Use requirement that *operators*, not vendors, set up user accounts). This shows Storable's good-faith belief.

The fact that others unaffiliated with Storable believe that SafeLease's method of access is impermissible demonstrates that Storable's right is at least "colorable." An unaffiliated FMS provider, U-Haul, blocked SafeLease from using the same method of access at issue in this appeal—access through user accounts created for SafeLease by operators. BC5RR76–77; DX-177 at BC7RR2686. U-Haul explained that this method of access violated the user agreement, and that risk-product vendors should get the information they need from operators, rather than through user accounts. *Id.* In addition, an unaffiliated risk-management-product vendor testified that it was not reasonable for SafeLease to access Storable's FMS without paying for an API, and that SafeLease's approach is to improperly "skirt the system" in a way that "creates a risk for the platform for Storable [and] for the end user." BC4RR233–234. This vendor also testified that SafeLease's approach is prohibited by contract. BC4RR261.

At minimum, the evidence established that Storable had a colorable right that precludes SafeLease from recovering for tortious interference.

## V. SafeLease's Unclean Hands Defeat Its Entitlement To The Equitable Remedy Of A Temporary Injunction.

"An applicant for a temporary injunction seeks extraordinary equitable relief in that he seeks to immobilize a person from a course of conduct which that person may have a legal right to pursue." *Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 341 (Tex. 1964). "It is well-settled that a party seeking an equitable remedy must do equity and come to court with clean hands." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). "The doctrine of unclean hands is applied to one whose own conduct in connection with the matter at issue has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." *Crown Const. Co., Inc. v. Huddleston*, 961 S.W.2d 552, 559 (Tex. App.—San Antonio 1997, no pet.).

SafeLease came to court with unclean hands because SafeLease deceptively and exploitatively created the emergency it now argues justifies a temporary injunction. SafeLease deliberately built its business model to rely on free access to Storable's FMS. BC4RR40–41; BC5RR62. SafeLease chose to not pay the higher API price, even though it can afford to do so, so that it could argue it would suffer "irreparable harm" rather than money damages. *See supra* Argument Section III.C (describing conclusive evidence of ability to pay). SafeLease also used deception to maneuver into its

allegedly precarious situation, such as lying to customers about being integrated with Storable's FMS through an API agreement, and circumventing Storable's security measures.[8] SafeLease also has unclean hands because of its forum shopping strategy described above. *See supra* Argument Section II.

This is the type of behavior that courts characterize as unclean hands. *See, e.g.*, *Truly*, 744 S.W.2d at 938 (the plaintiff had unclean hands because he contributed to "failure of the project" and "violated the reasonable expectations and values that permeate business transactions"); *Wynne v. Fischer*, 809 S.W.2d 264, 267 (Tex. App.—Dallas 1991, writ denied) (the plaintiff had unclean hands because he failed to pay taxes); *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 220–21 (Tex. App.—San Antonio 2003, no pet.) (plaintiff had unclean hands because it induced the construction that it now sought to enjoin).

---

[8]	BC4RR59 (SafeLease admitting "integrate" means to use an API so SafeLease should be "very, very careful whenever we are speaking to people to not use that term"); BC4RR69 (customer points out SafeLease lied by saying SafeLease "seamlessly integrates with SiteLink"); BC5RR113 (discussing DX-306 at BC7RR3614, in which operator says to SafeLease "feeling a bit tricked that this was going on as were signing up with you all. It was our understanding that you worked with Storable and had a contract with them."); *see supra* Argument Section IV.D (describing circumvention of security measures).

Storable argued unclean hands to the business court, but the Temporary Injunction fails to address unclean hands. BC3RR92–93; DC2RR58; CR252–253; CR747–755.

## VI. The Temporary Injunction Functions As A Mandatory Injunction Requiring Storable To Provide Services, And A Mandatory Injunction Requires Clear And Compelling Evidence.

"An injunction compelling affirmative action is known as a mandatory injunction—as distinguished from a traditional, prohibitive injunction that forbids status-quo-altering conduct." *Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 214–15 (Tex. App.—Fort Worth 2021, no pet.). Courts can only grant a mandatory injunction based on "a clear and compelling presentation of extreme necessity or hardship." *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 401 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

The Temporary Injunction is framed as enjoining Storable from preventing access to its FMS. 1SuppCR47. However, since Storable is the entity that runs Storable's FMS, this functions as a *mandatory* injunction because it requires Storable to not only extend Storable's software licenses to encompass SafeLease but also provide sufficient computing power from Storable's servers. *See supra* Argument Section IV.C.1 (describing burden on Storable's servers). Therefore, even if SafeLease had provided some evidence

to support all elements required for a temporary injunction, which it did not, it would not have satisfied the higher bar for a mandatory injunction.

## **<u>PRAYER</u>**

For these reasons, Appellants request that this court reverse the Remand Denial, dissolve the Temporary Injunction, and remand this case to the district court from which it was removed. Appellants also pray for such further relief to which they may justly be entitled.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: */s/ Dale Wainwright*
    Dale Wainwright
    State Bar No. 00000049
    Dale.wainwright@gtlaw.com
    Justin Bernstein
    State Bar No. 24105462
    justin.bernstein@gtlaw.com300
    West 6th Street, Suite 2050
    Austin, Texas 78701
    T: (512) 320-7200
    F: (512) 320-7210

    COUNSEL FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of TEX. R. APP. P. 9.4(i)(3) because this brief consists of 13,367 words as determined by Microsoft Word Count, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Dale Wainwright*
Dale Wainwright

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on counsel of record by using the Court's CM/ECF system on the 17th day of April 2025.

*/s/ Dale Wainwright*
Dale Wainwright

## APPENDIX

| Tab # | Description |
|-------|-------------|
| 1. | February 10, 2025 Opinion and Order denying Defendants' motion to remand. CR747–755. |
| 2. | SafeLease's Notice of Removal. CR5–14. |
| 3. | March 11, 2025 Amended Order Granting Temporary Injunction, signed March 11. 1SuppCR40–48 |
| 4. | March 11, 2025 Memorandum Opinion and Order regarding objections. 1Supp.CR49–57 |
| 5. | March 24, 2025 Order on Motion for Clarification. 1Supp.CR112–115 |
| 6. | TEX. GOV'T CODE § 25A.006 (containing deadline for removal) |
| 7. | Email from Judge Mangrum's briefing attorney stating "The Temporary Injunction is DENIED." CR700 |
| 8. | Terms of Use for Storable's FMS. 7BCRR at DX-1, DX-2, DX-3 |
| 9. | Amended Notice of Appeal. 1SuppCR167–168 |
| 10. | Redline comparing temporary injunction proposed by SafeLease to amended temporary injunction signed by the business court |
| 11. | SafeLease's March 11, 2025 letter regarding new customers. SCR65–67 |

# TAB 1

2025 Tex. Bus. 6



# The Business Court of Texas,
# Third Division

SAFELEASE INSURANCE
SERVICES LLC,

§
§
§
§

*Plaintiff,*

§ Cause No. 25-BC03A-0001

v.

§
§

STORABLE, INC., et al.,

§
§

*Defendants.*

§

## OPINION AND ORDER

¶1    Before the Court is a motion to remand filed by defendants Storable, Inc., RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively, Defendants). Having considered the arguments of the parties and the governing law, the Court **DENIES** the motion to remand. The Court holds that (1) the deadline for removing an action does not begin running before the action is filed, and (2) a party need not seek damages for an action to meet this Court's jurisdictional amount-in-controversy requirements.

1

0747

**Background**

¶2     This suit arises out of a dispute between plaintiff SafeLease Insurance Services LLC (SafeLease), which provides insurance for self-storage facilities, and Defendants, who license facility-management software (FMS) to such facilities. The dispute centers on SafeLease's access to information maintained on Defendants' software by self-storage facilities, which SafeLease uses in providing insurance to those facilities or their individual customers. Until recently, SafeLease accessed the software as an authorized user on its customers' accounts, meaning that it did not have a separate access agreement with Defendants.

¶3     In late 2024, Defendants began restricting SafeLease's access to one of its three FMS platforms, storEDGE. The parties disagree as to the impetus of these actions: SafeLease alleges that Defendants are seeking to drive it out of the self-storage insurance market to benefit Defendants' own insurance products, while Defendants counter that they are enforcing their software's terms of agreement and mitigating security threats posed by SafeLease's misuse of their software.

¶4     SafeLease sued Defendants in the 345th District Court in Travis County on December 30, 2024. SafeLease sought a temporary restraining order (TRO) and injunctive relief to compel Defendants to restore SafeLease's authorized-user access to storEDGE and prohibit Defendants from removing or restricting SafeLease's access to storEDGE or Defendants' other two FMS platforms, SiteLink

2

0748

and Easy Storage Solutions (ESS). The District Court granted (and later extended) the TRO but denied the temporary injunction (TI) on January 21, 2025, after an evidentiary hearing. Defendants then locked SafeLease out of all three of its FMS platforms. On January 28, SafeLease amended its petition to add allegations about Defendants' post-injunction actions and new tortious-interference claims.

¶5    SafeLease removed the action to this Court the next day, again seeking a TRO and TI to protect its access to the information on Defendants' software while the suit is pending. The Court denied the TRO on January 30 and set the TI for hearing on February 11. In the meantime, Defendants moved to remand the case. It is to that motion that the Court now turns.

## Analysis

¶6    Defendants assert that the Court must remand for two reasons: first, removal was untimely because it was not filed within 30 days of when SafeLease "discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action," which Defendants assert occurred before the lawsuit was filed; second, the action does not meet the Court's jurisdictional amount-in-controversy requirements because the action seeks only equitable relief and not money damages. Both arguments fail.

3

## A.   SafeLease's removal was timely.

¶7   Under Section 25A.006 of the Government Code and Texas Rule of Civil Procedure 355, if an action filed in a district court or county court at law is within the Business Court's jurisdiction and venue, a party can remove the action to the Business Court by timely filing a notice of removal in both courts.[1] A notice of removal is timely if it is filed within 30 days after (a) the party "discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action" or (b) a TI is granted or denied, if the TI application was pending when the party "discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action."[2]

¶8   Defendants do not dispute that SafeLease filed its notice of removal within 30 days of filing suit and just over a week after the district court denied the TI application filed with the suit. But Defendants argue that SafeLease "discovered, or reasonably should have discovered" the facts that give the Court jurisdiction over the action well before SafeLease filed suit. Defendants provide no evidence for their assertions but contend that SafeLease's pleadings establish that SafeLease knew all the relevant facts before filing suit, meaning it had notice of those facts more than 30 days before the January 29 notice of removal.

---

[1] TEX. GOV'T CODE § 25A.006(d)–(f); TEX. R. CIV. P. 355.

[2] TEX. R. CIV. P. 355(c)(2); *see also* TEX. GOV'T CODE § 25A.006(f)(1).

4

0750

¶9    The Court holds that the 30-day removal deadlines in Section 25A.006 and Rule 355 do not begin running before the lawsuit is filed. Both the statute and the rule pivot on the discovery of facts "establishing the business court's jurisdiction to hear *the action*."[3] Before suit is filed, there is no "action" for the court to have authority over.[4] When undefined,[5] the Texas Supreme Court[6] and this Court[7] have construed the term "action" to refer to a lawsuit or judicial proceeding generally and the term "claim" to refer to an individual theory of liability or cause of action asserted within a lawsuit.[8] Consistently, the Texas Business Court has held

---

[3] TEX. GOV'T CODE § 25A.006(f)(1) (emphasis added); *see also* TEX. R. CIV. P. 355(c)(2) (using same language except term "authority" is substituted for "jurisdiction").

[4] *Tema Oil & Gas Co. v. ETC Field Servs., LLC*, 2024 Tex. Bus. 3 at ¶ 15, 2024 WL 5337411, at *3 (Tex. Bus. Ct. Nov. 6, 2024); *C Ten 31 LLC ex rel. Summer Moon Holdings LLC v. Tarbox*, 2025 Tex. Bus. 1 at ¶¶ 26–27, 2025 WL 224542, at *7 (Tex. Bus. Ct. Jan. 3, 2025).

[5] When these terms are defined by the statute, the Texas Supreme Court employs the definition given. *E.g.*, *Montelongo v. Abrea*, 622 S.W.3d 290, 300 (Tex. 2021) ("By defining 'legal action' to include not just 'lawsuits,' 'petitions,' 'pleadings,' and 'filings,' but also 'causes of action,' 'cross-claims,' and 'counterclaims,' the Act permits a party to seek dismissal within sixty days after service of a cause of action or claim, even if it's not 'early' in the litigation.").

[6] *See Off. of the Att'y Gen. of Tex. v. C.W.H.*, 531 S.W.3d 178, 183 (Tex. 2017) (quoting *Jaster* and *Thomas* for meaning of "action"); *Jaster v. Comet II Constr., Inc*, 438 S.W.3d 556, 563–64 (Tex. 2014) ("The common meaning of the term 'action' refers to an entire lawsuit or cause or proceeding, not to discrete 'claims' or 'causes of action' asserted within a suit, cause, or proceeding."); *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) (distinguishing between lawsuits and causes of action in interpreting "health care liability claim"); *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995) ("The term 'action' is generally synonymous with 'suit[.]'"); *see also Montelongo*, 622 S.W.3d at 301.

[7] *C Ten*, 2025 Tex. Bus. 1 at ¶¶ 25–31, 2025 WL 224542, at *7–9.

[8] Thus, this analysis is distinct from limitations analyses, which focus on when an individual claim accrued—something that can and typically does occur before suit is filed.

5

0751

that "[a] civil action is a lawsuit."[9] A civil suit, or action, is "commenced by a petition filed in the office of the clerk."[10] This Court had no jurisdiction or authority to decide this "action" before it came into existence, which occurred when the petition was filed. Because SafeLease filed its notice of removal within 30 days of when it filed suit and within eight days of the district court's TI ruling, the notice was timely.

¶10    In addition to being consistent with a plain reading of the statutory text, this outcome avoids a host of practical difficulties with Defendants' approach. Under Defendants' theory, the 30-day deadline begins running when the parties have knowledge of the underlying facts that give rise to claims that fall within this Court's jurisdiction. If that were the case, the removal window could begin *and end* before a plaintiff files suit—*even for other parties*. Section 25A.006 and Rule 355 apply the same deadline to any "party" seeking to remove an action to this Court.[11] A defendant with knowledge of the jurisdictional facts would have no opportunity to timely remove a case if the plaintiff waited more than 30 days to file suit.[12] The

---

[9] *Tema*, 2024 Tex. Bus. 3 at ¶ 15, 2024 WL 5337411, at *3; *C Ten*, 2025 Tex. Bus. 1 at ¶¶ 26–27, 2025 WL 224542, at *7; *Sebastian v. Durant*, 2025 Tex. Bus. 4 at ¶ 16, 2025 WL 394634, at *2 (Tex. Bus. Ct. Feb. 4, 2025).

[10] TEX. R. CIV. P. 22.

[11] *See* TEX. GOV'T CODE § 25A.006(f)–(j); TEX. R. CIV. P. 355.

[12] Defendants argue that this will not occur because defendants will not know the amount of plaintiffs' damages or what claims they will bring. But it is plausible that there will be circumstances in which a defendant knows, or reasonably should know, what kinds of claims the plaintiff intends to

6

0752

extended deadline for pending TI applications could likewise never apply when the underlying facts were known before suit was filed.[13]

¶11 Defendants assert that allowing a plaintiff to file suit in one forum then remove to another forum 30 days later enables forum shopping, which is what they contend SafeLease did here. But the Legislature chose to authorize removal by "[a] party,"[14] rather than limiting removal to "defendants" as in the federal removal statute.[15] This plainly enables removal by plaintiffs even though they also chose the original venue. To the extent the process can be abused for forum shopping, that risk is present in other Texas procedures, such as the plaintiff's right to nonsuit, and Texas law has mechanisms for addressing it.[16] And regardless, this Court must effectuate the statute as written and will not second guess the policy determinations made by the Legislature—the body duly elected to make such policy decisions.[17]

---

assert and the extent of the damages—including, for example, when the parties engaged in pre-suit settlement discussions.

[13] *See* TEX. GOV'T CODE § 25A.006(f)(2); TEX. R. CIV. P. 355(c)(2)(B).

[14] TEX. GOV'T CODE § 25A.006(d); *see also* TEX. R. CIV. P. 355(a).

[15] 28 U.S.C. §§ 1441(a), 1446(a).

[16] *See, e.g.*, TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001(1); *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (upholding sanctions against counsel who filed seventeen nearly identical cases, and then nonsuited sixteen of them, for the purpose of securing a particular forum); *In re Boehme*, 256 S.W.3d 878, 883 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *In re Bennett* for the proposition that "attorneys who abuse the legal process—as through improper forum-shopping—may be sanctioned").

[17] *See, e.g.*, *Bexar Appraisal Dist. v. Johnson*, 691 S.W.3d 844, 857 (Tex. 2024) ("[W]e do not ignore a statute's text to impose our own judicial meaning to reach a certain result, even if [] we[] think the statute unwise. Instead, we must refrain from rewriting text that lawmakers chose." (internal citations and quotation marks omitted)).

7

0753

**B.** **The amount in controversy in this case meets the Court's jurisdictional threshold.**

¶12    SafeLease alleges that this case falls within this Court's jurisdiction under Section 25A.004(b), (d), and (e) of the Texas Government Code and that the amount in controversy exceeds the $5 million and $10 million minimums under those provisions.[18] Defendants do not attempt to disprove SafeLease's specific factual allegations; instead, they contend that SafeLease cannot meet the monetary thresholds because it does not seek an award of damages. The Court disagrees. As both the Texas Supreme Court and this Court have recognized, "the phrase 'amount in controversy,' in the jurisdictional context, means 'the sum of money *or the value of the thing* originally sued for[.]'"[19] Accordingly, both the Texas Supreme Court and this Court have held that actions in which damages were not sought nevertheless could satisfy jurisdictional amount-in-controversy minimums.[20]

¶13    Defendants rely on *Medina v. Benkiser*, a case out of the First Court of Appeals in Houston, to argue that a claim for damages is the only way to satisfy

---

[18] For example, SafeLease alleges that the action puts at risk the entire $140 million value of its business and $600 million worth of insurance contracts.

[19] *Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 361–62 (Tex. 2000) (emphasis in original) (quoting *Gulf, C. & S.F.Ry. Co. v. Cunnigan,* 95 Tex. 439, 441, 67 S.W. 888, 890 (1902)); *see also C Ten*, 2025 Tex. Bus. 1 at ¶ 32, 2025 WL 224542, at *9.

[20] *Tune*, 23 S.W.3d at 362 (holding that appeal from denial of concealed-handgun license satisfied amount-in-controversy requirement because of value of rights at issue); *Tex. Dep't of Public Safety v. Barlow*, 48 S.W.3d 174, 176 (Tex. 2001) (holding that appeal from suspension of driver's license satisfied amount-in-controversy requirement because of value of rights at issue); *C Ten*, 2025 Tex. Bus. 1 at ¶ 32, 2025 WL 224542, at *9 (holding that amount-in-controversy requirement may be met in injunctive and declaratory action).

8

0754

amount-in-controversy minimums.[21] But *Medina* is distinguishable—it dealt with whether a statutory county court at law had jurisdiction to decide an injunctive suit arising under the Election Code.[22] The relief sought related to the procedures a political party would follow at its state convention, and there was no discussion of any argument that the rights sued for had any monetary value.[23] Even if *Medina* were not distinguishable, however, this Court is bound to follow Texas Supreme Court precedent.[24]

### Conclusion

¶14    The Court concludes that SafeLease's notice of removal was timely and Defendants have not shown that the amount-in-controversy falls below the Court's jurisdictional minimums. Defendants' motion to remand is therefore DENIED.

SIGNED ON: February 10, 2025.

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

---

[21] 262 S.W.3d 25 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

[22] *Id.* at 26–27.

[23] *See id.*

[24] Texas courts of appeals have likewise considered the value of non-monetary relief in determining whether an amount-in-controversy threshold is met. *See, e.g.*, *Harris v. State*, 402 S.W.3d 758, 763 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *In re Commitment of Richards*, 202 S.W.3d 779, 789–90 (Tex. App.—Beaumont 2006, pet. denied).

9

0755

# TAB 2

E-filed in the Office of the Clerk
for the Business Court of Texas
1/29/2025 6:31 PM
Accepted by: Beverly Crumley
Case Number: 25-BC03A-0001

No. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| Plaintiff, | § § | |
| v. | § | THIRD DIVISION |
| | § | |
| STORABLE, INC., et al., | § § | |
| Defendants. | § § | TRAVIS COUNTY, TEXAS |

## NOTICE OF REMOVAL TO THE TEXAS BUSINESS COURT

Pursuant to Texas Rule of Civil Procedure 355 and Texas Government Code § 25A.006, Plaintiff SafeLease Insurance Services LLC ("SafeLease") submits this Notice of Removal to the Texas Business Court and hereby removes this action to the Texas Business Court, Third Business Court Division. Defendants do not agree to this removal.

Texas Government Code § 25A.006 provides that "[a] party to an action filed in a district court or county court at law that is within the jurisdiction of the business court may remove the action to the business court." Likewise, Texas Rule of Civil Procedure 355 provides that "[a] party to an action originally filed in a district court or county court at law may remove the action to the business court by filing a notice of removal" in both "the court from which removal is sought" and "the business court."

As required by Rule 355(b)(3), this Notice "contain[s] a copy of the district court's or county court at law's docket sheet and all process, pleadings, and orders in the action," attached hereto as an Appendix and transmitted concurrently to both courts.

As explained below, this Notice satisfies all the requirements for removal under Texas law.

## I.    The Business Court Has Authority to Hear this Action.

The Business Court has authority to hear this action and jurisdiction over this case. *See* Tex. R. Civ. P. 355(b)(2)(A). It is appropriate to consider all pleadings in a case, including petitions, answers, and the notice of removal, in assessing the removing party's pleading burden. *C Ten 31 LLC ex rel. Summer Moon Holdings LLC v. Tarbox*, No. 24-BC03A-0004, 2025 WL 224542, at *10 (Tex. Bus. Ct. Jan. 3, 2025) (Andrews, J.) ("As the United States Supreme Court has observed, it would be 'anomalous' to treat the jurisdictional allegations in a complaint differently than from those in a notice of removal."). And Texas courts examine the amount in controversy by looking to the value of the rights at issue, not just to the amount that a party seeks as damages, if any. *See id.* at *5, *9-10 (quoting *Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 361–62 (Tex. 2000)).

The Second Amended Petition, hereby incorporated by reference, alleges that Defendants are violating the Texas Antitrust Act. Through several monopolistic exercises of their market power in the market for self-storage facility management software—where Defendants have a dominant market share—Defendants are excluding competition in the market for tenant insurance for independent self-storage facilities—a market in which Defendants and Plaintiff are competitors. These acts range from Defendants demanding that Plaintiff pay prices many times higher than competitive market prices to access Defendants' facility management software to Defendants unilaterally disabling authorized customer accounts that share the customer's information with Plaintiffs. These anticompetitive actions are deliberately designed to extort, cripple, or exclude Plaintiff to strengthen Defendants' presence in the market for tenant insurance for independent self-storage facilities. This behavior violates state antitrust law.

Moreover, these same facts constitute tortious interference with both Plaintiff's existing contracts and Plaintiff's prospective business relationships. As a result of Defendants' intentional

2

and deliberate efforts to exclude Plaintiff and capture additional insurance customers by leveraging Defendants' market power in self-storage facility management software, existing and prospective customers are being forced to breach their agreements with Plaintiff, to abandon their contracts with Plaintiff, and to forego business opportunities that would have been consummated but for Defendants' tortious and anticompetitive conduct.

Several measurements of the amount in controversy could be relevant, but all of them exceed the jurisdictional minimums for the Business Court because Defendants' anticompetitive behavior threatens massive financial consequences. The value of the insurance coverage that is imminently at risk because of Defendants' actions exceeds $600 million. Plaintiff's entire enterprise is jeopardized by Defendants' unlawful conduct; a recent independent, third-party valuation has placed the enterprise value of Plaintiff's business at approximately $140 million.

Even considering only Defendants' most recent conduct, since January 21, 2025, their anticompetitive behavior has threatened many tens of millions of dollars in damages or loss. Plaintiff estimates that it has been cut off from servicing its customers for at least 275,906 individual coverage plans. *See* 2d Am. Pet. ¶ 45. Of these, Defendants have permanently cut off SafeLease from servicing approximately 45,000 tenants, resulting in a loss of approximately $6.5 million in total contract value annually, *cf. id.* ¶ 60, and Defendants have indicated that they will not be willing to restore access to these accounts at any price.

The remaining plans account for approximately $33 million in total contract value annually. Defendants are willing to restore access, they claim, only if Plaintiff pays an extortionate software fee of $1.00 or $1.50 per month per unit (the price difference depends solely on whether the unit switched to SafeLease from Defendants' insurance business). This fee is vastly more costly than what other vendors have been paying. Assuming 230,000 affected coverage plans at the

3

lowest price of $1.00 per unit (an overly conservative estimate), Defendants have threatened Plaintiff with approximately $2.75 million in anticompetitive and monopolistic rents per year indefinitely. Additional actual damages from Defendants' conduct over the past week, to the extent they can be measured, will surely be much higher.

On these facts, jurisdiction is proper in the Texas Business Court on several independent grounds. By any measure of damages and of the rights at issue in this litigation, both the $5 million and $10 million thresholds for Texas Business Court jurisdiction are satisfied. *See* Tex. Gov't Code § 25A.004(b), (d). Because Defendants' conduct constitutes an illegal anticompetitive scheme that violates the Texas Business and Commerce Code, this litigation constitutes "an action in which a claim under a state or federal securities or trade regulation law is asserted against . . . an organization," conferring jurisdiction at the $5 million threshold. *Id.* § 25A.004(b)(3). Likewise, this litigation also constitutes "an action that arises out of a violation of the . . . Business & Commerce Code by an organization or an officer or governing person acting on behalf of an organization other than a bank, credit union, or savings and loan association," conferring jurisdiction at the $10 million threshold. *Id.* § 25A.004(d)(3). Moreover, this dispute also entails "qualified transactions," establishing yet a third basis for jurisdiction. *Id.* § 25A.004(d)(1); *see id.* § 25A.001(14) (defining qualified transactions to include those "with an aggregate value of at least $10 million").

The Texas Business Court also has the express power to grant the injunctive relief that Plaintiff seeks. *Id.* § 25A.004(e) ("The business court has civil jurisdiction concurrent with district courts in an action seeking injunctive relief . . . involving a dispute based on a claim within the court's jurisdiction under Subsection (b), (c), or (d)."); *see also C Ten*, 2025 WL 224542, at *8-9

4

(differentiating between the words "action" and "claim" and holding that the amount-in-controversy is evaluated based on the action as a whole rather than a claim-by-claim basis).

For at least these reasons, jurisdiction in the Texas Business Court is proper.

**II.     Venue is Proper in the Third Business Court Division.**

Venue is proper within Travis County and, therefore, in the Third Business Court Division. *See* Tex. R. Civ. P. 355(b)(2)(B). This case was originally filed in Travis County District Court, where venue is proper because the principal place of business for Plaintiff and most Defendants is in Austin, Texas. *See* 2d Am. Pet. ¶¶ 15-22; Ans. ¶¶ 3-6. This case concerns Defendants' conduct that was planned and carried out within Travis County, regarding companies operating or controlled out of Travis County, and affecting businesses and residents of Travis County and the entire State of Texas. Moreover, no Defendant has asserted that venue is improper in Travis County. Accordingly, venue is proper in the Third Business Court Division. *See* Tex. Gov't Code § 25A.003(e); *id.* § 74.042(d).

**III.    Removal is Timely.**

When "all parties have not agreed to remove the action, the notice of removal must be filed" within one of two timeframes. Tex. R. Civ. P. 355(c)(2); *accord* Tex. Gov't Code § 25A.006(f). First, a notice of removal is timely if it is filed "within 30 days after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action." Tex. R. Civ. P. 355(c)(2)(A); *accord* Tex. Gov't Code § 25A.006(f)(1). Second, "if an application for temporary injunction is pending on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action," a notice of removal is timely if it is filed "within 30 days after the date the application is granted, denied, or denied by

5

operation of law." Tex. R. Civ. P. 355(c)(2)(B); *accord* Tex. Gov't Code § 25A.006(f)(2). Both timeframes are satisfied here.[1]

Plaintiff filed this action in Travis County District Court on December 30, 2024. In the same filing, Plaintiff submitted an application for a temporary restraining order and a temporary injunction. The temporary restraining order was granted on December 31, 2024, and was subsequently extended to January 21, 2025, when it expired on its own terms. On January 15, 2025, Defendants filed an answer, affirmative defenses, and response to the application for temporary injunction, and for the first time asserted counterclaims. A temporary injunction hearing was held on January 16, 2025. That request remained pending until the Court denied the request for temporary injunction in an email notice from its clerk dated January 21, 2025. On January 28, 2025, Plaintiff filed its Second Amended Petition alleging material new facts and changed circumstances, as well as asserting new causes of action.

Removal is timely several times over. The additional new facts and changed circumstances that Plaintiff asserts in the Second Amended Petition, which occurred within the past 8 days, amply justify the jurisdiction of the Business Court. Even if the original Petition could have been filed in the Business Court, this Notice is filed within 30 days of that pleading. Moreover, Plaintiff's application for temporary injunction was filed concurrently with the original Petition, and it remained pending until the Court's ruling on January 21, 2025, fewer than 30 days prior to the filing of this Notice. Finally, Defendants asserted their counterclaims against Plaintiff on January

---

[1] Rule 355 and the Texas Government Code make no distinction between plaintiffs and defendants for purposes of removal to the Business Court—any party may remove a case. *See* Tex. Gov't Code § 25A.006(d) (allowing removal by "[a] party to an action"); *accord* Tex. R. Civ. P. 355(c)(2).

0010

15, 2025, only 14 days prior to this Notice. Accordingly, Plaintiff's Notice of Removal is timely under any standard.

## CONCLUSION

For the foregoing reasons, Plaintiff hereby removes this case from the Travis County District Court for the 345th Judicial District to the Texas Business Court, Third Business Court Division, and notifies all parties and counsel of record.

Dated: January 29, 2025                Respectfully submitted.

*/s/ Christopher D. Hilton*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Alexander M. Dvorscak
Texas Bar No. 24120461
**STONE HILTON PLLC**
600 Congress Ave.
Austin, TX 78748
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
alex@stonehilton.com

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

***Counsel for Plaintiff***

7

**CERTIFICATE OF CONFERENCE**

I hereby certify that on January 29, 2025, Plaintiff's counsel contacted Defendants' counsel via email to inquire whether Defendants would agree to remove this case to the Texas Business Court. Counsel for Defendants responded and did not agree to removal.

/s/ Christopher D. Hilton
Christopher D. Hilton


**CERTIFICATE OF SERVICE**

I hereby certify that this document was served on all counsel of record for Defendants via the Court's electronic filing service on January 29, 2025 in accordance with the Texas Rules of Civil Procedure.

/s/ Alexander M. Dvorscak
Alexander M. Dvorscak

0012

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bonnie Chester on behalf of Christopher Hilton
Bar No. 24087727
accounts@stonehilton.com
Envelope ID: 96767239
Filing Code Description: Notice of Removal to Business Court
Filing Description: 20250129_Notice of Removal_Business Ct
Status as of 1/30/2025 7:58 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Ray T.Torgerson | | rtorgerson@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Neil Kenton Alexander | | ken.alexander@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Jonna N.Summers | | jsummers@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bonnie Chester on behalf of Christopher Hilton
Bar No. 24087727
accounts@stonehilton.com
Envelope ID: 96767239
Filing Code Description: Notice of Removal to Business Court
Filing Description: 20250129_Notice of Removal_Business Ct
Status as of 1/30/2025 7:58 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Elizabeth Eoff | | leoff@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Lakshmi N.Kumar | | lkumar@porterhedges.com | 1/29/2025 6:31:35 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 1/29/2025 6:31:35 PM | ERROR |
| Alexander Dvorscak | | alex@stonehilton.com | 1/29/2025 6:31:35 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 1/29/2025 6:31:35 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 1/29/2025 6:31:35 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 1/29/2025 6:31:35 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 1/29/2025 6:31:35 PM | SENT |

# TAB 3

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, *Plaintiff,* v. STORABLE, INC., et al., *Defendants.* | § § § § § § § § | Cause No. 25-BC03A-0001 |

**AMENDED ORDER GRANTING TEMPORARY INJUNCTION**

On this day, the Court considered the Application for Temporary Injunction and, in the Alternative, Motion for Reconsideration (the Application) filed by plaintiff SafeLease Insurance Services LLC (SafeLease) against defendants Storable, Inc. (Storable), RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively, Defendants). After due notice, the parties appeared in person and by counsel for an evidentiary hearing commencing on February 11, 2025 (the TI Hearing). After considering the Application, evidence presented, arguments of counsel, and papers on file, the Court finds that a Temporary Injunction is necessary to preserve the status quo and prevent irreparable injury, loss, or damage. The Court grants the Application.

The Court makes the findings and conclusions below based on the evidence presented at the TI Hearing and the parties' filings properly before the Court. The Court recognizes that the case is in its early stages, discovery is still ongoing, and the evidence presented at future stages of the case (including summary judgment and trial) may differ from the evidence presented at the TI hearing and could support different findings and conclusions.

1. SafeLease has pleaded and proved the elements required for temporary injunctive relief: a valid cause of action against Defendants; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim.

0040

2.      SafeLease has properly pleaded valid causes of action against Defendants in the Second Amended Petition ("Petition") for violations of the Texas Antitrust Act, tortious interference with existing contracts, and tortious interference with prospective business relations. The Petition gives fair and adequate notice of the facts upon which SafeLease bases its claims.

3.      The evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with valid, existing SafeLease contracts.[1] Defendants reasonably do or should know that these contracts involve providing tenant-insurance services that require SafeLease to access and use certain customer-owned data within the processes of the FMS systems that customers license from Defendants and expressly authorize and enable SafeLease to access and use, as required by their agreements with SafeLease. FMS systems licensed from Defendants are critical to customers to maintain and access their data, which is not readily or effectively accessible otherwise. Under the terms of their contracts with Defendants, customers are entitled to designate third-party contractors as authorized users to access and use this customer data within the processes of the FMS systems to assist customer operations. Defendants' actions are calculated to impede, prevent, and interfere with performance of these contract rights by preventing SafeLease's access to customer-owned data on customers' FMS systems. Defendants reasonably do or should know that their actions impede, prevent, and interfere with performance of these customer contracts, proximately causing harm and loss to SafeLease and its business, operations, reputation, and goodwill.

---

[1] *See, e.g.*, *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024) (observing that party's showing of probable right to relief at temporary-injunction stage "does not mean that the party obtaining temporary relief will prevail on the merits based on a fully developed record" and conversely, failure to demonstrate probable right to temporary relief does not mean party will not prevail at trial); *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953) ("To warrant the issuance of the writ [of temporary injunction], the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation.").

4. Defendants intentionally interfere with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means, including by blocking SafeLease from accessing customer-owned data within the processes of their licensed FMS systems—a marked change from Defendants' past practices; by using their position in the FMS market to prevent and impede SafeLease from providing services to customers in the tenant insurance market; and by making false or misleading representations about SafeLease to mutual customers regarding misuse of sensitive customer data, use of malicious code and processes, and the risks to cybersecurity.

5. The evidence failed to show that SafeLease misused or improperly disclosed customer data; that SafeLease used spybots, engaged in hacking, or introduced or attempted to introduce malicious code or viruses; that SafeLease overloaded Defendants' FMS system, causing a crash, outage, or otherwise interfered with or interrupted the performance or integrity of the FMS systems; that SafeLease accessed customer data in a manner not authorized by the customer; or that SafeLease's access and use of its customers' data on FMS systems licensed by Defendants materially increased the risk of a security breach beyond what it otherwise was. The evidence presented by Defendants to support these claims was not credible, and SafeLease's controverting evidence was credible. While there was evidence that SafeLease used automated processes, or "bots," to conduct its business, evidence from both sides showed that "bots" can be good bots or bad bots, and the evidence did not show that SafeLease's automated processes were harmful. The evidence also did not establish that SafeLease caused Defendants' SiteLink or storEDGE FMS systems to crash or have an interruption of services. While there was some evidence indicating that Defendant's Easy Storage Solutions (ESS) FMS Platform may have crashed in April 2024,

0042

for which Defendants blamed SafeLease, there was conflicting evidence as to whether a crash or outage actually occurred and insufficient evidence that SafeLease was a sole or principal cause.

6.	The evidence fails to show that Defendants' actions are justified or privileged.[2]

7.	Storable's Terms of Service authorize customers to "designate and authorize as many Users as you wish under the Agreement." These Terms of Service specify that a User "may include . . . consultants, contractors and agents, and third parties with which you transact business." Storable asserts that customers' designation of SafeLease, and possibly any insurance provider, as an authorized user violates the Terms of Service. Storable also asserts that it could amend their Terms of Service at any time, such as to preclude customers from designating insurance providers as authorized users. But Defendants admit that they have not changed their Terms of Service or informed their customers that they are allegedly in breach of the Terms of Service or otherwise attempted to enforce their alleged contractual rights against the customers themselves. After SafeLease made a public statement to mutual customers, Storable communicated to customers that "this is not your problem" and that its actions were motivated by data privacy and the threat that SafeLease allegedly posed to the stability of Defendants' platforms. As discussed above, the evidence presented at the temporary-injunction hearing does not support these claims.

8.	Storable asserts that the Terms of Service for SiteLink and storEDGE require that "any use to develop a commercial product requires a separate third-party DEI [Data Exchange Interface] agreement." The evidence presented at the temporary-injunction hearing does not show that SafeLease was using SiteLink or storEDGE to develop a commercial product.

---

[2] Justification or privilege is an affirmative defense on which Defendants bear the burden of proof. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex. 2000); *ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997).

0043

9. While the evidence does establish that SafeLease needs access to the customer data on the FMS platforms to perform insurance services for the parties' mutual customers, the evidence establishes that the same is generally true for other third-party vendors that customers designate as authorized users on the FMS platforms, and Defendants agree that designation of other vendors, such as accountants, does not violate their terms of services. Defendants attempt to distinguish accountants, as authorized users, from insurance providers (like SafeLease), as authorized users, based on the extent of use, but the Terms of Service do not draw such a distinction.

10. The evidence shows that Defendants' actions are not motivated by any alleged breach of their Terms of Service.

11. Defendants assert justification or privilege based on an alleged right to prevent "free riders" on their services. The evidence at the hearing shows that Defendants are paid for their services by their customers, that their customers are authorized to designated third-party vendors as authorized users, and that the customers in question have designated SafeLease as an authorized user. Additionally, Defendants have not identified, and the Court has not found, any authority holding under what circumstances, if ever, an alleged right to prevent free riders constitutes a justification or privilege defeating a tortious-interference claim under Texas law.

12. The evidence shows that SafeLease will incur a probable, imminent, and irreparable injury absent injunctive relief before trial of this case. Beginning in 2021, it routinely accessed customer-owned data within the processes of their FMS systems licensed from Defendants with express customer permission for such access and use. This access was through the graphical user interface as an authorized user, consistent with the customers' own access and their rights to appoint authorized users. On December 17, 2024, Defendants cut off SafeLease from access to Defendants' storEDGE system, which was restored through a temporary restraining order. After

- 5 -

0044

January 21, 2025, Defendants cut off SafeLease from access to all three of their FMS systems and revoked access granted to SafeLease by the parties' mutual customers. Without access to customer-owned data within the processes of these customer FMS systems, SafeLease's ability to service customers is wholly or significantly impaired. Among other services, SafeLease is prevented from or impeded in issuing contracted-for new or renewed policies to customers, providing timely and effective lease compliance services, amending lease documentation for tenant protection plans, processing opt-out tenants with separate coverage, providing timely and accurate insurance data visualization services, issuing required tenant notices or billing, and promptly and fully adjusting tenant claims for loss.

13. The evidence shows that Defendants intend to continue to refuse to allow SafeLease to access customer-owned data within the processes of FMS systems licensed by customers who grant SafeLease such access.

14. The evidence at the temporary-injunction hearing supported SafeLease's assertion that it cannot practicably perform its contractual obligations to the parties' mutual clients while blocked from the FMS systems by Defendants, and that obtaining reports from customers is not, alone, a long-term viable solution. If injunctive relief is not granted, the interim injury to SafeLease may prevent the case from reaching a final resolution on the merits.

15. The evidence shows that the harm to SafeLease is and would be irreparable. Its loss of ability to service customers that license Defendants' FMS will be difficult or impossible to measure fully with damages. It is likely to permanently damage SafeLease's customer relationships and reputation and good will in the industry, as well as put customers at risk of disruption and loss. Without access to customer-owned data in its customers' FMS systems, SafeLease will be substantially impaired or prevented from offering its services to its customers,

- 6 -

0045

and SafeLease likely will be unable to continue operating or competing in the tenant-insurance market. These harms could not be adequately remedied with money damages or otherwise at law, and some portion of the likely pecuniary injury will be extremely difficult, if not impossible, to accurately identify, trace, quantify, and prove with reasonable certainty.

16. The evidence shows that temporary injunctive relief is necessary to preserve the status quo before trial. The status quo is the last, actual, peaceable, non-contested status that preceded this controversy. Here, it is customer-authorized access by SafeLease to customer-owned data within the processes of FMS systems licensed from Defendants. The status quo is preserved by ensuring resumed access to such customer-owned data in their FMS systems so that SafeLease may provide agreed services to the parties' mutual customers.

17. The evidence shows that the balance of equities favors issuance of injunctive relief. Beginning in 2021, and with customer permission and Defendants' knowledge, SafeLease accessed customer-owned data in their licensed FMS systems in order to provide tenant insurance services to the parties' mutual customers. On December 17, 2024, with no advance customer permission or notice, Defendants cut off SafeLease's access to the storEDGE platform. On December 31, 2024, it took Defendants less than an hour to restore access after TRO relief was granted. After the TRO expired on January 21, 2025, and the district court denied SafeLease's original temporary-injunction application, Defendants immediately disabled access by SafeLease to customer-owned data in all three of Defendants' FMS platforms. Access by SafeLease to customer-owned data in their FMS systems, as it had for three years before this dispute arose, will create no imminent or likely risk of SafeLease data breach or misuse, nor of disruption to Defendants' server performance or stability. SafeLease employs SOC-2 certified data protection processes and uses customer data only consistent with its customer agreements. If temporary

- 7 -

injunctive relief is granted, Defendants will suffer no irreparable harm and, at most, immaterial monetary harm that will be protected by the bond ordered below.

18.     The evidence also shows significantly changed circumstances that further altered the status quo from the time the district court denied SafeLease's first request for temporary injunction.

19.     The Court finds it equitable and appropriate to restore the status quo and protect SafeLease from irreparable injury by entering this Temporary Injunction against Defendants.

Therefore, it is Ordered, Adjudged, and Decreed that Defendants are enjoined as follows:

As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

This injunctive relief is subject to SafeLease maintaining SOC-2 certification of its data protection processes and only using customer data stored in FMS licensed from Defendants consistent with its customer agreements and historic practices.

The Clerk of the Court shall issue a writ of injunction to Defendants in accordance with the terms of this Order. Service of the writ by private process server is authorized.

This Order is binding upon Defendants and all their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

It is further Ordered that this Order shall expire 30 days after a trial on the merits in this case is completed, unless extended or earlier terminated by further order of this Court. Trial on the merits shall be scheduled to begin on the 30th day of June, 2026.

0047

It is further Ordered that SafeLease shall post with the Clerk of this Court a bond in the amount of $6,600,000.[3] This bond reflects the amount of anticipated losses resulting from the temporary injunction as estimated by Defendants; but it does not include potential additional losses Defendants could suffer in the result of a data breach during the pendency of the temporary injunction, as no credible evidence has been presented to indicate that such a data breach is likely to occur as a result of this injunctive relief.

The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this temporary injunction. SafeLease may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

SIGNED ON: March 11, 2025.

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

---

[3] The Court notes that SafeLease has done so, and a writ of injunction has issued, as of the date of this Amended Order.

# TAB 4

2025 Tex. Bus. 10



## The Business Court of Texas,
### Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § § § § § § | |
| *Plaintiff,* | | |
| v. | | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | | |
| *Defendants.* | | |

## MEMORANDUM OPINION AND ORDER

¶1    Before the Court is a document titled "Objections To Temporary Injunction Order, Motion to Rule On Exclusion Of Opinions Of Dr. Williams, And Motion to Reconsider Based On Objections And Exclusion" (hereafter, the Motion to Reconsider) filed by defendants Storable Inc., RedNova Labs Inc., Bader Co., SiteLink Software LLC, Easy Storage Solutions LLC, and Property First Group LP (collectively, Storable). The Court GRANTS in part and DENIES in part the Motion to Reconsider, as detailed below.

1

**Background**

¶2      This suit arises out of a dispute between SafeLease Insurance Services LLC (SafeLease), which provides insurance for self-storage facilities, and Storable, which licenses facility-management software (FMS) to such facilities. Storable's FMS platforms include storEDGE, SiteLink, and Easy Storage Solutions (ESS). The dispute centers on SafeLease's access to information maintained on these platforms by self-storage facilities that license FMS software from Storable and that are also customers of SafeLease. Until recently, SafeLease accessed these FMS platforms as an authorized user on its customers' accounts. In late 2024, Storable began blocking SafeLease's access to storEDGE. The parties dispute the impetus of these actions: SafeLease alleges that Storable seeks to drive it out of the self-storage insurance market to benefit Storable's own self-storage insurance products; Storable asserts that it is enforcing its software's terms of use and mitigating security threats posed by SafeLease's misuse of the platform.

¶3      SafeLease sued Storable in the 345th District Court in Travis County on December 30, 2024. The District Court granted a temporary restraining order (TRO) compelling Storable to restore SafeLease's authorized-user access to storEDGE and prohibiting Storable from removing or restricting SafeLease's access to storEDGE, SiteLink, or ESS. After extending the TRO, the District Court denied the request for a temporary injunction (TI). A week later, SafeLease amended its

2

0050

petition to include new tortious interference claims and allegations about Storable's actions after the TI was denied. SafeLease then removed the action to this Court.

¶4    In this Court, SafeLease filed a new application for a TRO and TI to protect its access to the information on Storable's FMS platforms while the lawsuit is pending.[1] On January 30, 2025, the Court denied the TRO and set a TI hearing. The TI hearing was conducted on February 11, 13, and 14, with closing arguments on Tuesday, February 18. The Court issued a TI Order the following day, February 19, granting SafeLease limited injunctive relief. Storable filed this Motion two days later, on Friday, February 21, and set it for written submission today, March 11.

<div align="center">

**Analysis**

</div>

**A.    Storable's Request for Ruling and Reconsideration**

¶5    The Motion to Reconsider asks the Court to rule on another motion filed by Storable—its "Motion To Exclude Or Disregard Opinions Of Dr. Williams On The Ground That They Are Unreliable And Constitute No Evidence" (the Motion to Exclude)—and to reconsider the TI Order on that basis. The Court determines that reconsideration is unnecessary for several reasons.

---

[1] The Court treats this as a new application, based on the newly asserted claims and the changed circumstances that occurred after the District Court denied the prior TI application. In any event, the Court views the District Court's prior decisions in this case with the same deference and as carrying the same weight as its own prior decisions in the case.

<div align="center">

3

</div>

¶6    First, exclusion of the challenged testimony would not alter the Court's decision to grant the TI Order. The Motion to Exclude challenges the testimony of SafeLease's antitrust economist, Dr. Michael Williams. Dr. Williams testified in support of SafeLease's antitrust claim, but the TI Order does not rely on SafeLease's antitrust claim; it relies exclusively on SafeLease's claim for tortious interference with existing contracts. The Motion to Reconsider points to a reference in paragraph 4 of the TI Order to Storable "leveraging" its "market power in the FMS market." Although "leveraging" and "market power" may be terms of art in antitrust law, the Court refers to Storable's use of its position in the FMS market and as the FMS provider for a large segment of SafeLease's tenant-insurance customers, and not to SafeLease's antitrust claims. To avoid any potential confusion, the Court will amend the TI Order to replace "leveraging their market power in the FMS market" with "using their position in the FMS market."

¶7    Second, while the Motion to Reconsider was set for written submission, the underlying Motion to Exclude was never set for either written submission or oral hearing. A motion must be presented to the court to trigger the court's duty to rule.[2]

---

[2] *See, e.g.*, *Ballard v. King*, 652 S.W.2d 767, 769 (Tex. 1983); *Lawrence v. Jones*, No. 14-23-00270-CV, 2024 WL 1269874, at *4 (Tex. App.—Houston [14th Dist.] Mar. 26, 2024, no pet.); *In re Ogaz*, No. 08-23-00344-CR, 2023 WL 8519276, at *1 (Tex. App.—El Paso Dec. 7, 2023, no pet.); *In re Liverman*, 658 S.W.3d 881, 882 (Tex. App.—El Paso 2022, no pet.); *In re Blakeney*, 254 S.W.3d 659, 662 (Tex. App.—Texarkana 2008, orig. proceeding); *Guyot v. Guyot*, 3 S.W.3d 243, 246 (Tex. App.—Fort Worth 1999, no pet.); *Evans v. First Nat'l Bank of Bellville*, 946 S.W.2d 367, 378 (Tex. App.—Houston [14th Dist.] 1997, writ denied); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 736 (Tex. App.—Dallas 1992, writ denied).

4

0052

Merely filing the motion does not satisfy this requirement; presentation requires that the motion be set for an oral hearing or written submission.[3] This process is important because, among other reasons, it puts opposing parties on notice of when responsive filings are due. Because the Motion to Exclude was never set, SafeLease never responded and was not required to do so. Given the pace of the TI proceedings, the Court likely would have expedited setting the Motion to Exclude, while still giving SafeLease an opportunity to respond, if requested.[4] But the Court received no request to do so or to otherwise set the Motion to Exclude.

¶8    Third, the February 18 Motion to Exclude challenges Dr. Williams's testimony given at the TI hearing on February 11. A motion to exclude filed a week after the conclusion of the challenged testimony generally comes too late.[5]

¶9    Storable's Motion to Exclude asserts challenges to the foundation and methodology underlying Dr. Williams's opinions.[6] To be timely, those objections

---

[3] *E.g.*, *Lawrence*, 2024 WL 1269874, at *4; *Moore v. Carder*, No. 01-22-00156-CV, 2023 WL 3102582, at *2 (Tex. App.—Houston [1st Dist.] Apr. 27, 2023, no pet.); *Smith v. El Paso Veterans Transitional Living Ctr.*, 556 S.W.3d 361, 362 (Tex. App.—El Paso 2018, no pet.); *see also* TEX. BUS. CT. LOC. R. 5; 3RD DIV. CT. PRO. at V(A)–(B).

[4] The parties have known since February 14 that the Court would issue its TI Order on February 19. When it filed the Motion to Exclude on February 18, Storable was aware that it was filing the day before the TI Order would issue.

[5] *See, e.g.*, *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 44 (Tex. App.—Texarkana 2017, pets. denied); *Farm Servs., Inc. v. Gonzales*, 756 S.W.2d 747, 750 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied); *Traders & Gen. Ins. Co. v. Randolph*, 467 S.W.2d 689, 690 (Tex. App.—Amarillo 1971, writ dism'd).

[6] For example, Storable argues that Williams: failed to "provide reliable data to support his market-share opinion" or "study the factors that determine the likelihood of monopoly power"; should have used revenue or output, rather than the number of facilities, in measuring market share; "used

0053

had to be raised and ruled on before or when the testimony is offered.[7] The purpose of this requirement is two-fold: (1) it gives the trial court the necessary opportunity to look beyond the face of the testimony to inquire into its underlying basis before ruling,[8] and (2) it "gives the proponent a fair opportunity to cure any deficiencies and prevents trial and appeal by ambush."[9] Once opinion testimony is admitted without objection, "it may be considered probative evidence even if the basis for the opinion is unreliable."[10]

¶10   The Motion to Exclude also argues that Dr. Williams's opinion that Storable had "a dangerous probability of achieving monopoly power" in the tenant-insurance market is conclusory.[11] Unlike objections to foundation or methodology, a party need not timely object to expert testimony that is conclusory on its face; such

---

incorrect numbers, without necessary adjustments, for the number of Storable's facilities and the total number of self-storage facilities in the United States"; and should not have excluded certain large operators in defining the relevant market. Motion to Exclude at 1, 7.

[7] *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009).

[8] *Pike*, 610 S.W.3d at 786 (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)); *Pollock*, 284 S.W.3d at 816–17 (same).

[9] *Pike*, 610 S.W.3d at 786; *Pollock*, 284 S.W.3d at 817; *see also, e.g.*, *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 716 (Tex. 2016); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex. 1998).

[10] *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 899 (Tex. 2020) (quoting *Pollock*, 284 S.W.3d at 818); *see also Pike*, 610 S.W.3d at 786 (same).

[11] Motion to Exclude at 3–7.

6

0054

testimony inherently lacks probative value.[12]  But the Court need not reach this issue because it did not consider Dr. Williams's opinion regarding whether Storable had a dangerous probability of achieving monopoly power in the tenant-insurance market. As Storable points out in its Motion to Exclude,[13] that opinion related to SafeLease's antitrust claims, which the Court did not rely on in granting injunctive relief under the TI Order.

¶11     The Court notes that Storable objected to Dr. Williams's testimony on several grounds at the TI hearing and took Dr. Williams on voir dire. To the extent any objections were timely raised and ruled on at the hearing, no further objection or ruling is needed. The Court further notes that there was limited opportunity for discovery and to vet the expert opinions before the TI hearing, which occurred less than two months after the case was filed. While it was necessary to expedite the TI proceedings, the substance of any testimony offered in the TI proceedings remains subject to challenges and objections at future stages of the case, including summary judgment and trial.

## B.     Storable's Objections to the TI Order

¶12     Storable objects that the TI Order decides the "ultimate merits" of the case rather than only whether SafeLease demonstrated a "probable" right to

---

[12] *Pike*, 610 S.W.2d at 786 (quoting *Coastal Transp.*, 136 S.W.3d at 233); *Pollock*, 284 S.W.3d at 816 (same).

[13] Motion to Exclude at 3.

7

0055

recover.[14] The Court disagrees and notes that Storable issued a press release shortly after the TI issued demonstrating that it correctly understood that the TI Order "does not represent a final determination on the merits of the case."[15] The TI Order states that SafeLease demonstrated a "probable right to relief" and expressly notes that such a showing does not mean that SafeLease will ultimately prevail on the merits based on a fully developed record.[16] Rule 683 compels the Court to include in the TI Order the findings that form the reasons it granted the injunction,[17] and the TI Order makes it clear that the findings are based on the evidence presented at the TI hearing and that a final trial on the merits has not yet occurred. Nevertheless, to avoid any potential confusion, the Court will amend the TI Order to further clarify that the holdings in the order are based on the evidence the parties presented at the

---

[14] Motion to Reconsider at 2–3.

[15] Exhibit A to "Supplement to Plaintiff's Response to Objections to Injunction and Motion to Reconsider."

[16] TI Order at ¶ 3 & n.1 (quoting *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024); *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953)).

[17] TEX. R. CIV. P. 683 (requiring order to specify the reasons the court granted the relief). Storable objects to the statement in the TI Order that "SafeLease has *pleaded and proved* valid causes of action against Defendants; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim." Motion to Reconsider at 3 (emphasis added). But this is a common way of stating the elements required for a TI. *See, e.g.*, *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Hughs v. Dikeman*, 631 S.W.3d 362, 382 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Adobe Oilfield Servs., Ltd. v. Trilogy Operating, Inc.*, 305 S.W.3d 402, 405 (Tex. App.—Eastland 2010, no pet.); *8100 N. Freeway Ltd. v. City of Houston*, 329 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The statement is in no way a ruling that SafeLease has or ultimately will prevail on the merits.

8

0056

TI hearing and do not prevent either party from proving or disproving any of the disputed facts at the trial on the merits.

¶13    The Court will also amend the TI Order to remove a statement that the parties agreed to the form but not the substance of the order. Although the Court instructed the parties to confer and reach an agreement as to the form (but not the substance) of each side's proposed orders, the Motion informs the Court that Storable refused to do so.[18] The Court notes that if Storable had meaningfully engaged in this process, some of its concerns might have been ameliorated before the TI Order issued.

SIGNED ON: March 11, 2025.

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

___

[18] Motion to Reconsider at 3.

0057

# TAB 5



**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § | Cause No. 25-BC03A-0001 |
| v. | § | |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

---

**ORDER**

---

¶1   Before the Court is the Motion for Clarification filed by defendants Storable Inc., RedNova Labs Inc., Bader Co., SiteLink Software LLC, Easy Storage Solutions LLC, and Property First Group LP (collectively, Storable), plaintiff SafeLease Insurance Services, LLC's (SafeLease) response, and Storable's reply. The Court GRANTS in part and DENIES in part the Motion for Clarification.

### 1. Request for clarification

¶2   This Court issued a temporary injunction (TI) that enjoins Storable from blocking SafeLease's authorized-user access to Storable's FMS platforms for "SafeLease customers as of January 21, 2025." Storable asserts that SafeLease

1

misinterprets the TI as also applying to new customers acquired after January 21, 2025. In response, SafeLease does not deny that the TI is limited to customers as of January 21, 2025 but asserts that Storable misinterprets the TI as prohibiting SafeLease from using Storable's platforms for customers acquired after January 21, 2025 and giving Storable a "free pass" to block access for new customers.

¶3 The Court HOLDS that the TI is clear as written: it governs only conduct relating to existing customers as of January 21, 2025. It neither authorizes nor prohibits conduct relating to new customers acquired after January 21, 2025.

## 2. Request for login names and static IP addresses

¶4 Storable states that it conducts "certain security measures" in the ordinary course of its business and asks the Court to "clarify" that SafeLease must provide Storable with a list of its "account login names" and "specified static IP addresses" so that Storable can "ensure that [its] necessary system maintenance does not interfere with these accounts and is in no way misperceived as violating" the TI. SafeLease responds that: Storable provides no explanation of the security measures it references "or how knowing login names or IP addresses is required" for such measures; the TI merely requires Storable to maintain the status quo, under which Storable has allowed the same user-authorized access for years without the requested information and without incident; and SafeLease does not use static IP addresses. In its reply, Storable indicates that it needs the account login names and

2

static IP to facilitate its monitoring of SafeLease's use of Storable's FMS platforms "to protect its network security while complying with the injunction."

¶5     Storable bears the burden of showing its entitlement to relief it requests, but Storable's motion is not accompanied by supporting evidence and contains little detail about the security measures Storable performs in the ordinary course of its business, why those measures present a threat of interference with SafeLease's access, or how a list of usernames and static IP addresses would help prevent such interference. The evidence at TI hearing did not show that an exchange of usernames and static IP addresses was the status quo between the parties before this dispute arose or that Storable's security measures interfered with SafeLease's user-authorized access during that time. The Court DENIES Storable's request.

¶6     For clarity, the Court provides the following additional guidance: The Court expects Storable to take all reasonable measures to comply with the TI. The Court does not intend to penalize conduct that is reasonably designed to comply with the TI, preserves or continues the parties' conduct and practices as they existed prior to this dispute, does not single out or disproportionately affect SafeLease, and causes only negligible interruptions or delays.

3

SIGNED ON: March 24, 2025.

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

4

# TAB 6

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle A. Courts
        Chapter 25A. Business Court (Refs & Annos)

V.T.C.A., Government Code § 25A.006

§ 25A.006. Initial Filing; Removal and Remand

Currentness

(a) An action within the jurisdiction of the business court may be filed in the business court. The party filing the action must plead facts to establish venue in a county in a division of the business court, and the business court shall assign the action to that division. Venue may be established as provided by law or, if a written contract specifies a county as venue for the action, as provided by the contract.

(b) If the business court does not have jurisdiction of the action, the court shall, at the option of the party filing the action:

  (1) transfer the action to a district court or county court at law in a county of proper venue; or

  (2) dismiss the action without prejudice to the party's rights.

(c) If, after an action is assigned to a division of the business court, the court determines that the division's geographic territory does not include a county of proper venue for the action, the court shall:

  (1) if an operating division of the court includes a county of proper venue, transfer the action to that division; or

(2) if there is not an operating division of the court that includes a county of proper venue, at the option of the party filing the action, transfer the action to a district court or county court at law in a county of proper venue.

(d) A party to an action filed in a district court or county court at law that is within the jurisdiction of the business court may remove the action to the business court. If the business court does not have jurisdiction of the action, the business court shall remand the action to the court in which the action was originally filed.

(e) A party to an action filed in a district court or county court at law in a county of proper venue that is not within an operating division of the business court or the judge of the court in which the action is filed may not remove or transfer the action to the business court.

(f) A party may file an agreed notice of removal at any time during the pendency of the action. If all parties to the action have not agreed to remove the action, the notice of removal must be filed:

(1) not later than the 30th day after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action; or

(2) if an application for temporary injunction is pending on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action, not later than the 30th day after the date the application is granted, denied, or denied as a matter of law.

(g) The notice of removal must be filed with the business court and the court in which the action was originally filed. On receipt of the notice, the clerk of the court in which the action was originally filed shall immediately transfer the action to the business court in accordance with rules adopted by the supreme court, and the business court clerk shall assign the action to the appropriate division of the business court.

(h) The filing of an action or a notice of removal in the business court is subject to Section 10.001, Civil Practice and Remedies Code.

(i) Removal of a case to the business court is not subject to the statutes or rules governing the due order of pleading.

(j) Removal of a case does not waive a defect in venue or constitute an appearance to determine personal jurisdiction.

(k) The judge of a court in which an action is filed may request the presiding judge for the court's administrative region to transfer the action to the business court if the action is within the business court's jurisdiction. The judge shall notify all parties of the transfer request and request a hearing on the transfer request. After a hearing on the request, the presiding judge may transfer the action to the business court if the presiding judge finds the transfer will facilitate the fair and efficient administration of justice. The business court clerk shall assign an action transferred under this subsection to the appropriate division of the business court.

(*l*) The business court judge on establishment of jurisdiction and venue over an action shall by order declare the county in which any jury trial for the action will be held as determined under Section 25A.015.

**Credits**
Added by Acts 2023, 88th Leg., ch. 380 (H.B. 19), § 1, eff. Sept. 1, 2023.

V. T. C. A., Government Code § 25A.006, TX GOVT § 25A.006
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

**From:** Grant Woodby
**To:** Wolff, Michelle N.; Allen, Susanna
**Cc:** Summers, Jonna N.; Kumar, Lex N.; Torgerson, Ray T.; Alexander, Ken; Eoff, Elizabeth F.; Yetter, Paul; Allen, Susanna; Smith, Shannon; Smith, Alyssa; Brunelle, Dolores; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Pamela Seger
**Subject:** Court Ruling in D-1-GN-24-010233; Safelease Insurance Services, LLC v. Bader Co., et al
**Date:** Tuesday, January 21, 2025 2:36:08 PM

**External Sender** - From: (Grant Woodby &lt;Grant.Woodby@traviscountytx.gov&gt;)

This message came from outside your organization.

Learn More

Hello Counselors,

Judge Mangrum asked that I relay her ruling on the Temporary Injunction from last week. Please allow the following to serve as the Orders of the Court:

The Temporary Injunction is DENIED.

Counsel for Defendants shall draft an order memorializing this ruling, send same to opposing counsel to review as to form, then submit an Order that is agreed to form to Ms. Seger by January 31, 2025.

Thank you,

*T. Grant Woodby,* he/him
Briefing Attorney for the Honorable Jessica Mangrum
200th Judicial District Court of Travis County, Texas
grant.woodby@traviscountytx.gov
(512) 854-4916

This electronic mail message, including any attachments, may be confidential or privileged under applicable law. This email is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this email, you are notified that any use, dissemination, distribution, copying, disclosure or any other action taken in relation to the content of this email including any attachments is strictly prohibited. If you have received this email in error, please notify the sender immediately and permanently delete the original and any copy of this email, including secure destruction of any printouts.

# TAB 8

A1156

# Terms of Service

**TERMS OF SERVICE**
**Revised: January 23, 2023**

Easy Storage Solutions, LLC ("ESS," "we," "our," or "us") is happy to provide you with access to its self-storage business solutions accessible through the website and associated domains of www.storageunitsoftware.com and other custom domains, related software, content, and services, including all versions and upgrades thereto, and any third-party services that we may procure on your behalf (collectively, the "Services"). Your use of the Services is subject to and governed by the terms and conditions in these Terms of Service (the "Terms"). We may, at our discretion, update the Terms at any time. You can access and review the most current version of the Terms at the URL for this page, by clicking on the "Terms of Service" link within the Services, or as we otherwise make available.

PLEASE REVIEW THE TERMS CAREFULLY. BY REGISTERING FOR AN ACCOUNT OR OTHERWISE ACCESSING OR USING THE SERVICES, YOU AGREE TO BE BOUND BY THE TERMS, INCLUDING ANY UPDATES OR REVISIONS POSTED HERE OR OTHERWISE COMMUNICATED TO YOU. IF YOU ARE ENTERING INTO THESE TERMS ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT AND WARRANT THAT YOU ARE AUTHORIZED AND LAWFULLY ABLE TO BIND SUCH ENTITY TO THESE TERMS, IN WHICH CASE THE TERM "YOU" SHALL REFER TO SUCH ENTITY. IF YOU DO NOT HAVE SUCH AUTHORITY, OR IF YOU DO NOT AGREE WITH THE TERMS, YOU MAY NOT ACCESS OR USE THE SERVICES,

**THE TERMS REQUIRES FINAL AND BINDING ARBITRATION TO RESOLVE ANY DISPUTE OR CLAIM ARISING OUT OF OR RELATING IN ANY WAY TO THE TERMS, OR YOUR ACCESS TO OR USE OF THE SERVICES,** INCLUDING THE VALIDITY, APPLICABILITY OR INTERPRETATION OF THE TERMS, AND YOU AGREE THAT ANY SUCH CLAIM WILL BE RESOLVED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION, ARBITRATION OR OTHER SIMILAR PROCESS. PLEASE REVIEW SECTION 19 CAREFULLY TO UNDERSTAND YOUR RIGHTS AND OBLIGATIONS WITH RESPECT TO THE RESOLUTION OF ANY CLAIM.

# OTHER AGREEMENTS

Your access to and use of the Services is subject to the ESS Privacy Policy (the "Privacy Policy"), any usage or other policies relating to the Services we post or otherwise make available to you (collectively, "Additional Terms"), which are hereby incorporated by reference, and you agree to be bound by the Additional Terms.

**Defendant's**

**Ex. 1**

# GRANT OF RIGHTS

Subject to and conditioned upon your compliance with these Terms (including all Additional Terms), ESS grants you a limited, non-exclusive, non-transferable, non-sublicensable, revocable license: (a) to access and view pages within the Services (b) to the extent that the Services provides access to any online software,

A1502

STORABLE000001

A1157

only in the form found within the Services, in each case only for your internal business purposes.

# PERSONAL INFORMATION; REGISTRATION; ACCOUNT

You acknowledge and agree that by accessing or using the Services, ESS may receive certain information about you, including personal information, and ESS may collect, use, disclose, store and process such information in accordance with these Terms.

In registering for the Services, you agree to: (i) provide true, accurate, current and complete information about yourself (the "Registration Data"); and (ii) maintain and promptly update the Registration Data to keep it true, accurate, current and complete. If you provide any information that is untrue, inaccurate, not current or incomplete, or ESS reasonably suspects that you have done so, ESS may suspend or terminate your account.

You may not share your account or password with anyone. You are fully responsible for all activities that occur under your account, whether or not you authorized the particular use or user, and regardless of your knowledge of such use. You agree to notify ESS immediately of any unauthorized use of your account or password or any other similar breach of security.

# RESPONSIBILITY FOR CONTENT

You acknowledge and agree that all information, data, data records, databases, text, software, music, sounds, photographs, images, graphics, videos, messages, scripts, tags and other materials accessible through the Services, whether publicly posted or privately transmitted ("Content"), are the sole responsibility of the person from whom such Content originated. This means that you, and not ESS, are entirely responsible for all Content that you upload, post, email, transmit or otherwise make available through the Services ("Your Content"), and other users of the Services, and not ESS, are similarly responsible for all Content they upload, post, email, transmit or otherwise make available through the Services ("User Content"). To the extent that you submit any Content, you represent and warrant that: (i) you have all necessary right and authority to grant the rights set forth in these Terms with respect to Your Content; and (ii) Your Content does not violate any duty of confidentiality owed to another party, or the copyright, trademark, right of privacy, right of publicity or any other right of any other party. You acknowledge and agree that the Services are not intended as a data warehouse ESS has no obligation to make redundant copies of or to back up Your Content, and that you are solely responsible for backing up Your Content should you feel the need to do so. You acknowledge and agree that you may not have access to Your Content through ESS or the Services following the expiration or termination of these Terms.

You shall not upload, post, email, transmit or otherwise make available any Content that: (i) is illegal, harmful, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful or otherwise objectionable; (ii) may not be made available under any law or under contractual or fiduciary relationships (such as confidential or proprietary information learned as part of an employment relationship or under a non-disclosure agreement); (iii) infringes any patent, trademark, trade secret, copyright or other proprietary right of any party; (iv) consists of unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, commercial electronic messages or any other form of solicitation; (v) contains software viruses or any other code, files or programs designed to interrupt, destroy or limit the functionality of any software or hardware; or (vi) consists of information that you know or have reason to know is false or inaccurate.

# SUPPORT

Except as generally described on our website or as otherwise explicitly agreed by ESS in any applicable Additional Terms, ESS is not obligated to provide you any support for the Services and ESS make no specific service level guarantees. In the event that ESS voluntarily provides you with any support beyond our basic descriptions or that is not explicitly agreed by ESS in any applicable Additional Terms, it shall not be deemed a commitment by ESS to provide you any support in the future, and ESS may choose, in its sole discretion, to discontinue such support at any time and for any reason without any liability to you.

# RIGHTS TO CONTENT

A1503

STORABLE000002

A1158

royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make and have made Your Content (in any form and any medium, whether now known or later developed) as necessary to (i) provide access to the Services to you and other users; and (ii) monitor and improve the Services. To the extent you have made Your Content accessible to others within your organization through the Services, you acknowledge and agree that ESS may continue to make Your Content accessible to others within your organization through the Services even after you have deleted your user account or the applicable portion of Your Content from your user account.

Except with respect to Your Content, you acknowledge and agree that, as between you and ESS, ESS owns all rights, title and interest (including all intellectual property rights) in the Services, and all improvements, enhancements or modifications thereto, including all Content and other materials therein. The Services is protected by U.S. and international copyright, trademark, patent and other intellectual property laws and treaties. ESS reserves all rights not expressly granted to you.

As used herein, "Aggregate Data" means Your Content that has been aggregated in a manner that does not reveal any personal information and cannot reasonably be used to identify you, your organization or its customers or vendors as the source of such data. You acknowledge and agree that ESS may collect or generate Aggregate Data in connection with providing you with access to or use of the Services, and, subject to your provision of consent, you hereby grant ESS and its service providers a perpetual, irrevocable, worldwide, royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make and have made Aggregate Data (in any form and any medium, whether now known or later developed) for any lawful purpose.

Except with respect to Your Content and subject to the limited rights expressly granted to you in Section 2, you may not: (i) use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make, have made, assign, pledge, transfer or otherwise grant rights to the Services; (ii) reverse engineer, disassemble, decompile or translate, or otherwise attempt to derive the source code, architectural framework or data records of any software within or associated with the Services; (iii) frame or utilize any framing technique to enclose any Content; (iv) access the Services for the purpose of developing, marketing, selling or distributing any product or service that competes with or includes features substantially similar to the Services or any products or services offered by ESS; (v) rent, lease, lend, sell or sublicense the Services or otherwise provide access to the Services as part of a service bureau or similar fee-for-service purpose; (vi) remove or obscure any proprietary notice that appears within the Services; or (vii) use the Services in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

You acknowledge and agree that we may record calls between you or your agents and us (or between your current or prospective tenants and us) for quality assurance and training purposes, including when a call is placed on hold ("Call Recordings"). Any Call Recordings are our sole and exclusive property and may be retained or destroyed by us at our sole discretion.  We may use Call Recordings for any lawful business purpose, in accordance with our Privacy Policy.  Unless otherwise required by applicable law, rule, regulation or court order, we have no obligation to provide you with any Call Recordings.

You acknowledge that the Services, these Terms, Call Recordings and any other confidential information provided by us constitutes valuable proprietary information and trade secrets ("Confidential Information"). You agree to preserve the confidential nature of any Confidential Information you receive by retaining and using it in confidence.  You may use Confidential Information solely for your internal business use in connection with your use of Services, and you may not provide such Confidential Information to any third party, except with our prior written consent.

## USER CONDUCT

In connection with your access to or use of the Services, you shall not:

impersonate any person or entity, including ESS personnel, or falsely state or otherwise misrepresent your affiliation with any person or entity;

forge headers or otherwise manipulate identifiers in order to disguise the origin of any Content transmitted through the Services;

act in a manner that negatively affects the ability of other users to access or use the Services;

A1504

STORABLE000003

A1159

infrastructure;

interfere with or disrupt the Services or servers or networks connected to the Services, or disobey any requirements, procedures, policies or regulations of networks connected to the Services;

use spiders, crawlers, robots, scrapers, automated tools or any other similar means to access the Services, or substantially download, reproduce or archive any portion of the Services;

sell, share, transfer, trade, loan or exploit for any commercial purpose any portion of the Services, including your user account and password; or

violate any applicable local, state, provincial, federal or international law or regulation.

## FEES

You are solely responsible for any data, usage and other charges assessed by mobile, cable, internet or other communications services providers for your access to and use of the Services. Some features of the Services are free to use, but fees may apply for premium features and other components. If there is a fee listed for any portion of the Services, by accessing or using that portion, you agree to pay the fee. Your access to the Services may be suspended or terminated if you do not make payment on time or in full.

For all Services you agree to pay the specified fees and you authorize us to charge you according to the monthly plan level you choose and any other charges you may incur in connection with your use of the Services. A valid credit card or ACH account may be required for you to use the Services on a month-to-month basis. The Services are billed in advance on a monthly basis and such fees are non-refundable. There will be no refunds or credits for partial months, or for months unused with an open account. We reserve the right to change rates upon thirty (30) days' notice. Such notice may be provided at any time by posting the changes to our website or by email.

1.  The service period for each of our Services that you have selected to receive will begin on the day your payment method is charged and will continue until the day before your next charge is scheduled. If you do not cancel the applicable Services at least forty-eight (48) hours prior to your next scheduled charge, your payment method will be charged.

## TENANT PROTECTION PLANS

ESS administers self-storage tenant protection plans ("Tenant Protection Plans") in certain U.S. states. As a condition of providing our Tenant Protection Plans to your tenants, You, the self-storage operator, represent that you require all tenants to maintain insurance or our tenant property protection coverage for stored personal property at your premises during your tenants' rental terms. Tenants may purchase a Tenant Protection Plan from You directly in-person, via the online rental process, or they may be enrolled in the Tenant Protection Plan by You or Your representative(s) or through other services provided by ESS to verify adequate coverage of stored property is maintained by the tenant. As part of enrollment in the Tenant Protection Plan, the tenant shall agree to an addendum to their rental agreement (the "Lease Addendum") outlining a property protection plan under which the self-storage owner/operator assumes limited liability for loss or damage to certain personal property stored by such tenant at the applicable property, as more particularly described in the Lease Addendum. You, the self-storage owner/operator, accept all risks and responsibility associated with direct communications and representations made by You to your tenants regarding the Tenant Protection Plans. Fees for the Tenant Protection Plans will be invoiced periodically on the tenant's account directly in the ESS software. When a tenant pays for the Tenant Protection Plan, that money is considered "collected." You, the self-storage owner/operator, will keep a portion of the "collected" fees, and ESS will deduct the remaining balance of all "collected" fees monthly for the previous month from your account as ESS's compensation for administering the Tenant Protection Plans. You, the self-storage owner/operator, may opt out of or cancel the availability of the Tenant Protection Plans at any time and for any reason by notifying Easy Storage Solutions via email at tenantprotection@storageunitsoftware.com or via phone at 435-673-2979. ESS will, at its own expense and during the term of this agreement, maintain a policy that insures the coverage amount as described in each applicable Lease Addendum. Coverage under the policy is subject to the terms, conditions and limits of the policy. To receive a copy of the policy, please submit a request to Easy Storage Solutions at tenantprotection@storageunitsoftware.com.

A1505

STORABLE000004

A1160

## PAYMENT PROCESSING

Easy Storage Payments is an optional feature of our Services. Payment processing services on Easy Storage Solutions are fulfilled by our Partner Providers, Stripe and Payrix. Easy Storage Payments is subject to the Stripe Connected Account Agreement, which includes the Stripe Terms of Service (collectively, the "Stripe Services Agreement") or Payrix, and are subject to the Payrix Terms of Service. By agreeing to these terms and/or continuing to use the Services in conjunction with Easy Storage Payments, you agree to be bound by the Partner Provider terms, and the same may be modified by our Partner Providers from time to time. As a condition of Easy Storage Solutions enabling payment processing services through a Partner Provider, you agree to provide ESS accurate and complete information about you and your business, and you authorize ESS to share such information and transaction information related to your use of the payment processing services provided by our Partner Providers.

Easy Storage Solutions acknowledges its responsibility for the protection of all cardholder data that it possesses or otherwise stores, processes, or transmits on behalf of our customers. Easy Storage Solutions is in compliance with all requirements of the PCI DSS, and has implemented  appropriate data protection measures to ensure a level of security commensurate to the risks.

## ACCESS CONTROL

Access control equipment is an optional feature of our Services. Easy Storage Solutions is only a distributor of such equipment and does not manufacture or install access control equipment. You should consult with licensed professional contractors with respect to the installation and use of access control equipment.  In the event that such equipment is damaged by accident, by gross negligence or during installation, you agree that Easy Storage Solutions shall not be held liable.  You represent that you are fully aware of the risks and hazards connected with any and all activities pertaining to the installation of access control systems and that such activities include the risk of injury and even death, and voluntarily assumes full responsibility for any risks of loss, property damage, or personal injury, including death, that may be sustained as a result of such activities to the fullest extent allowed by law.

## SUGGESTIONS

If you elect to provide or make available to ESS any suggestions, comments, ideas, improvements or other feedback relating to the Services ("Suggestions"), you hereby grant ESS and its service providers a perpetual, irrevocable, worldwide, royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license, to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make, have made, assign, pledge, transfer or otherwise grant rights in your Suggestions in any form and any medium (whether now known or later developed), without credit or compensation to you.

## LINKS AND EXTERNAL MATERIALS

The Services may provide links or other connections to other websites or resources. You acknowledge and agree that ESS does not endorse and is not responsible for any content, advertising, products, services or other materials on or available through such sites or resources ("External Materials"). External Materials are subject to different terms of use and privacy policies. You are responsible for reviewing and complying with such terms of use and privacy policies. You further acknowledge and agree that ESS shall not be liable for any damage or loss resulting from or arising out of use of or reliance on any External Materials.

## MODIFICATIONS TO THE SERVICES

ESS reserves the right to modify, suspend or discontinue the Services or any product or service to which it connects, with or without notice, and ESS shall not be liable to you or to any third party for any such modification, suspension or discontinuance. ESS may at its sole discretion from time to time develop patches, bug fixes, updates, upgrades and other modifications to improve the performance of the Services or related services ("Updates"). ESS may develop Updates that require installation by you before you continue to access or use the Services or related services. Updates may also be automatically installed without providing any additional notice to you or receiving any additional consent from you. The manner in which Updates may be automatically downloaded and installed is determined by settings on your device and its operating system.

A1506

STORABLE000005

A1161

# INDEMNIFICATION

You shall indemnify, defend and hold ESS and its affiliates, and each of their officers, directors, employees, agents, partners and licensors (collectively, "ESS Parties") harmless from and against any claim, demand, loss, damage, cost, liability and expense, including reasonable attorneys' fees, resulting from or arising out of: (a) Your Content; (b) your violation of these Terms, any law or regulation, or any rights (including intellectual property rights) of another party; or (c) your use of the Services.

A1507

# DISCLAIMERS

YOUR USE OF THE SERVICES IS AT YOUR SOLE RISK. THE SERVICES IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITH ALL FAULTS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ESS PARTIES EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED OR ARISING FROM STATUTE, COURSE OF DEALING, USAGE OF TRADE OR OTHERWISE, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. ESS PARTIES MAKE NO WARRANTY OR REPRESENTATION THAT: (i) THE SERVICES WILL MEET YOUR REQUIREMENTS; (ii) ACCESS TO THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE; (iii) THE INFORMATION, CALCULATIONS AND ANY RESULTS THAT MAY BE OBTAINED FROM ACCESS TO OR USE OF THE SERVICES WILL BE ACCURATE, RELIABLE, CURRENT OR COMPLETE; OR (IV) ANY ACCESS CONTROLS INCLUDED IN THE SERVICES ("ACCESS CONTROLS") MAY NOT BE COMPROMISED OR CIRCUMVENTED OR THAT THE ACCESS CONTROLS WILL PREVENT ANY PROPERTY LOSS. YOU ACKNOWLEDGE AND AGREE THAT YOU ARE SOLELY RESPONSIBLE FOR VERIFYING THE ACCURACY AND COMPLETENESS OF ALL CONTENT SUBMITTED TO OR OBTAINED FROM THE SERVICES BEFORE TAKING ANY ACTION BASED UPON SUCH CONTENT, INCLUDING MAKING ANY PAYMENTS OR COLLECTING ANY AMOUNTS BASED THEREON. YOU ASSUME ALL RISK ASSOCIATED WITH THE SUITABILITY, INSTALLATION AND PERFORMANCE OF THE ACCESS CONTROLS AND AND OTHER THIRD-PARTY COMPONENTS, HARDWARE, SOFTWARE AND SERVICES THAT YOU SELECT.

Any model contracts, forms or other documents ESS makes available for your use with your customers ("Model Contracts") are provided for informational purposes only and should not be relied on as legal advice. Nothing herein constitutes the establishment of an attorney-client relationship between you and ESS or anyone involved in the drafting of the Model Contracts and you should seek the advice of legal counsel prior to use of the Model Contracts. By utilizing the Model Contracts, you: (i) assume full responsibility for any loss, damage, or liability resulting from the use of the Model Contracts; and (ii) release ESS and the authors of the Model Contracts, their contributors, agents, licensees, successors and assigns from any and all known or unknown claims, demands or causes of action that may arise, at any time, out of or relating to your use of any of the Model Contracts.

# LIMITATION OF LIABILITY

THE ESS PARTIES SHALL NOT BE LIABLE FOR ANY LOST PROFITS OR COST OF COVER, OR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING DAMAGES ARISING FROM ANY TYPE OR MANNER OF COMMERCIAL, BUSINESS OR FINANCIAL LOSS, EVEN IF THE ESS PARTIES HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE. IN NO EVENT SHALL THE ESS PARTIES' TOTAL LIABILITY TO YOU FOR ALL CLAIMS ARISING FROM OR RELATING TO THESE TERMS OR YOUR ACCESS TO OR USE OF (OR INABILITY TO ACCESS OR USE) THE SERVICES EXCEED THE GREATER OF FIFTY DOLLARS ($50) OR THE AMOUNT PAID BY YOU TO ESS FOR ACCESS TO THE SERVICES WITHIN THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE APPLICABLE CLAIM AROSE.

# TERMINATION

Subject to the Additional Terms, if you violate these Terms, all rights granted to you under these Terms shall terminate immediately, with or without notice to you. Upon termination of these Terms for any reason: (i) you must immediately uninstall and cease using the Services; (ii) ESS, in its sole discretion, may remove and discard Your Content and delete your user account; (iii) any provision that, by its terms, is intended to survive the expiration or termination of these Terms shall survive such expiration or termination; and (iv) all rights granted to you under these Terms shall immediately terminate, but all other provisions shall survive termination. You are solely responsible for the proper cancellation of your account. You may cancel your account at any time by calling or emailing ESS.

STORABLE000006

A1162

These Terms shall be governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to conflict of laws principles. The United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to these Terms.

# BINDING ARBITRATION AND CLASS ACTION WAIVER

ALL CLAIMS (AS DEFINED IN ABOVE) SHALL BE RESOLVED BY BINDING ARBITRATION RATHER THAN IN COURT, EXCEPT THAT YOU MAY ASSERT CLAIMS IN SMALL CLAIMS COURT (DEFINED FOR THE PURPOSES OF THESE TERMS AS A COURT OF LIMITED JURISDICTION THAT MAY ONLY HEAR CLAIMS NOT EXCEEDING $5,000) IF YOUR CLAIMS ARE WITHIN THE COURT'S JURISDICTION. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED.

The arbitration shall be conducted by the American Arbitration Association (AAA) under its then-applicable Commercial Arbitration Rules or, as appropriate, its Consumer Arbitration Rules. The AAA's rules are available at http://www.adr.org/. The arbitrator will, among other things, have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any Claims. Payment of all filing, administration and arbitrator fees shall be governed by the AAA's rules. The arbitration shall be conducted in the English language by a single independent and neutral arbitrator. For any hearing conducted in person as part of the arbitration, you agree that such hearing shall be conducted in Austin, Texas or, if the Consumer Arbitration Rules apply, another location reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances, as determined by the arbitrator. The decision of the arbitrator on all matters relating to the Claim shall be final and binding. Judgment on the arbitral award may be entered in any court of competent jurisdiction.

WE EACH AGREE THAT ALL CLAIMS (AS DEFINED ABOVE) SHALL BE RESOLVED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE ACTION, ARBITRATION OR OTHER SIMILAR PROCESS AND EXPRESSLY WAIVE ANY RIGHT TO HAVE A CLAIM DETERMINED OR RESOLVED ON A CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE BASIS. IF FOR ANY REASON THE PROVISIONS OF THE PRECEDING SENTENCE ARE HELD TO BE INVALID OR UNENFORCEABLE IN A CASE IN WHICH CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE CLAIMS HAVE BEEN ASSERTED, THE PROVISIONS OF THIS SECTION 19 REQUIRING BINDING ARBITRATION SHALL LIKEWISE BE UNENFORCEABLE AND NULL AND VOID. IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN IN ARBITRATION, WE EACH WAIVE ANY RIGHT TO A JURY TRIAL AND AGREE THAT SUCH CLAIM SHALL BE BROUGHT ONLY IN A COURT OF COMPETENT JURISDICTION IN AUSTIN, TEXAS. YOU HEREBY SUBMIT TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS AND WAIVE ANY OBJECTION ON THE GROUNDS OF VENUE, FORUM *NON-CONVENIENS* OR ANY SIMILAR GROUNDS WITH RESPECT TO ANY SUCH CLAIM.

Notwithstanding anything to the contrary, you and ESS may seek injunctive relief and any other equitable remedies from any court of competent jurisdiction to protect our intellectual property rights, whether in aid of, pending or independently of the resolution of any dispute pursuant to the arbitration procedures set forth in this Section 19.

If ESS implements any material change to this Section 19, such change shall not apply to any Claim for which you provided written notice to ESS before the implementation of the change

# LEGAL COMPLIANCE

You represent and warrant that you are not: (a) located in a country that is subject to a U.S. Government embargo or designated by the U.S. Government as a "terrorist supporting" country; and (b) listed on any U.S. Government list of prohibited or restricted parties, including the Specially Designated Nationals List.

# U.S. GOVERNMENT ENTITIES

This section applies to access to or use of the Services by a branch or agency of the United States Government. The Services includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 and qualifies as "commercial items" as defined in 48 C.F.R. 2.101. Such items are provided to the United States Government: (a) for acquisition by or on behalf of civilian

A1508

STORABLE000007

A1163

of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 and 227.7202-3. The United States Government shall acquire only those rights set forth in these Terms with respect to the such items, and any access to or use of the Services by the United States Government constitutes: (a) agreement by the United States Government that that such items are "commercial computer software" and "commercial computer software documentation" as defined in this section; and (b) acceptance of the rights and obligations herein.

# NO THIRD-PARTY BENEFICIARIES

You agree that, except for ESS Parties and as otherwise expressly provided in these Terms, there shall be no third-party beneficiaries to these Terms.

# QUESTIONS

Call (435) 656-1990 or email support@storageunitsoftware with any questions about our Terms.

# GENERAL PROVISIONS

These Terms (together with the Additional Terms) constitute the entire agreement between you and ESS concerning your access to and use of the Services. It supersedes all prior and contemporaneous oral or written negotiations and agreements between you and ESS with respect to such subject matter. In the event of any conflict between or among these Terms and any Additional Terms to which these Terms refers, the terms and conditions of these Terms shall take precedence and govern. These Terms may not be amended by you except in a writing executed by you and an authorized representative of ESS. For the purposes of these Terms, the words "such as," "include," "includes" and "including" shall be deemed to be followed by the words "without limitation." You may not assign or delegate any right or obligation under these Terms without the prior written consent of ESS. The failure of ESS to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. If any provision of these Terms is held to be invalid or unenforceable under applicable law, then such provision shall be construed, limited, modified or, if necessary, severed to the extent necessary to eliminate its invalidity or unenforceability, without in any way affecting the remaining parts of these Terms. Any prevention of or delay in performance by ESS hereunder due to labor disputes, acts of god, governmental restrictions, enemy or hostile governmental action, fire or other casualty or other causes beyond its reasonable control shall excuse the performance of its obligations for a period equal to the duration of any such prevention or delay.

## Company

**About Us**
**Support**
**Privacy Policy**
**Terms Of Service**

## Quick Links

**Press**
**Associations**
**Partners**
**Contact Us**

## Reviews

**Google**
**Capterra**
**Software Advice**
**Get App**



A1509

**STORABLE000008**

A1164

A1510

**STORABLE000009**

# SITELINK TERMS OF USE

## Master Subscription Agreement General Terms and Conditions

*Effective as of December 31, 2019*

This Master Subscription Agreement is comprised of these General Terms and Conditions, Additional Terms of Service, when elected, and the Order Form, all of which are collectively referred to as the "**Agreement**" and is a legally binding agreement between SiteLink software, LLC (the "Company") and you.

This Agreement governs your access to and use of the Services. By accepting this Agreement, either by clicking a box indicating your acceptance or by executing an order form that references this Agreement, you agree to the terms of this Agreement. If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such legal entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the Services.

## Definitions.

"**Bundled Services**" means a combination of Services (each, a "**Component**") that is licensed as a package.

"**Content**" means information obtained by us from our content licensors or publicly available sources and provided to you pursuant to an Order Form, as more fully described in the Documentation.

"**Documentation**" means our online user guides, documentation, and help and training materials, as updated from time to time, accessible via [www.sitelink.com/support-help](http://www.sitelink.com/support-help)

Defendant's

Ex. 2

exhibitsticker.com

STORABLE000010

**"Facilities"** means a distinct self-storage facility at a single location which contains individual Units set forth in the Order Form for which the Services relate.

**"Fees"** means the agreed upon fee the Services or Supplemental Services to be paid by you to us as set forth in an applicable Order Form.

**"Malicious Code"** means code, files, scripts, agents or programs intended to do harm, including, for example, viruses, worms, time bombs and Trojan horses. Additionally, any file, script, program, browser plug-in, browser helper or extension, or any robot or application designed to scrape and collect data or automate the entry of data into or out of Services.

**"Model Contracts"** means any model contracts, forms or other agreement provided by the Company to you, for your use with your end users.

**"Order Form"** means an ordering document specifying the Services to be provided hereunder that is entered into between you and us, including any addenda and supplements thereto. By entering into an Order Form hereunder, an Affiliate agrees to be bound by the terms of this Agreement as if it were an original party hereto.

**"Personally Identifiable Information"** means any information that can be associated with or traced to any individual, including an individual's name, address, telephone number, e-mail address, credit card information, social security number or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically).

**"Services"** means any of the Company service offerings described in Section 2 (Services) below and specified in and Order Form either on a subscription basis or otherwise as stated in an Order Form. Services include Supplemental Services and/or Professional Services.

**"Supplemental Services"** means the non-reoccurring services that are ordered by you, for a fee such as customer specific consulting, configuration, implementation, migration, setup fees, website customization or other professional services as specified in an applicable Order Form.

**"Units"** means the number of separate rentable self-storage units, parking spaces, storage containers, or lockers set forth in the Order Form for which the Services relate. Units shall not include Post Office boxes or similar boxes to which mail is delivered by a mail carrier.

**"User"** means an individual who is authorized by you to use a Service, for whom you have ordered the Service, and to whom you have supplied a user identification and

STORABLE000011

password. Users may include, for example, your employees, consultants, contractors and agents, and third parties with which you transact business.

**"we," "us" or "our"** means the Company.

**"you" or "your"** means the company or other legal entity for which you are accepting this Agreement.

**"Your Data"** means electronic data and information submitted by or for you to the purchased Services or collected and processed by or for you using the purchased Services, excluding Content and Non-Salesforce.com Applications.

# 2.1 Services.

We offer the Services listed in Exhibit A through our proprietary software as a service platform that we host for our customers. Products may be added to this Agreement as they become available but only products subscribed to on an Order Form will be available to you. To subscribe for a Service, you must execute an Order Form for that Service. You are only entitled to use the Services for which you have subscribed and paid and your use of the Services is subject to your compliance with all terms and conditions of the Agreement. You acknowledge and agree that we reserve the right to modify the Services (or any part thereof) from time to time and that we shall not be liable to you or to any third party for any modification to the Services.

# 2.1Additional Services.

**2.1.1. No Fee Customer Support.** Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We will use commercially reasonable efforts to provide, at no additional charge to you, technical support services to you and your Users who have subscribed to the Services.

**2.1.2. No Fee Training.** Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We shall make available our standard training services (by way of remote, live or recorded training sessions) to your designated, named and authorized Users as well as provide tutorials which are accessible via the Marketing Websites at no additional charge.

**2.1.3. Expanding the Services.** From time to time we may make available on a general release basis additional service offerings. Any such additional service offering would be available on a general release basis, and should you wish to subscribe, access or use

STORABLE000012

such service, such will be memorialized in a new applicable Order Form. Nothing in this Section 2.1.3 should be construed to imply or promise that additional functionality, features, products will be available. Rather, in the event that new services are made available, such Services shall be subject to these General Terms of Services and any additional terms and conditions that may specifically apply to such additional Services.

**2.1.4  Tenant Protection Plans.** The Company administers self-storage tenant protection plans ("Tenant Protection Plans") in certain U.S. states as an Additional Service to self-storage operators. You, the self-storage owner/operator, may elect to offer our Tenant Protection Plans to your tenants after completing an Order Form or specific Tenant Protection Plan Agreement.  As a condition of providing our Tenant Protection Plans to your tenants, You represent that you require all tenants to maintain insurance or our tenant property protection coverage for stored personal property at your premises during your tenants' rental terms.  Your tenants may purchase a Tenant Protection Plan from You directly in-person, via the online rental process, or they may be enrolled in the Tenant Protection Plan by You or Your representative(s) or through other services and/or technologies provided by the Company to verify adequate coverage of stored property is maintained by the tenant. You represent that you will cooperate with and adhere to the Company's services, technologies, and terms of the Tenant Protection Plan Agreement in the provision of the Company's Tenant Protection Plan to your tenants.  As part of enrollment in the Tenant Protection Plan, the tenant shall agree to an addendum to their rental agreement (the "Lease Addendum") outlining a property protection plan under which the self-storage owner/operator assumes limited liability for loss or damage to certain personal property stored by such tenant at the applicable property, as more particularly described in the Lease Addendum. In the event You offer the Company's Tenant Protection Plan after converting from a tenant insurance program or third-party tenant protection plan you previously provided to your tenants storing property at your facilities, and to avoid any lapse of coverage for your tenants, the tenant may be enrolled in our Tenant Protection Plan by a notice process whereby the tenant shall accept and agree to the Lease Addendum by otherwise not providing evidence of valid stored property insurance coverage.  The tenant may opt-out of coverage provided under the Company's Tenant Protection Plan at any time by providing evidence of valid stored property insurance coverage to You in an acceptable manner communicated to the tenant.  You, the self-storage owner/operator, accept all risks and responsibility associated with direct communications and representations made by You to your tenants regarding the Tenant Protection Plans.  Fees for the Tenant Protection Plans will be invoiced periodically on the tenant's account directly in the SiteLink management software. When a tenant pays for the Tenant Protection Plan, that money is considered "collected." You, the self-storage owner/operator, will keep a portion of the "collected" fees, and We will deduct the remaining balance of all "collected" fees monthly for the previous month from your account as the Company's compensation for

STORABLE000013

administering the Tenant Protection Plans. You, the self-storage owner/operator, may opt out of or cancel the availability of the Tenant Protection Plans for any reason via written notice provided to the Company at least forty-five (45) days prior to the cancellation date by notifying the Company via email at policyservices@storable.com or via phone at 888-611-4778. We will, at our own expense and during the term of this Agreement, maintain a policy that insures the coverage amount as described in each applicable Lease Addendum. Coverage under the policy is subject to the terms, conditions and limits of the policy. To receive a copy of the policy, please submit a request to the Company at policyservices@storable.com.

# 3. Fees.

**3.1 Service Fees.** You shall pay the Fees for the Services in the amount set forth in the Order Form and according to the billing frequency stated in the Order Form. Service Fees shall be due and payable on the date of the invoice and must be received by us within the payment terms established in the applicable Order Form. Fees may be increased at our discretion after the initial term stated in the applicable Order Form upon notice to you.

**3.2 Late Payments.** You acknowledge that your failure to pay any fees or charges when due may result in suspension or termination of the Services. If you fail to pay any of the Fees in a timely manner, we will notify you and you will have a thirty (30) day cure period (the "**Payment Cure Period**") in which you can bring your account up-to-date. If you fail to bring your account up-to-date (including any late fees) within the Payment Cure Period, we will terminate your access to the Services. If you fail to pay any of the Fees or charges due hereunder, the Company reserves the right to engage a collections agency to collect the fees and charges and you acknowledge and agree that you shall pay all costs incurred by us in connection with the collection of such past due amounts, including, without limitation, reasonable attorneys' and collections agencies' fees plus interest in an amount equal to the lesser of 1.50% per month or the maximum rate permitted by applicable law.

**3.3 Taxes.** You shall be responsible for all sales tax, use tax, value added taxes, withholding taxes and any other similar taxes and charge of any kind imposed by federal, state or local governmental entity on the transactions contemplated by the Agreement. When we have the legal obligation to pay or collect taxes for which you are responsible, pursuant to this Section 3, the appropriate amount shall be invoiced to and thereafter paid by you unless you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority before invoice is sent.

# 4. Your Rights and Restrictions.

STORABLE000014

**4.1. Right to Access and Use the Services.** Subject to the terms and conditions of the Agreement, and upon timely payment of all applicable Fees set forth in an Order Form, we hereby grant to you a non-exclusive, non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed solely for your internal business purposes.

**4.2. Authorized Users.** You may designate and authorize as many Users as you wish under the Agreement. You (i) are responsible for your Users' compliance with the Agreement, and (ii) shall use commercially reasonable efforts to

prevent unauthorized access to or use of the Services and shall notify us immediately of any such unauthorized access or use. It is your responsibility to remove access to the Services if authorized status of a User or designated employee changes.

**4.3. Your Responsibilities and Restrictions.** You are responsible for all activities that occur under your use of the Services and the use by your Users. You shall: (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all data and content that you submit for your use of the Services; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering or any other unauthorized access to, or use of, the Services and notify us promptly of any unauthorized use or security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regarding privacy and protection of personal or consumer information) in using the Services; (iv) to the extent applicable, comply with all applicable rules of credit card associations (including American Express, MasterCard and Visa); and (v) obtain and maintain all computer hardware, software and communications equipment needed to access the Services and pay all access charges (e.g., ISP fees) incurred by you in connection with your use of the Services. You may not, and you shall ensure your Users do not, (i) disassemble, reverse engineer, decompile or otherwise attempt to decipher any code in connection with the Services, or modify, adapt, create derivate works based upon, or translate the Services; (ii) license, sublicense, sell, rent , assign, distribute, time share transfer, lease, loan, resell, distribute or otherwise commercially exploit, grant rights in or make the Services available to any third party; (iii) use the Services except as expressly authorized hereunder or in violation of any applicable laws; (iv) engage in any illegal or deceptive trade practices with respect to the Services;

(v) circumvent or disable any security or other technical features or measures of the Services or any other aspect of

the Software or, in any manner, attempt to gain or attain unauthorized access to the Services or its related computer systems or networks; (vi) use the Services to transmit infringing, libelous, obscene, threatening, Malicious Code, or otherwise unlawful, unsafe,

STORABLE000015

abusive or tortious material, or to store or transmit material in violation of third-party privacy rights; (vii) use the Service to store or transmit any Malicious Code or unsolicited messages in violation of applicable laws; or (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein.

**4.4. Reservation of Rights.** No other rights are granted except as expressly set forth in the Agreement. The Agreement is not a sale and does not convey any rights or ownership in, or to, the Services or any underlying software. We own all right, title, and interest, including all intellectual property rights, in and to the Services and the underlying software and any and all updates, upgrades, modifications, enhancements, Content, improvements or derivative works thereof, and in any idea, know-how, and programs developed by us or our licensors during the course of performance of the Services.

**4.5. Data Exchange Interface ("DEI") Rights.** The Company provides an advanced DEI exclusively for customer internal use. Any use by a third party, affiliate, agent of customer, or any use to develop a commercial product, requires a separate third-party DEI agreement, which will expressly memorialize the rights and uses thereunder.

**4.6. Our Use of Anonymous Data.** You agree that the Company may use the data generated by and stored on our servers anonymously, for our own internal business purposes, including but not limited to the development of anonymous marketing and sales collateral materials, statistical analysis of data regarding rental rates, unit availability, traffic sources, vacancy, and other relevant data to construct yield optimization models, and publication solely in an aggregated form of operating data in industry benchmark reports. You shall at all times retain ownership of your data.

# 5. Term and Termination.

**5.1. Term.** The term of the Services varies depending on the Services subscribed to or obtained and shall be set forth on the Order Form.

**5.2. Notification of Non-Renewal.** Written notice of non-renewal by you must be submitted to the Company at the address in the preamble.

**5.3. Termination for Cause.** Either party may terminate the Agreement and all Services under an existing Order Form (i) if the other party breaches any of its material obligations under the Agreement and such breach is not cured within thirty (30) days of receipt of notice from the non-breaching party or (ii) if the other party becomes insolvent or bankrupt, liquidated or is dissolved, or ceases substantially all of its

STORABLE000016

business. We may terminate the Agreement immediately in the event of a breach of Section 4.3 (Your Responsibilities and Restrictions) above.

**5.4. Termination for Convenience.** You may terminate the Agreement, all the Services, or any individual Component of a Services Bundle, at any time for any reason, upon fifteen (15) days' written notice to the Company.

**5.5. Effect of Termination**. Upon a termination of the Agreement or any Service, you will immediately discontinue use of the applicable Services, cease to represent in any form that you are a user of the terminated Services, and destroy all our Confidential Information in your possession. Neither party shall be liable for any damages resulting from a

termination of the Agreement or any subscriptions to Services as provided for herein; provided, however, that the termination of the Agreement shall not affect any claim arising prior to such termination.

**5.6. Handling of Your Data in the Event of Termination.** You acknowledge and agree that following expiration or termination of any of your subscriptions to the Services, we may immediately deactivate all affected and related Services and that we shall have no obligation to continue to store your data during any period of suspension or termination or to permit you to retrieve such data. You further agree that we shall not be liable to you or to any third party for any termination of your access to the Services or deletion of your data pursuant to this Agreement. **Following the termination of your right to use the Services for any reason other than termination for cause by us, you shall be entitled to take advantage of any post-termination assistance we may generally make available with respect to the Services, such as data retrieval arrangements we may elect to make available.** We may also endeavor to provide you with unique post-suspension or post-termination assistance, but we shall be under no obligation to do so.

**5.7. Exemption from Return of Data.** Notwithstanding anything to the contrary in this Section 5. (Term and Termination) the Company shall not be required to return to customer or destroy those copies of the customer data or customer Confidential Information which copies were created pursuant to our automatic archiving and backup procedures and the removal of which is not technically reasonable.

# 6. Downtime and Service Suspensions.

STORABLE000017

In addition to our rights to terminate or suspend our Services (each, a "**Service Suspension**") to you, you acknowledge that: (i) your access to and use of the Services may be suspended for the duration of any unanticipated, unscheduled, or scheduled downtime or unavailability of any portion or all of the Services for any reason; and (ii) we shall also be entitled, without any liability to you or related third parties, to suspend access to any portion of the Services at any time. Without limitation, we shall have no liability whatsoever for any damage, liabilities, losses (including any loss of data or profits) or any other consequences that may occur as a result of any Service Suspension. To the extent we are able, we will endeavor to provide you email notice of any Service Suspension and to post updates on our bulletin board regarding resumption of the Services following any such Service Suspension, but we shall have no liability for the manner in which we may do so or if we fail to do so.

## 7. Representations and Warranties.

**7.1. Mutual Representations and Warranties.** Each party hereby represents and warrants to the other party that (i) it has all necessary authority to enter into and perform its obligations under the Agreement without the consent of any third party or breach of any contract or agreement with any third party, (ii) all persons performing any obligations hereunder have entered into all necessary agreements in order for it to comply with the terms and conditions of the Agreement, and (iii) it shall comply in all material respects with all laws applicable to the Services.

## 7.2. Disclaimer of Warranties.

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION 7, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE MAKE NO OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, IN LAW OR FROM A COURSE OF DEALING OR USE OF TRADE, AS TO ANY MATTER, INCLUDING THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WE DO NOT WARRANT THAT THE SERVICES WILL MEET ALL OF YOUR REQUIREMENTS, INCLUDING ACCOUNTING REQUIREMENTS, OR THAT THE USE OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. THE SERVICES ARE PROVIDED TO YOU ON AN "AS IS" BASIS AND YOUR USE OF SERVICES IS AT YOUR OWN RISK, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY LAWS OR REGULATIONS RELATED TO PROPERTY MANAGEMENT. THE PARTIES EXPRESSLY ACKNOWLEDGE THAT THE DISCLAIMER OF WARRANTY CONSTITUTES AN ESSENTIAL PART OF THE AGREEMENT. WE SHALL HAVE NO OBLIGATION OR OTHER

STORABLE000018

LIABILITY WITH REGARD TO ANY ERROR OR NON-COMPLIANCE WITH A WARRANTY THAT IS CAUSED BY YOUR BREACH OF THIS AGREEMENT.

WE DISCLAIM ANY REPRESENTATIONS OR WARRANTIES THAT YOUR USE OF THE SERVICES WILL SATISFY OR ENSURE COMPLIANCE WITH ANY LEGAL OBLIGATIONS OR LAWS OR REGULATIONS. THIS DISCLAIMER APPLIES TO BUT IS NOT LIMITED TO ANY FEDERAL OR STATE STATUTES OR REGULATIONS THAT MAY BE APPLICABLE TO YOU. YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT YOUR USE OF THE SERVICES IS IN ACCORDANCE WITH APPLICABLE LAW.

IF YOU ARE DISSATISFIED WITH THE SERVICES OR THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICES.

# 8. Confidentiality.

**8.1. Definition of Confidential Information.** "**Confidential Information**" means all information disclosed by a party ("**Disclosing Party**") to the other party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Your Confidential Information includes your Data; our Confidential Information includes the Services and Content; and Confidential Information of each party includes the terms and conditions of this Agreement and all Order Forms (including pricing), as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party. However, Confidential Information does not include any information that (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party.

**8.2. Protection of Confidential Information.** The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) (i) not to use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (ii) except as otherwise authorized by the Disclosing Party in writing, to limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees and contractors who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with

STORABLE000019

the Receiving Party containing protections no less stringent than those herein. Neither party will disclose the terms of this Agreement or any Order Form to any third party other than its Affiliates, legal counsel and accountants without the other party's prior written consent, provided that a party that makes any such disclosure to its Affiliate, legal counsel or accountants will remain responsible for such Affiliate's, legal counsel's or accountant's compliance with this Section 8.2.

**8.3. Compelled Disclosure.** The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

# 9. Indemnification.

**9.1. Indemnification for Infringement.** Subject to Section 9.4, we shall, at our expense, defend you against any third party claim brought against you which alleges that the Services infringe any US patent issued to a third party as of the Effective Date or infringe any copyright, trademark or trade secret of any third party (collectively referred to as the "**Infringing Item**"). In the event an injunction is sought or obtained against use of the Infringing Item or in our opinion is likely to be sought or obtained, we shall, at our option and expense, either (i) procure for you and your named Users the right to continue to use the Services, or (ii) replace or modify the Services to make their use non-infringing while being capable of substantially performing the same function. In the event subsections (i) and (ii) above are not commercially practicable, we may terminate the Services and refund any prepaid, but unused Service Fees. We shall not be obligated to defend or be liable for any costs or damages under this Section 9.1 if the alleged infringement arises out of or is in any manner attributable to (i) any unauthorized modification of any Services by you (or any of your Users) or (ii) use of Services in combination with services and products not provided or authorized by the Company if such infringement would have been avoided without such modification or combination or (iii) compliance with your designs or instructions or (iv) a claim that does not state with specificity that the Services are the subject of the claim (each an "**Excluded Claim**").

STORABLE000020

**9.2. Indemnification for Data Security and Privacy.** Subject to Section 9.4, and during the term of your subscription to the Services, we shall, at our expense, defend you against any third party claim brought against you which allege our gross negligence in preventing unauthorized access to, or our willful misconduct in disclosing, Personally Identifiable Information of your customers in our possession or control. This indemnity will not apply to the extent that such claim, arises from or relates to your negligence or willful misconduct or that of your agents or representatives, or to the extent liability is disclaimed or limited by either party under the Agreement. The indemnity obligations set forth in this section are contingent upon your proving our gross negligence or willful misconduct has directly and proximately resulted in the unauthorized access to or disclosure of Personally Identifiable Information of your customers in our possession or control.

**9.3. Your Indemnification.** You agree to indemnify, hold harmless, and defend us and all our employees, officers, directors and agents from any and all claims, demands, suits, proceedings, investigations, damages, costs, expenses, losses, and any other liabilities (including reasonable attorneys' fees, court costs and expenses) arising out of or relating to (i) your use of the Services, (ii) an Excluded Claim, (iii) any content provided by you, (iv) any actual or alleged breach by you of any representation, warranty, covenant or obligation under the Agreement, (v) your use of the Model Contracts; or (vi) your gross negligence or willful misconduct. Your indemnification obligations under this Section 9.3 shall survive any termination or expiration of the Agreement.

**9.4. Notification and Cooperation.** The indemnifying party's obligations to the indemnified party under this Section 9 above are conditioned upon (i) indemnified party notifying indemnifying party promptly in writing within 30 days, upon knowledge of any claim, for which it may be entitled to indemnification under the Agreement; (ii) to the extent applicable, indemnified party ceasing use of the claimed infringing Services upon receipt of notice of same; (iii) indemnified party permitting indemnifying party to have the sole right to control the defense and settlement of any such claim (provided that indemnifying party may not settle any claim without the indemnified party's consent unless the settlement unconditionally releases indemnified party from all liability); (iv) indemnified party providing reasonable assistance to indemnifying party, at indemnifying party's expense, in the defense of such claim; (v) indemnified party not entering into any settlement agreement or otherwise settling any such claim without indemnifying party's express prior written consent or request; and (vi) indemnified party complying with any settlement or court order made in connection with the claim (related to the future use of any infringing materials). Indemnified party may participate in the defense or settlement of a claim with counsel of its own choice and at its own expense.

STORABLE000021

**9.5. Exclusive Remedy.** This Section 9 states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any type of claim described in this Section.

# 10. Limitation on Liability.

10.1 EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 (YOUR RESPONSIBILITIES AND RESTRICTIONS) OR 11 (PERSONAL INFORMATION AND PRIVACY STATEMENT), TO THE MAXIUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY'S TOTAL CUMULATIVE LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT EXCEED THE SUM OF THE AMOUNTS PAID BY YOU FOR THE SERVICES GIVING RISE TO THE LIABILITY DURING THE ONE YEAR PERIOD IMMEDIATELY PRECEEDING THE DATE THE CAUSE OF ACTION AROSE.

10.2. EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 OR 11, TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY HERETO, ITS LICENSORS OR SUPPLIERS, HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND BASED ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), ARISING OUT OF THE AGREEMENT, THE PERFORMANCE OR NONPERFORMANCE BY EITHER PARTY OF ITS OBLIGATIONS HEREUNDER, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10.3. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU, IN WHICH CASE OUR LIABILITY SHALL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

# 11. Personal Information and Privacy Statement.

You will comply with all applicable privacy and other laws, rules, regulations and guidelines relating to protection, collection, use and distribution of Personally Identifiable Information of any person. You will post a privacy statement on the page where you collect Personally Identifiable Information (**"Privacy Statement"**) that complies with all applicable laws, rules, regulations and guidelines and, at a minimum, notifies users of the Personally Identifiable Information collected, how it will be used and how it will be secured and identifies the collection (via cookies, web beacons and

STORABLE000022

other applicable means) and use of information gathered in connection with the Services and obtains prior informed consent (opt-in) before utilizing any tracking technologies, to the extent required by applicable laws and regulations. Such Privacy Statement shall also include technical information related to collection, transmission and storage of Personally Identifiable Information provided by us through the Services. If required by applicable data protection legislation or other law or regulation, you will inform third parties that you are providing their Personally Identifiable Information to us for processing and will ensure that any required third parties have given their consent to such disclosure and processing. You agree to comply with the descriptions and provisions of the Privacy Statement.

# 12. Miscellaneous.

**12.1. Model Contracts.** The Model Contracts are provided for informational purposes only and should not be relied on as legal advice. Nothing herein constitutes the establishment of an attorney-client relationship between you and the Company or anyone involved in the drafting of the Model Contracts. The Company makes no claims, promises, or guarantees about the accuracy, completeness, or adequacy of anything contained in the Model Contracts. If you use the Model Contracts, you should seek the advice of legal counsel to develop a contract that meets your specific needs. As state and local laws may differ, any legal questions should be referred to appropriate legal counsel. By utilizing the Model Contracts, you: (i) assume full responsibility for any loss, damage, or liability resulting from the use of the Model Contracts; and (ii) release the Company and the authors of the Model Contracts, their contributors, agents, licensees, successors and assigns from any and all known or unknown claims, demands or causes of action that may arise, at any time, out of or relating to your use of any of the Model Contracts.

**12.2. Independent Parties.** You and the Company are independent contractors. The Agreement does not create any joint venture, partnership, agency or employment relationship between the parties. You shall be solely responsible for managing your employees and for any and all compensation, taxes, benefits and liabilities to your employees and any of your other representatives or service providers. Neither you nor any of your employees, representatives, or service providers shall make any representations, warranties or guarantees with respect to us, the Agreement or the Services other than as expressly authorized by us in writing.

**12.3. Assignment.** Neither the Agreement nor any of your rights or obligations under the Agreement may be assigned or transferred, by operation of law or otherwise, without our prior written consent, unless assigned to a successor in interest, or pursuant to a merger, corporate reorganization, or a sale or transfer of all or

STORABLE000023

substantially all of your assets of which you provide us notice at least thirty (30) days prior to the consummation of the transaction and such transaction does not involve a competitor of the Company. You and the Company will negotiate the cost of this assignment upon the notification of the change. An assignment by you based on any other circumstances requires our prior consent, which consent shall not be unreasonably withheld. We may freely assign this Agreement without your consent provided that the Services continue to operate as outlined in this Agreement. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**12.4. Force Majeure.** Neither party will be responsible for any delay, interruption or other failure to perform under the Agreement due to acts beyond the control of the responsible party, but only for so long as such conditions persist. Force majeure events include, but are not limited to: natural disasters (e.g. lightning, earthquakes, hurricanes, floods); wars, riots, terrorist activities, and civil commotions; a local exchange carrier's activities, and other acts of third parties; explosions and fires; embargoes, strikes, and labor disputes; governmental decrees; failures of telecommunications providers or internet service providers; failures of third party suppliers, service providers or vendors; and any other cause beyond the reasonable control of a party.

**12.5. Choice of Law.** The Agreement and any dispute arising out of or in connection with the Agreement shall be governed by and construed under the laws of the State of Texas, without regard to the principles of conflict of laws. All disputes arising out of or related to the Agreement shall be subject to the exclusive jurisdiction and venue of the Texas state and federal courts, and the parties consent to the personal and exclusive jurisdiction of these courts.

12.6.**E-mail and Notices.** You further agree that we may provide any and all notices, statements and other communications to you through either e-mail, mail, express delivery service, or delivered by a recognized commercial carrier addressed to the address last designated on the Agreement. You are responsible for providing us with any updated contact information.

**12.7. No Waiver; Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

**12.8. Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the

STORABLE000024

fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in full force and effect.

**12.9. Entire Agreement.** To the maximum extent permitted by applicable law, this Agreement, together with the documents referenced herein and all Order Forms constitute the entire agreement between the parties as to its subject matter, and supersede all previous and contemporaneous agreements, proposals or representations, written or oral, concerning the subject matter of this Agreement. No representation, undertaking or promise shall be taken to have been given or be implied from anything said or written in negotiations between the parties prior to this Agreement except as expressly stated in this Agreement. Neither party shall have any remedy in respect of any untrue statement made by the other upon which that party relied in entering into this Agreement (unless such untrue statement was made fraudulently) and that party's only remedy in respect of any untrue statement shall be for breach of contract as provided in this Agreement. You acknowledge and agree that Your agreement hereunder is not contingent upon the delivery of any future functionality or features not specified herein or in an Order Form or dependent upon any oral or

written, public or private comments made by Us with respect to future functionality or features for the Services. In the event of any conflict between the provisions in these General Terms of Service and any Order Form or Additional Terms of Service, the terms of this Master Service Agreement shall prevail, to the extent of such conflict. No terms or conditions stated in Your purchase order or in any other of Your order documentation shall be incorporated into or form any part of this Agreement, and all such terms or conditions shall be null and void.

**12.10. Export.** Both parties agree to comply with applicable US export and import laws and regulations. You shall not permit your Users to access or use the Services in violation of any U.S. export embargo, prohibition or restriction.

**12.11. Publicity.** We reserve the right to name you as a user of Our Services on Our marketing and promotional materials unless you opt out of such disclosure on an applicable Order Form.

**12.12. Links to Third-Party Sites.** The Services or our website may include links to third party sites ("**Linked Sites**"). The Linked Sites are not under our control and we are not responsible for the contents of any Linked Site, including without limitation any link contained in a Linked Site, or any changes or updates to a Linked Site or the Services provided via a Linked Site. We are providing these links to you only as a convenience, and the inclusion of any link does not imply endorsement by us of the site or any associated services provided by the site.

STORABLE000025

**12.13. Enhancement Requests.** We may, but have no obligation to, consider your suggestions or requests regarding new functionality or features of the Services ("**Enhancement Requests**"). All modifications proposed or requested in an Enhancement Request shall be our sole and exclusive property. We may, in our sole discretion, include such modifications in a future version of the Services, but our acceptance and consideration of an Enhancement Request shall not obligate us to include in any version of the Services any modifications proposed or requested in such Enhancement Request.

**12.14. Trademarks.** You acknowledge and agree that this Agreement does not convey to you any right, title, or interest in or to any of our trademarks or trade names. You shall not use or attempt to register any of our trademarks or trade names or any trademarks or trade names that are confusing similar to them.

**12.15. Conflicts.** In the event of any conflict between these General Terms and Conditions and any other component of the Agreement, these General Terms and Conditions will take precedence with regard to your rights and obligations with respect to the Services.

# EXHIBIT A – SERVICES & SUPPLEMENTAL SERVICES

1. The Order Form that you have executed identifies (a) the Fees payable by you to the Company for the specific Services (Bundled or Supplemental) purchased, (b) the term of your Services, and (c) the payment terms of the Fees payable by you to the Company.

**HOME / PRIVACY**



| ABOUT US | SOLUTIONS | PRODUCTS | RESOURCES | News |
|----------|-----------|----------|-----------|------|
| Our Story | Marketing | Management Software | Help | Contact |
| Our Culture | Operations | | Learn | Support |
| Leadership | | Access Control | Connect | |

STORABLE000026

Corporate Responsibility

Careers

Storage Marketplace

Insurance Solutions

Facility Websites

Payment Processing

Request a Demo

Storage Beat



© Copyright 2025 Storable.
All rights reserved.
**Privacy** | **Security**

STORABLE000027

# STOREDGE TERMS OF SERVICE

## *Effective as of December 15, 2019*

This Master Subscription Agreement is comprised of these General Terms and Conditions, Additional Terms of Service, when elected, and the Order Form, all of which are collectively referred to as the "Agreement" and is a legally binding agreement between RedNova Labs, LLC dba StorEDGE (the "Company") and you.

This Agreement governs your access to and use of the Services. By accepting this Agreement, either by clicking a box indicating your acceptance or by executing an order form that references this Agreement, you agree to the terms of this Agreement. If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such legal entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the Services.

### 1. Definitions.

"Bundled Services" means a combination of Services (each, a "Component") that is licensed as a package.

"Content" means information obtained by us from our content licensors or publicly available sources and provided to you pursuant to an Order Form, as more fully described in the Documentation.

"Documentation" means our online user guides, documentation, and help and training materials, as updated from time to time, accessible via https://help.storedge.com/ or https://www.storable.com/privacy/

"Facilities" means a distinct self-storage facility at a single location which contains individual Units set forth in the Order Form for which the Services relate.



Defendant's

Ex. 3

STORABLE000028

"Fees" means the agreed upon fee the Services or Supplemental Services to be paid by you to us as set forth in an applicable Order Form.

"Malicious Code" means code, files, scripts, agents or programs intended to do harm, including, for example, viruses, worms, time bombs and Trojan horses. Additionally, any file, script, program, browser plug-in, browser helper or extension, or any robot or application designed to scrape and collect data or automate the entry of data into or out of Services.

Model Contracts" means any model contracts, forms or other agreement provided by the Company to you, for your use with your end users.

"Order Form" means an ordering document specifying the Services to be provided hereunder that is entered into between you and us, including any addenda and supplements thereto. By entering into an Order Form hereunder, an Affiliate agrees to be bound by the terms of this Agreement as if it were an original party hereto.

"Personally Identifiable Information" means any information that can be associated with or traced to any individual, including an individual's name, address, telephone number, e-mail address, credit card information, social security number or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically).

"Services" means any of the Company service offerings described in Section 2 (Services) below and specified in and Order Form either on a subscription basis or otherwise as stated in an Order Form. Services include Supplemental Services and/or Professional Services.

"Supplemental Services" means the non-recurring services that are ordered by you, for a fee such as customer specific consulting, configuration, implementation, migration, setup fees, website customization or other professional services as specified in an applicable Order Form.

"Units" means the number of separate rentable self-storage units, parking spaces, storage containers, or lockers set forth in the Order Form for which the Services relate. Units shall not include Post Office boxes or similar boxes to which mail is delivered by a mail carrier.

"User" means an individual who is authorized by you to use a Service, for whom you have ordered the Service, and to whom you have supplied a user identification and password. Users may include, for example, your employees, consultants, contractors and agents, and third parties with which you transact business.

STORABLE000029

"we," "us" or "our" means the Company.

"you" or "your" means the company or other legal entity for which You are accepting this Agreement.

"Your Data" means electronic data and information submitted by or for you to the purchased Services or collected and processed by or for you using the purchased Services, excluding Content and Non-Salesforce.com Applications.

**2. Services.**

We offer the Services listed in Exhibit A through our proprietary software as a service platform that we host for our customers. Products may be added to this Agreement as they become available but only products subscribed to on an Order Form will be available to you. To subscribe for a Service, you must execute an Order Form for that Service. You are only entitled to use the Services for which you have subscribed and paid and your use of the Services is subject to your compliance with all terms and conditions of the Agreement. You acknowledge and agree that we reserve the right to modify the Services (or any part thereof) from time to time and that we shall not be liable to you or to any third party for any modification to the Services.

2.1. Additional Services. We offer a facility management hosted software service ("storEDGE management software) with options including CRM, lead tracking, tenant billing and accounting, and facility reporting. The Order Form that You have executed identifies (a) the Subscription Fees payable by You to storEDGE, (b) the term of Your subscription to storEDGE management software and the related facility management Supplemental Services You are subscribing for, and (c) the number of Units for which You may use storEDGE management software and the related Supplemental Services You have subscribed to.

2.1.1 No Fee Customer Support. Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We will use commercially reasonable efforts to provide, at no additional charge to you, technical support services to you and your Users who have subscribed to the Services.

2.1.2 No Fee Training. Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We shall make available our standard training services (by way of remote, live or recorded training sessions) to your designated, named and authorized Users as well as provide tutorials which are accessible via the Marketing Websites at no additional charge.

2.1.3 Expanding the Services. From time to time we may make available on a general release basis additional service offerings. Any such additional service offering would be

STORABLE000030

available on a general release basis, and should you wish to subscribe, access or use such service, such will be memorialized in a new applicable Order Form. Nothing in this Section 2.1.3 should be construed to imply or promise that additional functionality, features, products will be available. Rather, in the event that new services are made available, such Services shall be subject to these General Terms of Services and any additional terms and conditions that may specifically apply to such additional Services.

2.1.4  Tenant Protection Plans. The Company administers self-storage tenant protection plans ("Tenant Protection Plans") in certain U.S. states as an Additional Service to self-storage operators. You, the self-storage owner/operator, may elect to offer our Tenant Protection Plans to your tenants after completing an Order Form or specific Tenant Protection Plan Agreement.  As a condition of providing our Tenant Protection Plans to your tenants, You represent that you require all tenants to maintain insurance or our tenant property protection coverage for stored personal property at your premises during your tenants' rental terms.  Your tenants may purchase a Tenant Protection Plan from You directly in-person, via the online rental process, or they may be enrolled in the Tenant Protection Plan by You or Your representative(s) or through other services and/or technologies provided by the Company to verify adequate coverage of stored property is maintained by the tenant. You represent that you will cooperate with and adhere to the Company's services, technologies, and terms of the Tenant Protection Plan Agreement in the provision of the Company's Tenant Protection Plan to your tenants.  As part of enrollment in the Tenant Protection Plan, the tenant shall agree to an addendum to their rental agreement (the "Lease Addendum") outlining a property protection plan under which the self-storage owner/operator assumes limited liability for loss or damage to certain personal property stored by such tenant at the applicable property, as more particularly described in the Lease Addendum. In the event You offer the Company's Tenant Protection Plan after converting from a tenant insurance program or third-party tenant protection plan you previously provided to your tenants storing property at your facilities, and to avoid any lapse of coverage for your tenants, the tenant may be enrolled in our Tenant Protection Plan by a notice process whereby the tenant shall accept and agree to the Lease Addendum by otherwise not providing evidence of valid stored property insurance coverage.  The tenant may opt-out of coverage provided under the Company's Tenant Protection Plan at any time by providing evidence of valid stored property insurance coverage to You in an acceptable manner communicated to the tenant.  You, the self-storage owner/operator, accept all risks and responsibility associated with direct communications and representations made by You to your tenants regarding the Tenant Protection Plans.  Fees for the Tenant Protection Plans will be invoiced periodically on the tenant's account directly in the storEDGE management software. When a tenant pays for the Tenant Protection Plan, that money is considered "collected." You, the self-storage owner/operator, will keep a portion of the "collected" fees, and We will deduct the remaining balance of all "collected" fees

STORABLE000031

monthly for the previous month from your account as the Company's compensation for administering the Tenant Protection Plans. You, the self-storage owner/operator, may opt out of or cancel the availability of the Tenant Protection Plans for any reason via written notice provided to the Company at least forty-five (45) days prior to the cancellation date by notifying the Company via email at policyservices@storable.com or via phone at 888-611-4778. We will, at our own expense and during the term of this Agreement, maintain a policy that insures the coverage amount as described in each applicable Lease Addendum. Coverage under the policy is subject to the terms, conditions and limits of the policy. To receive a copy of the policy, please submit a request to the Company at policyservices@storable.com.

### 3. Fees.

3.1. Service Fees. You shall pay the Fees for the Services in the amount set forth in the Order Form and according to the billing frequency stated in the Order Form. Service Fees shall be due and payable on the date of the invoice and must be received by us within the payment terms established in the applicable Order Form. Fees may be increased at our discretion after the initial term stated in the applicable Order Form upon notice to you.

3.2. Late Payments. You acknowledge that your failure to pay any fees or charges when due may result in suspension or termination of the Services. If you fail to pay any of the Fees in a timely manner, we will notify you and you will have a thirty (30) day cure period (the "Payment Cure Period") in which you can bring your account up-to-date. If you fail to bring your account up-to-date (including any late fees) within the Payment Cure Period, we will terminate your access to the Services. If you fail to pay any of the Fees or charges due hereunder, the Company reserves the right to engage a collections agency to collect the fees and charges and you acknowledge and agree that you shall pay all costs incurred by us in connection with the collection of such past due amounts, including, without limitation, reasonable attorneys' and collections agencies' fees plus interest in an amount equal to the lesser of 1.50% per month or the maximum rate permitted by applicable law.

3.3. Taxes. You shall be responsible for all sales tax, use tax, value added taxes, withholding taxes and any other similar taxes and charge of any kind imposed by federal, state or local governmental entity on the transactions contemplated by the Agreement. When we have the legal obligation to pay or collect taxes for which you are responsible, pursuant to this Section 3, the appropriate amount shall be invoiced to and thereafter paid by you unless you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority before invoice is sent.

### 4. Your Rights and Restrictions.

STORABLE000032

4.1. Right to Access and Use the Services. Subject to the terms and conditions of the Agreement, and upon timely payment of all applicable Fees set forth in an Order Form, we hereby grant to you a non-exclusive, non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed solely for your internal business purposes.

4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement. You (i) are responsible for your Users' compliance with the Agreement, and (ii) shall use commercially reasonable efforts to prevent unauthorized access to or use of the Services and shall notify us immediately of any such unauthorized access or use. It is your responsibility to remove access to the Services if authorized status of a User or designated employee changes.

4.3. Your Responsibilities and Restrictions. You are responsible for all activities that occur under your use of the Services and the use by your Users. You shall: (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all data and content that you submit for your use of the Services; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering or any other unauthorized access to, or use of, the Services and notify us promptly of any unauthorized use or security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regarding privacy and protection of personal or consumer information) in using the Services; (iv) to the extent applicable, comply with all applicable rules of credit card associations (including American Express, MasterCard and Visa); and (v) obtain and maintain all computer hardware, software and communications equipment needed to access the Services and pay all access charges (e.g., ISP fees) incurred by you in connection with your use of the Services. You may not, and you shall ensure your Users do not, (i) disassemble, reverse engineer, decompile or otherwise attempt to decipher any code in connection with the Services, or modify, adapt, create derivate works based upon, or translate the Services; (ii) license, sublicense, sell, rent , assign, distribute, time share transfer, lease, loan, resell, distribute or otherwise commercially exploit, grant rights in or make the Services available to any third party; (iii) use the Services except as expressly authorized hereunder or in violation of any applicable laws; (iv) engage in any illegal or deceptive trade practices with respect to the Services; (v) circumvent or disable any security or other technical features or measures of the Services or any other aspect of the Software or, in any manner, attempt to gain or attain unauthorized access to the Services or its related computer systems or networks; (vi) use the Services to transmit infringing, libelous, obscene, threatening, Malicious Code, or otherwise unlawful, unsafe, abusive or tortious material, or to store or transmit material in violation of third-party privacy rights; (vii) use the Service to store or transmit any Malicious Code or unsolicited messages in violation

STORABLE000033

of applicable laws; or (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein.

4.4. Reservation of Rights. No other rights are granted except as expressly set forth in the Agreement. The Agreement is not a sale and does not convey any rights or ownership in, or to, the Services or any underlying software. We own all right, title, and interest, including all intellectual property rights, in and to the Services and the underlying software and any and all updates, upgrades, modifications, enhancements, Content, improvements or derivative works thereof, and in any idea, know-how, and programs developed by us or our licensors during the course of performance of the Services.

4.5. Data Exchange Interface ("DEI") Rights. The Company provides an advanced DEI exclusively for customer internal use. Any use by a third party, affiliate, agent of customer, or any use to develop a commercial product, requires a separate third-party DEI agreement, which will expressly memorialize the rights and uses thereunder.

4.6. Our Use of Anonymous Data. You agree that the Company may use the data generated by and stored on our servers anonymously, for our own internal business purposes, including but not limited to the development of anonymous marketing and sales collateral materials, statistical analysis of data regarding rental rates, unit availability, traffic sources, vacancy, and other relevant data to construct yield optimization models, and publication solely in an aggregated form of operating data in industry benchmark reports. You shall at all times retain ownership of your data.

**5. Terms and Termination.**

5.1. Term. The term of the Services varies depending on the Services subscribed to or obtained and shall be set forth on the Order Form.

5.2. Notification of Non-Renewal. Written notice of non-renewal by you must be submitted to the Company at the address in the preamble.

5.3. Termination for Cause. Either party may terminate the Agreement and all Services under an existing Order Form (i) if the other party breaches any of its material obligations under the Agreement and such breach is not cured within thirty (30) days of receipt of notice from the non-breaching party or (ii) if the other party becomes insolvent or bankrupt, liquidated or is dissolved, or ceases substantially all of its business. We may terminate the Agreement immediately in the event of a breach of Section 4.3 (Your Responsibilities and Restrictions) above.

5.4. Termination for Convenience. You may terminate the Agreement, all the Services, or any individual Component of a Services Bundle, at any time for any reason, upon fifteen

STORABLE000034

(15) days' written notice to the Company.

5.5. Effect of Termination. Upon a termination of the Agreement or any Service, you will immediately discontinue use of the applicable Services, cease to represent in any form that you are a user of the terminated Services, and destroy all our Confidential Information in your possession. Neither party shall be liable for any damages resulting from a termination of the Agreement or any subscriptions to Services as provided for herein; provided, however, that the termination of the Agreement shall not affect any claim arising prior to such termination.

5.6. Handling of Your Data in the Event of Termination. You acknowledge and agree that following expiration or termination of any of your subscriptions to the Services, we may immediately deactivate all affected and related Services and that we shall have no obligation to continue to store your data during any period of suspension or termination or to permit you to retrieve such data. You further agree that we shall not be liable to you or to any third party for any termination of your access to the Services or deletion of your data pursuant to this Agreement. Following the termination of your right to use the Services for any reason other than termination for cause by us, you shall be entitled to take advantage of any post-termination assistance we may generally make available with respect to the Services, such as data retrieval arrangements we may elect to make available. We may also endeavor to provide you with unique post-suspension or post-termination assistance, but we shall be under no obligation to do so.

5.7 Exemption from Return of Data. Notwithstanding anything to the contrary in this Section 5. (Term and Termination) the Company shall not be required to return to customer or destroy those copies of the customer data or customer Confidential Information which copies were created pursuant to our automatic archiving and backup procedures and the removal of which is not technically reasonable.

**6. Downtime and Service Suspensions.**

In addition to our rights to terminate or suspend our Services (each, a "Service Suspension") to you, you acknowledge that: (i) your access to and use of the Services may be suspended for the duration of any unanticipated, unscheduled, or scheduled downtime or unavailability of any portion or all of the Services for any reason; and (ii) we shall also be entitled, without any liability to you or related third parties, to suspend access to any portion of the Services at any time. Without limitation, we shall have no liability whatsoever for any damage, liabilities, losses (including any loss of data or profits) or any other consequences that may occur as a result of any Service Suspension. To the extent we are able, we will endeavor to provide you email notice of any Service Suspension and to post updates on our bulletin board regarding resumption

STORABLE000035

of the Services following any such Service Suspension, but we shall have no liability for the manner in which we may do so or if we fail to do so.

**7. Representations and Warranties.**

7.1. Mutual Representations and Warranties. Each party hereby represents and warrants to the other party that (i) it has all necessary authority to enter into and perform its obligations under the Agreement without the consent of any third party or breach of any contract or agreement with any third party, (ii) all persons performing any obligations hereunder have entered into all necessary agreements in order for it to comply with the terms and conditions of the Agreement, and (iii) it shall comply in all material respects with all laws applicable to the Services.

7.2. Disclaimer of Warranties.

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION 7, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE MAKE NO OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, IN LAW OR FROM A COURSE OF DEALING OR USE OF TRADE, AS TO ANY MATTER, INCLUDING THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WE DO NOT WARRANT THAT THE SERVICES WILL MEET ALL OF YOUR REQUIREMENTS, INCLUDING ACCOUNTING REQUIREMENTS, OR THAT THE USE OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. THE SERVICES ARE PROVIDED TO YOU ON AN "AS IS" BASIS AND YOUR USE OF SERVICES IS AT YOUR OWN RISK, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY LAWS OR REGULATIONS RELATED TO PROPERTY MANAGEMENT. THE PARTIES EXPRESSLY ACKNOWLEDGE THAT THE DISCLAIMER OF WARRANTY CONSTITUTES AN ESSENTIAL PART OF THE AGREEMENT. WE SHALL HAVE NO OBLIGATION OR OTHER LIABILITY WITH REGARD TO ANY ERROR OR NON-COMPLIANCE WITH A WARRANTY THAT IS CAUSED BY YOUR BREACH OF THIS AGREEMENT.

WE DISCLAIM ANY REPRESENTATIONS OR WARRANTIES THAT YOUR USE OF THE SERVICES WILL SATISFY OR ENSURE COMPLIANCE WITH ANY LEGAL OBLIGATIONS OR LAWS OR REGULATIONS. THIS DISCLAIMER APPLIES TO BUT IS NOT LIMITED TO ANY FEDERAL OR STATE STATUTES OR REGULATIONS THAT MAY BE APPLICABLE TO YOU. YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT YOUR USE OF THE SERVICES IS IN ACCORDANCE WITH APPLICABLE LAW.

**8. Confidentiality.**

8.1. Definition of Confidential Information. means all information disclosed by a party ("Disclosing Party") to the other party ("Receiving Party"), whether orally or in writing,

STORABLE000036

that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Your Confidential Information includes your Data; our Confidential Information includes the Services and Content; and Confidential Information of each party includes the terms and conditions of this Agreement and all Order Forms (including pricing), as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party. However, Confidential Information does not include any information that (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party.

8.2. Protection of Confidential Information. The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) (i) not to use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (ii) except as otherwise authorized by the Disclosing Party in writing, to limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees and contractors who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither party will disclose the terms of this Agreement or any Order Form to any third party other than its Affiliates, legal counsel and accountants without the other party's prior written consent, provided that a party that makes any such disclosure to its Affiliate, legal counsel or accountants will remain responsible for such Affiliate's, legal counsel's or accountant's compliance with this Section 8.2.

8.3. Compelled Disclosure. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

**9. Idemnification.**

STORABLE000037

9.1. Indemnification for Infringement. Subject to Section 9.4, we shall, at our expense, defend you against any third party claim brought against you which alleges that the Services infringe any US patent issued to a third party as of the Effective Date or infringe any copyright, trademark or trade secret of any third party (collectively referred to as the "Infringing Item"). In the event an injunction is sought or obtained against use of the Infringing Item or in our opinion is likely to be sought or obtained, we shall, at our option and expense, either (i) procure for you and your named Users the right to continue to use the Services, or (ii) replace or modify the Services to make their use non-infringing while being capable of substantially performing the same function. In the event subsections (i) and (ii) above are not commercially practicable, we may terminate the Services and refund any prepaid, but unused Service Fees. We shall not be obligated to defend or be liable for any costs or damages under this Section 9.1 if the alleged infringement arises out of or is in any manner attributable to (i) any unauthorized modification of any Services by you (or any of your Users) or (ii) use of Services in combination with services and products not provided or authorized by the Company if such infringement would have been avoided without such modification or combination or (iii) compliance with your designs or instructions or (iv) a claim that does not state with specificity that the Services are the subject of the claim (each an "Excluded Claim").

9.2. Indemnification for Data Security and Privacy. Subject to Section 9.4, and during the term of your subscription to the Services, we shall, at our expense, defend you against any third party claim brought against you which allege our gross negligence in preventing unauthorized access to, or our willful misconduct in disclosing, Personally Identifiable Information of your customers in our possession or control. This indemnity will not apply to the extent that such claim, arises from or relates to your negligence or willful misconduct or that of your agents or representatives, or to the extent liability is disclaimed or limited by either party under the Agreement. The indemnity obligations set forth in this section are contingent upon your proving our gross negligence or willful misconduct has directly and proximately resulted in the unauthorized access to or disclosure of Personally Identifiable Information of your customers in our possession or control.

9.3. Your Indemnification. You agree to indemnify, hold harmless, and defend us and all our employees, officers, directors and agents from any and all claims, demands, suits, proceedings, investigations, damages, costs, expenses, losses, and any other liabilities (including reasonable attorneys' fees, court costs and expenses) arising out of or relating to (i) your use of the Services, (ii) an Excluded Claim, (iii) any content provided by you, (iv) any actual or alleged breach by you of any representation, warranty, covenant or obligation under the Agreement, (v) your use of the Model Contracts; or (vi)

STORABLE000038

your gross negligence or willful misconduct. Your indemnification obligations under this Section 9.3 shall survive any termination or expiration of the Agreement.

9.4. Notification and Cooperation. The indemnifying party's obligations to the indemnified party under this Section 9 above are conditioned upon (i) indemnified party notifying indemnifying party promptly in writing within 30 days, upon knowledge of any claim, for which it may be entitled to indemnification under the Agreement; (ii) to the extent applicable, indemnified party ceasing use of the claimed infringing Services upon receipt of notice of same; (iii) indemnified party permitting indemnifying party to have the sole right to control the defense and settlement of any such claim (provided that indemnifying party may not settle any claim without the indemnified party's consent unless the settlement unconditionally releases indemnified party from all liability); (iv) indemnified party providing reasonable assistance to indemnifying party, at indemnifying party's expense, in the defense of such claim; (v) indemnified party not entering into any settlement agreement or otherwise settling any such claim without indemnifying party's express prior written consent or request; and (vi) indemnified party complying with any settlement or court order made in connection with the claim (related to the future use of any infringing materials). Indemnified party may participate in the defense or settlement of a claim with counsel of its own choice and at its own expense.

9.5. Exclusive Remedy. This Section 9 states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any type of claim described in this Section.

**10. Limitation on Liability.**

10.1 EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 (YOUR RESPONSIBILITIES AND RESTRICTIONS) OR 11 (PERSONAL INFORMATION AND PRIVACY STATEMENT), TO THE MAXIUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY'S TOTAL CUMULATIVE LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT EXCEED THE SUM OF THE AMOUNTS PAID BY YOU FOR THE SERVICES GIVING RISE TO THE LIABILITY DURING THE ONE YEAR PERIOD IMMEDIATELY PRECEEDING THE DATE THE CAUSE OF ACTION AROSE.

10.2 EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 OR 11, TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY HERETO, ITS LICENSORS OR SUPPLIERS, HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND BASED ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), ARISING OUT OF THE AGREEMENT,

STORABLE000039

THE PERFORMANCE OR NONPERFORMANCE BY EITHER PARTY OF ITS OBLIGATIONS HEREUNDER, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10.3 BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU, IN WHICH CASE OUR LIABILITY SHALL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

**11. Personal Information and Privacy Statement.**

You will comply with all applicable privacy and other laws, rules, regulations and guidelines relating to protection, collection, use and distribution of Personally Identifiable Information of any person. You will post a privacy statement on the page where you collect Personally Identifiable Information ("Privacy Statement") that complies with all applicable laws, rules, regulations and guidelines and, at a minimum, notifies users of the Personally Identifiable Information collected, how it will be used and how it will be secured and identifies the collection (via cookies, web beacons and other applicable means) and use of information gathered in connection with the Services and obtains prior informed consent (opt-in) before utilizing any tracking technologies, to the extent required by applicable laws and regulations. Such Privacy Statement shall also include technical information related to collection, transmission and storage of Personally Identifiable Information provided by us through the Services. If required by applicable data protection legislation or other law or regulation, you will inform third parties that you are providing their Personally Identifiable Information to us for processing and will ensure that any required third parties have given their consent to such disclosure and processing. You agree to comply with the descriptions and provisions of the Privacy Statement.

**12. Miscellaneous.**

12.1 Model Contracts The Model Contracts are provided for informational purposes only and should not be relied on as legal advice. Nothing herein constitutes the establishment of an attorney-client relationship between you and the Company or anyone involved in the drafting of the Model Contracts. The Company makes no claims, promises, or guarantees about the accuracy, completeness, or adequacy of anything contained in the Model Contracts. If you use the Model Contracts, you should seek the advice of legal counsel to develop a contract that meets your specific needs. As state and local laws may differ, any legal questions should be referred to appropriate legal counsel. By utilizing the Model Contracts, you: (i) assume full responsibility for any loss, damage, or liability resulting from the use of the Model Contracts; and (ii) release the

STORABLE000040

Company and the authors of the Model Contracts, their contributors, agents, licensees, successors and assigns from any and all known or unknown claims, demands or causes of action that may arise, at any time, out of or relating to your use of any of the Model Contracts.

12.2. Independent Parties. You and the Company are independent contractors. The Agreement does not create any joint venture, partnership, agency or employment relationship between the parties. You shall be solely responsible for managing your employees and for any and all compensation, taxes, benefits and liabilities to your employees and any of your other representatives or service providers. Neither you nor any of your employees, representatives, or service providers shall make any representations, warranties or guarantees with respect to us, the Agreement or the Services other than as expressly authorized by us in writing.

12.3. Assignment. Neither the Agreement nor any of your rights or obligations under the Agreement may be assigned or transferred, by operation of law or otherwise, without our prior written consent, unless assigned to a successor in interest, or pursuant to a merger, corporate reorganization, or a sale or transfer of all or substantially all of your assets of which you provide us notice at least thirty (30) days prior to the consummation of the transaction and such transaction does not involve a competitor of the Company. You and the Company will negotiate the cost of this assignment upon the notification of the change. An assignment by you based on any other circumstances requires our prior consent, which consent shall not be unreasonably withheld. We may freely assign this Agreement without your consent provided that the Services continue to operate as outlined in this Agreement. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

12.4. Force Majeure. Neither party will be responsible for any delay, interruption or other failure to perform under the Agreement due to acts beyond the control of the responsible party, but only for so long as such conditions persist. Force majeure events include, but are not limited to: natural disasters (e.g. lightning, earthquakes, hurricanes, floods); wars, riots, terrorist activities, and civil commotions; a local exchange carrier's activities, and other acts of third parties; explosions and fires; embargoes, strikes, and labor disputes; governmental decrees; failures of telecommunications providers or internet service providers; failures of third party suppliers, service providers or vendors; and any other cause beyond the reasonable control of a party.

12.5. Choice of Law. The Agreement and any dispute arising out of or in connection with the Agreement shall be governed by and construed under the laws of the State of Texas, without regard to the principles of conflict of laws. All disputes arising out of or related to the Agreement shall be subject to the exclusive jurisdiction and venue of the

STORABLE000041

Texas state and federal courts, and the parties consent to the personal and exclusive jurisdiction of these courts.

12.6. E-mail and Notices. You further agree that we may provide any and all notices, statements and other communications to you through either e-mail, mail, express delivery service, or delivered by a recognized commercial carrier addressed to the address last designated on the Agreement. You are responsible for providing us with any updated contact information.

12.7. No Waiver; Cumulative Remedies. No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

12.8. Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in full force and effect.

12.9. Entire Agreement. To the maximum extent permitted by applicable law, this Agreement, together with the documents referenced herein and all Order Forms constitute the entire agreement between the parties as to its subject matter, and supersede all previous and contemporaneous agreements, proposals or representations, written or oral, concerning the subject matter of this Agreement. No representation, undertaking or promise shall be taken to have been given or be implied from anything said or written in negotiations between the parties prior to this Agreement except as expressly stated in this Agreement. Neither party shall have any remedy in respect of any untrue statement made by the other upon which that party relied in entering into this Agreement (unless such untrue statement was made fraudulently) and that party's only remedy in respect of any untrue statement shall be for breach of contract as provided in this Agreement. You acknowledge and agree that Your agreement hereunder is not contingent upon the delivery of any future functionality or features not specified herein or in an Order Form or dependent upon any oral or written, public or private comments made by Us with respect to future functionality or features for the Services. In the event of any conflict between the provisions in these General Terms of Service and any Order Form or Additional Terms of Service, the terms of this Master Service Agreement shall prevail, to the extent of such conflict. No terms or conditions stated in Your purchase order or in any other of Your order documentation shall be incorporated into or form any part of this Agreement, and all such terms or conditions shall be null and void.

STORABLE000042

12.10. Export. Both parties agree to comply with applicable US export and import laws and regulations. You shall not permit your Users to access or use the Services in violation of any U.S. export embargo, prohibition or restriction.

12.11. Publicity. We reserve the right to name you as a user of Our Services on Our marketing and promotional materials unless you opt out of such disclosure on an applicable Order Form.

12.12. Links to Third Party Sites. The Services or our website may include links to third party sites ("Linked Sites"). The Linked Sites are not under our control and we are not responsible for the contents of any Linked Site, including without limitation any link contained in a Linked Site, or any changes or updates to a Linked Site or the Services provided via a Linked Site. We are providing these links to you only as a convenience, and the inclusion of any link does not imply endorsement by us of the site or any associated services provided by the site.

12.13. Enhancement Requests. We may, but have no obligation to, consider your suggestions or requests regarding new functionality or features of the Services ("Enhancement Requests"). All modifications proposed or requested in an Enhancement Request shall be our sole and exclusive property. We may, in our sole discretion, include such modifications in a future version of the Services, but our acceptance and consideration of an Enhancement Request shall not obligate us to include in any version of the Services any modifications proposed or requested in such Enhancement Request.

12.14. Trademarks. You acknowledge and agree that this Agreement does not convey to you any right, title, or interest in or to any of our trademarks or trade names. You shall not use or attempt to register any of our trademarks or trade names or any trademarks or trade names that are confusing similar to them.

12.15. Conflicts. In the event of any conflict between these General Terms and Conditions and any other component of the Agreement, these General Terms and Conditions will take precedence with regard to your rights and obligations with respect to the Services.

**EXHIBIT A – SERVICES & SUPPLEMENTAL SERVICES**

1. 1. The Order Form that you have executed identifies (a) the Fees payable by you to the Company for the specific Services (Bundled or Supplemental) purchased, (b) the term of your Services, and (c) the payment terms of the Fees payable by you to the Company.

STORABLE000043

# HOME / PRIVACY



| ABOUT US | SOLUTIONS | PRODUCTS | RESOURCES | News |
|---|---|---|---|---|
| Our Story | Marketing | Management Software | Help | Contact |
| Our Culture | Operations | Access Control | Learn | Support |
| Leadership | | Storage Marketplace | Connect | Request a Demo |
| Corporate Responsibility | | Insurance Solutions | | Storage Beat |
| Careers | | Facility Websites | | |
| | | Payment Processing | | |



© Copyright 2025 Storable.
All rights reserved.
**Privacy | Security**

STORABLE000044

# TAB 9

E-filed in the Office of the Clerk
for the Business Court of Texas
3/26/2025 3:33 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

## CAUSE NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | § § § § § | THE BUSINESS COURT OF TEXAS |
| Plaintiff, | § § | |
| v. | § § | THIRD DIVISION |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP. | § § § § § § § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## AMENDED NOTICE OF APPEAL

Pursuant to Rules 25.1(a), 25.1(g), and 28.1 of the Texas Rules of Appellate Procedure, Defendants Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Defendants") hereby file this Amended Notice of Appeal.

On February 25, 2025, Defendants initially filed a notice of appeal in this case to appeal the Order Granting Temporary Injunction signed February 19, 2025. That order has now been amended by the business court. Accordingly, Defendants file this Amended Notice of Appeal to appeal the Amended Order Granting Temporary Injunction signed March 11, 2025 in the above-styled case, and all adverse rulings and failures to rule related to the Amended Order Granting Temporary Injunction. *See* Tex. R. App. P. 27.3 ("if the trial court modifies the order" being appealed, "the appellate court must treat the appeal as from the subsequent order"). This appeal includes, but is not limited to, rulings made during the injunction hearings in the case, the March 24, 2025 Order on Motion for Clarification, and the February 10, 2025 Opinion and Order denying Defendants' motion to remand.

0167

Defendants desire to appeal to the Fifteenth Court of Appeals, which has exclusive jurisdiction over this appeal pursuant to Texas Government Code Sections 22.220(d)(3) and 25A.007 because this is an appeal from an order of a business court.

This is an accelerated appeal because it is an appeal of an interlocutory order. Tex. R. App. P. 28.1(a). In compliance with Texas Rule of Appellate Procedure 25.1(d)(6), Defendants confirm that this appeal is not a parental termination or child protection case, or an appeal from an order certifying a child to stand trial as an adult.

Respectfully submitted,

Greenberg Traurig, LLP

By: */s/ Dale Wainwright*
Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
bernsteinju@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

Counsel for Appellants/defendants

0168

# TAB 10

**The Business Court of Texas,**
**Third Division**

SAFELEASE INSURANCE
SERVICES LLC,
     *Plaintiff,*

v.                                   Cause No. 25-BC03A-0001

STORABLE, INC., et al.,
     *Defendants.*

### AMENDED ORDER GRANTING TEMPORARY INJUNCTION

On this day, the Court considered the Application for Temporary Injunction and, in the Alternative, Motion for Reconsideration (**"the** Application**"**) filed by plaintiff SafeLease Insurance Services LLC **(SafeLease)** against defendants **Storable, Inc. (Storable), RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively, Defendants)**. After due notice, the parties appeared in person and by counsel for an evidentiary hearing commencing on February 11, 2025 **(the TI Hearing)**. After considering the Application, evidence presented, arguments of counsel, and papers on file, the Court finds that a Temporary Injunction is necessary to preserve the status quo and prevent irreparable injury, loss, or damage. The Court grants the Application.

~~The Court further finds that:~~

**The Court makes the findings and conclusions below based on the evidence presented at the TI Hearing and the parties' filings properly before the Court. The Court recognizes that the case is in its early stages, discovery is still ongoing, and the evidence presented at future stages of the case (including summary judgment and trial) may differ from the evidence presented at the TI hearing and could support different findings and conclusions.**

~~1.~~ **1.** SafeLease has pleaded and proved **the elements required for temporary**

**injunctive relief: a** valid cause~~s~~ of action against ~~d~~Defendants; a probable right to the relief

sought; and a probable, imminent, and irreparable injury in the interim.

2.    SafeLease has properly pleaded valid causes of action against ~~d~~Defendants in the Second Amended Petition ("Petition") for violation**s** of the Texas Antitrust Act, tortious interference with existing contracts, and tortious interference with prospective business relations. The Petition gives fair and adequate notice of the facts upon which SafeLease bases its claims.

~~3.~~    The evidence shows that SafeLease has a probable right to relief on its claims for ~~violation of the Texas Antitrust Act. The primary relevant market is for tenant insurance, including tenant insurance and tenant protection plan products and services, and the secondary relevant~~

~~0912~~

market is for facility management software ("FMS") products and services, both for independent self-storage facilities in the United States. Defendants possess substantial market power in the FMS market, with a market share of no less than 50%, and potentially over 80%, and with barriers to entry of high up-front costs and barriers to switching, including by refusing to allow transfer of tenant payment information to another FMS provider. Defendants' recent, ongoing, and imminent actions implemented in and from this State likely comprise an exclusionary use of their market power in refusing to continue to deal with SafeLease; an effort to leverage market power in an attempt to monopolize the market for tenant insurance; and the use of market power to exclude or foreclose competition. Defendants' actions have a dangerous probability of success.

4. The evidence shows a substantial impact on consumers and competition in Texas. Defendants' actions did and likely will injure SafeLease, the parties' mutual customers, and competition in the tenant insurance market in Texas absent intervention from the Court. All parties are based in or controlled from Texas, and access to and use of customer-owned data in customers' FMS systems licensed from defendants is implemented from Texas. Texas is the largest self-storage market in the nation, and it is SafeLease's largest market. Absent relief from this Court to ensure that SafeLease may resume access to and use of customer-owned data in their FMS systems licensed from defendants, SafeLease will be foreclosed from or substantially impaired in competing in the tenant insurance market in Texas, which will harm consumers and competition in Texas.

5. The evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with valid, existing SafeLease contracts.' Defendants reasonably do or should know that these contracts involve providing ~~tenant insurance~~**tenant-insurance** services that require SafeLease to access and use certain customer-owned data within the processes of the FMS systems that

-4-

0916

customers license from ~~d~~**D**efendants and expressly authorize and enable SafeLease to access and use**,** **as required by their agreements with SafeLease**. FMS systems licensed from ~~d~~**D**efendants are critical to customers to maintain and access their data, which is not readily or effectively accessible otherwise. Under the terms of their contracts with ~~d~~**D**efendants, customers are entitled to designate third-party contractors as authorized users to access and use this customer data within the processes of the FMS systems to assist customer operations. Defendants' actions are calculated to impede, prevent, and interfere with performance of these contract rights by preventing SafeLease**' s** access to customer-owned data on customers' FMS systems. Defendants reasonably do or should know that their actions impede, prevent, and interfere with performance of these customer contracts, proximately causing harm and loss to SafeLease and its business, operations, reputation, and goodwill.

~~6.~~ ~~The evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with prospective business relations. Defendants reasonably do or should know that SafeLease provides tenant insurance services that require it to access and use certain customer-owned data within the processes of the FMS systems that customers license from defendants and expressly authorize and enable SafeLease to access and use. FMS systems licensed from defendants are critical to customers to maintain and access their data, which is not readily or effectively accessible otherwise. Under the terms of their contracts with defendants, customers are entitled to designate third-party contractors as authorized users to access and use this customer data within the processes of the FMS systems to assist customer operations. Defendants' actions are calculated to impede, prevent, and interfere with consummation of future or prospective contracts by preventing SafeLease access to and use of customer-owned data on customers' FMS systems. Defendants reasonably do or should know that their actions impede, prevent, and interfere~~

- 5

~~0916~~**0043**

*See, e.g., Bienati v. Cloister Holdings, LLC,* 691 S.W.3d 493, 498 (Tex. 2024) (observing that party's showing of probable right to relief at temporary-injunction stage "does not mean that the party obtaining temporary relief will prevail on the merits based on a fully developed record" and conversely, failure to demonstrate probable right to temporary relief does not mean party will not prevail at trial); *Transp. Co. of Tex. v. Robertson Transps., Inc.,* 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953) ("To warrant the issuance of the writ [of temporary injunction], the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation.").

09160043

with consummation of future or prospective contracts, proximately causing harm and loss to SafeLease and its business, operations, reputation, and goodwill.

4. 7. The evidence shows that dDefendants' actions are not justified or privileged. They intentionally interfere with existing SafeLease customer contracts and prospective customer relations through exclusionary, anticompetitive, or otherwise wrongful means, by refusing to continue to cooperate and deal withincluding by blocking SafeLease infrom accessing customer-owned data within the processes of their licensed FMS systems, as a marked change from dDefendants have done for several years; by leveraging market power' past practices; by using their position in the FMS market to prevent and impede SafeLease from providing services to customers in the tenant insurance market; by requiring and securing agreements that prevent, restrict, or penalize competition among tenant insurance providers; and by disparaging SafeLease through knowinglyand by making false or misleading representations toabout SafeLease to mutual customers regarding compliance with FMS terms of service, misuse of sensitive customer data, use of malicious code and processes (like spybots and hacking), and cybersecuritythe risks to cybersecurity.

5. The evidence failed to show that SafeLease misused or improperly disclosed customer data; that SafeLease used spybots, engaged in hacking, or introduced or attempted to introduce malicious code or viruses; that SafeLease overloaded Defendants' FMS system, causing a crash, outage, or otherwise interfered with or interrupted the performance or integrity of the FMS systems; that SafeLease accessed customer data in a manner not authorized by the customer; or that SafeLease's access and use of its customers' data on FMS systems licensed by Defendants materially increased the risk of a security breach beyond what it otherwise was. The evidence presented by Defendants to support these claims was not credible, and SafeLease's controverting evidence was credible. While there was evidence that SafeLease used automated processes, or "bots," to conduct

its business, evidence from both sides showed that "bots" can be good bots or bad bots, and the evidence did not show that SafeLease's automated processes were harmful. The evidence also did not establish that SafeLease caused Defendants' SiteLink or storEDGE FMS systems to crash or have an interruption of services. While there was some evidence indicating that Defendant's Easy Storage Solutions (ESS) FMS Platform may have crashed in April 2024,

for which Defendants blamed SafeLease, there was conflicting evidence as to whether a crash or outage actually occurred and insufficient evidence that SafeLease was a sole or principal cause.

6. The evidence fails to show that Defendants' actions are justified or privileged.'

7. Storable's Terms of Service authorize customers to "designate and authorize as many Users as you wish under the Agreement." These Terms of Service specify that a User "may include . . . consultants, contractors and agents, and third parties with which you transact business." Storable asserts that customers' designation of SafeLease, and possibly any insurance provider, as an authorized user violates the Terms of Service. Storable also asserts that it could amend their Terms of Service at any time, such as to preclude customers from designating insurance providers as authorized users. But Defendants admit that they have not changed their Terms of Service or informed their customers that they are allegedly in breach of the Terms of Service or otherwise attempted to enforce their alleged contractual rights against the customers themselves. After SafeLease made a public statement to mutual customers, Storable communicated to customers that "this is not your problem" and that its actions were motivated by data privacy and the threat that SafeLease allegedly posed to the stability of Defendants' platforms. As discussed above, the evidence presented at the temporary-injunction hearing does not support these claims.

8. Storable asserts that the Terms of Service for SiteLink and storEDGE require that "any use to develop a commercial product requires a separate third-party DEI [Data Exchange Interface] agreement." The evidence presented at the temporary-injunction hearing does not show that SafeLease was using SiteLink or storEDGE to develop a commercial product.

[2] Justification or privilege is an affirmative defense on which Defendants bear the burden of proof. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77-78 (Tex. 2000); *ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997).

**9.** While the evidence does establish that SafeLease needs access to the customer data on the FMS platforms to perform insurance services for the parties' mutual customers, the evidence establishes that the same is generally true for other third-party vendors that customers designate as authorized users on the FMS platforms, and Defendants agree that designation of other vendors, such as accountants, does not violate their terms of services. Defendants attempt to distinguish accountants, as authorized users, from insurance providers (like SafeLease), as authorized users, based on the extent of use, but the Terms of Service do not draw such a distinction.

**10.** The evidence shows that Defendants' actions are not motivated by any alleged breach of their Terms of Service.

**11.** Defendants assert justification or privilege based on an alleged right to prevent "free riders" on their services. The evidence at the hearing shows that Defendants are paid for their services by their customers, that their customers are authorized to designated third-party vendors as authorized users, and that the customers in question have designated SafeLease as an authorized user. Additionally, Defendants have not identified, and the Court has not found, any authority holding under what circumstances, if ever, an alleged right to prevent free riders constitutes a justification or privilege defeating a tortious-interference claim under Texas law.

8. The evidence shows that SafeLease will incur a probable, imminent, and irreparable injury absent injunctive relief before trial of this case. Beginning in 2021, it routinely accessed customer-owned data within the processes of their FMS systems licensed from dDefendants with express customer permission for such access and use. This access was through the graphical user interface as an authorized user, consistent with itsthe customers' own access and their rights to appoint authorized users. On December 17, 2024, dDefendants cut off SafeLease from access to dDefendants' StorEdgestorEDGE system, which access was restored through a temporary restraining order. On After

January 21, 2025, Defendants cut off SafeLease from access to all three of their FMS systems and revoked access granted to SafeLease by the parties' mutual customers. Without access to customer-owned data within the processes of these customer FMS systems, SafeLease's ability to service customers

0916

is wholly or significantly impaired. Among other services, SafeLease is prevented from or impeded in issuing contracted-for new or renewed policies to customers, providing timely and effective lease compliance services, amending lease documentation for tenant protection plans, processing opt-out tenants with separate coverage, providing timely and accurate insurance data visualization services, issuing required tenant notices or billing, and promptly and fully adjusting tenant claims for loss.

12. ~~9.~~ The evidence shows that ~~d~~Defendants intend to continue to refuse to allow SafeLease to access customer-owned data within the processes of FMS systems licensed by customers who grant SafeLease such access.

13. **The evidence at the temporary-injunction hearing supported SafeLease's assertion that it cannot practicably perform its contractual obligations to the parties' mutual clients while blocked from the FMS systems by Defendants, and that obtaining reports from customers is not, alone, a long-term viable solution. If injunctive relief is not granted, the interim injury to SafeLease may prevent the case from reaching a final resolution on the merits.**

~~10.~~ The evidence shows that the harm to SafeLease is and would be irreparable. Its loss of ability to service customers that license ~~d~~Defendants' FMS will be difficult or impossible ~~fully~~ to measure **fully** with damages. It is likely to permanently damage ~~its~~**SafeLease's** customer relationships **and reputation and good will in the industry**, as well as put customers at risk of ~~substantial~~ disruption and loss. Without access to customer-owned data in its customers' FMS systems, SafeLease will be substantially impaired or prevented from offering its services to its customers,

- 6

0045

and SafeLease likely will be unable to continue operating or competing in the ~~tenant insurance~~**tenant-insurance** market. These harms could not be adequately remedied with money damages or otherwise at law**, and some portion of the likely pecuniary injury will be extremely difficult, if not impossible, to accurately identify, trace, quantify, and prove with reasonable certainty**.

**14.** ~~11.~~ The evidence shows that temporary injunctive relief is necessary to preserve the status quo before trial. The status quo is the last, actual, peaceable, non-contested status that preceded this controversy. Here, it is customer-authorized access by SafeLease to customer-owned data within the processes of FMS systems licensed from ~~d~~**D**efendants. The status quo is preserved by ensuring resumed access to such customer-owned data in their FMS systems so that SafeLease may provide agreed services to the parties' mutual customers.

0916

The evidence shows that the balance of equities favors issuance of injunctive relief. Beginning in 2021, and with customer permission and Defendants' knowledge, SafeLease accessed customer-owned data in their licensed FMS systems in order to provide tenant insurance services to the parties' mutual customers. On December 17, 2024, with no advance customer permission or notice, Defendants cut off SafeLease's access to the storEDGE platform. On December 31, 2024, it took Defendants less than an hour to restore access after TRO relief was granted. After the TRO expired on January 21, 2025, and the district court denied SafeLease's original temporary-injunction application, Defendants immediately disabled access by SafeLease to customer-owned data in all three of Defendants' FMS platforms. Access by SafeLease to customer-owned data in their FMS systems, as it had for three years before this dispute arose, will create no imminent or likely risk of SafeLease data breach or misuse, nor of disruption to Defendants' server performance or stability. SafeLease employs SOC-2 certified data protection processes and uses customer data only consistent with its customer agreements. If temporary

0047

injunctive relief is granted, ~~d~~Defendants will suffer no irreparable harm and, at most, immaterial monetary harm that will be protected by the bond ordered below.

**15.** **The evidence also shows significantly changed circumstances that further altered the status quo from the time the district court denied SafeLease's first request for temporary injunction.**

**16.** ~~13.~~ The Court finds it equitable and appropriate to restore the status quo and protect SafeLease from irreparable injury by entering this Temporary Injunction against ~~d~~Defendants. Therefore, it is Ordered, Adjudged, and Decreed that ~~d~~Defendants are enjoined as follows:

> **As to SafeLease customers as of January 21, 2025,** Defendants shall take no action to prevent, impede, or otherwise interfere with ~~access by SafeLease to its~~**SafeLease's authorized-user access to mutual** customers' data stored in FMS systems licensed from ~~d~~Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as **SafeLease's** use ~~by SafeLease~~ of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

**This injunctive relief is subject to SafeLease maintaining SOC-2 certification of its data protection processes and only using customer data stored in FMS licensed from Defendants consistent with its customer agreements and historic practices.**

The Clerk of the Court shall issue a writ of injunction to ~~d~~Defendants in accordance with the terms of this Order. Service of the writ by private process server is authorized.

This Order is binding upon ~~d~~Defendants and all their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

~~-6~~

It is further Ordered that this Order shall expire 30 days after a trial on the merits in this case is completed, unless extended or earlier terminated by further order of this Court. Trial on the

merits shall be scheduled to begin on the **30th** day of **June**, 202–**6**.

0047

It is further Ordered that SafeLease shall post with the Clerk of this Court a bond in the amount of **$6,600,000.**[3] **This bond reflects the amount of anticipated losses resulting from the temporary injunction as estimated by Defendants; but it does not include potential additional losses Defendants could suffer in the result of a data breach during the pendency of the temporary injunction, as no credible evidence has been presented to indicate that such a data breach is likely to occur as a result of this injunctive relief.**

~~amount of $~~ . The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this temporary injunction. SafeLease may post a cash deposit in lieu of a bond under ~~Tex. R. Civ. P.~~**Texas Rule of Civil Procedure** 14c.

SIGNED ON: ~~February~~ **March 11**, 2025.

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

0918

—7—

APPROVED AS TO FORM AND CONTENT


By: */s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
  (713) 632-8000

AND

Judd E. Stone II
State Bar No. 24076720
judd@stonehilton.com
Christopher D. Hilton
State Bar No. 24087727
chris@stonehilton.com
Alexander M. Dvorscak
State Bar No. 24120461
alex@stonehilton.com
STONE HILTON PLLC
600 Congress Ave.
Austin, Texas 78748
(737) 465-3897

  ATTORNEYS FOR PLAINTIFF

**The Court notes that SafeLease has done so, and a writ of injunction has issued, as of the date of this Amended Order.**

APPROVED AS TO FORM ONLY

By: /s/
Ray T. Torgerson SBN: 24003067 Neil Kenton Alexander SBN: 00996600 Jonna N. Summers SBN: 24060649 Elizabeth "Liza" Eoff SBN: 24095062 Lakshmi N. Kumar SBN: 24144581

PORTER HEDGES LLP
1000 Main St 36th floor
Houston, Texas 77002
(713) 226-6000 Phone
(713) 228-6000 Fax
rtorgerson@porterhedges.com kalexander@porterhedges.com
lkumar@porterhedges.com j summers@porterhedges.com leoff@porterhedges.com

AND 9

GREENBERG TRAURIG, LLP

Dale Wainwright0048

State Bar No. 00000049
dal e . wai nwri ght@gtlaw.com
Justin Bernstein
State Bar No. 24105462
b ern stei nj u@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

ATTORNEYS FOR DEFENDANTS

| Summary report: Litera Compare for Word 11.11.0.158 Document comparison done on 4/16/2025 1:33:38 PM | |
|---|---|
| **Style name:** GT-3 - Headers and footers included, no moves, no comments | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Proposed temporary injunction original.doc | |
| **Modified filename:** Temporary injunction amended signed.doc | |
| **Changes:** | |
| **Add** | 123 |
| **Delete** | 149 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 272 |

# TAB 11


March 11, 2025

Katherine Ginzburg Treistman
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755

Via email: katherine.treistman@arnoldporter.com

Re:     Storable's Compliance with the Temporary Injunction Order

Dear Katherine:

Thanks again for reaching out to me last week about your representation of Storable and its affiliated defendants in *SafeLease Ins. Servs. LLC v. Storable Inc., et al.* (No. 25-BC03A-0001). I appreciated connecting with you on our brief call.

I'm writing to bring to your attention two important issues—which I raised last week to Storable's General Counsel, Neil Verma—regarding your clients' compliance with the Court's February 19 order granting the temporary injunction. For reference, on page eight of the order, the injunction against your clients states:

> As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

SafeLease is concerned that Storable is violating the order by taking enjoined actions against the parties' mutual customers who use Easy Storage Solutions ("ESS"). SafeLease is also concerned that, based on a flawed reading of the order, Storable is going to prevent, impede, and interfere with SafeLease's ability to acquire new customers who use FMS products licensed by defendants. I'll address each of these concerns in turn.

1.  <u>Concern Regarding Temporary Injunction as to ESS Customers</u>

First, SafeLease has reason to believe that Storable is currently violating the temporary injunction as to mutual customers who use ESS.

Last week, mutual customer Watchdog Self Storage informed SafeLease that Storable disabled Watchdog's tenant insurance module in ESS in January and forced it to switch from SafeLease to ESS's tenant protection program. Watchdog has been a SafeLease customer since 2023. After the injunction issued, ESS did not immediately restore Watchdog's access to its tenant insurance module and continued to force Watchdog to use ESS's tenant protection program. On March 5, I requested that Storable immediately restore this customer's access. I understand that on March 6, access was restored, but only *after* Watchdog contacted ESS and complained.

In response to Watchdog's problem, SafeLease investigated and discovered that at least two other mutual customers have had their ESS tenant insurance modules disabled and been forcibly converted to ESS's tenant protection program. These customers are Square One Storage Solutions and Robb Street Mini Storage. Both companies were SafeLease customers before January 21, 2025. The conversion from SafeLease to ESS's tenant protection program appears to have occurred recently, possibly after entry of the injunction. As of today, SafeLease understands that neither Square One nor Robb Street have had their insurance module access restored.

As to these mutual customers, SafeLease is concerned that Storable is at best failing to ensure compliance with the Court's order and at worst knowingly violating it. SafeLease requests that defendants address this concern and respond in writing with the following information:

- Explain when and why Watchdog, Square One, and Robb Street had their ESS tenant insurance modules disabled and were converted to ESS's tenant protection program.
- Explain why, after the injunction issued, Storable did not restore Watchdog's, Square One's, and Robb Street's access to their ESS tenant insurance modules; and confirm that Storable will restore Square One's and Robb Street's access by March 12.
- Identify any other ESS mutual customers who, since December 31, 2024, have had their tenant insurance modules disabled or who were converted from SafeLease to ESS's tenant protection program.
- Confirm that while the temporary injunction is in effect, Storable will not disable any other ESS mutual customers' tenant insurance modules or convert any such customers from SafeLease to ESS's tenant protection program.

SafeLease requests that defendants reply by noon on March 12 with responses to the above questions, and the requested assurances, to avoid the need to raise this issue to the Court.

2. <u>Defendants Threaten to Interfere with New and Prospective SafeLease Customers</u>

Yesterday, defendants filed an omnibus reply that made clear their intent to interfere with new and prospective SafeLease customers. The reply states:

This limitation means that the Temporary Injunction does not require Storable to provide access to new customers. Accordingly, ***Storable, which owns the FMS and can on that basis decide what is permitted with that software (absent a contrary court order), will not permit SafeLease to use Storable's FMS for new customers until Storable's concerns are resolved.*** Therefore, it is true that "SafeLease is not permitted" to access Storable's FMS for new customers.

Storable's reading of the order is flawed and undermines relief granted by the Court. The Court's well-reasoned order details the many evidentiary findings supporting the injunction. The Court rejected the attempt by your clients to single out SafeLease from among the many other vendors who access customer data on the FMS and who are designated as authorized users. If Storable knowingly interferes again with SafeLease customers on grounds the Court found not credible and unsupported by the evidence—such as the free-riding, performance, and security excuses—such interference would be just as improper as its interference in January.

We respectfully ask Storable to reconsider its continued attacks on SafeLease. We believe there are paths toward a mutually beneficial resolution for our respective clients outside of this litigation. That said, if Storable chooses to disable access by new SafeLease customers, to target SafeLease and treat it differently from other vendors on defendants' platforms, we will have no choice but to seek appropriate relief from the Court.

Sincerely,

Adam Locke

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 99826432
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellants' Brief
Status as of 4/18/2025 7:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Delonda Dean | | ddean@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Cody Coll | | cody@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 4/17/2025 7:29:05 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 4/17/2025 7:29:05 PM | SENT |
| Ray Torgerson | | rtorgerson@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Jonna Summers | | jsummers@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Lakshmi Kumar | | lkumar@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Neil KentonAlexander | | kalexander@porterhedges.com | 4/17/2025 7:29:05 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| R. Paul Yetter | | pyetter@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 99826432
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellants' Brief
Status as of 4/18/2025 7:07 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Susanna R.Allen | | sallen@yettercoleman.com | 4/17/2025 7:29:05 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 4/17/2025 7:29:05 PM | SENT |